**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.),<br><br>                    Plaintiffs,<br><br>v.<br><br> UNITED STATES,<br><br>                    Defendant. | Court No. 25-00053<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Confidential Information has been deleted from the Attachment. |

**COMPLAINT**

Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat")[1] (collectively, "QMC-Muntajat," "Respondents," or "Plaintiffs"), by and through the undersigned counsel, White & Case LLP, allege and state as follows:

1.     Plaintiffs contest certain aspects of the final determination issued by the International Trade Administration of the Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of melamine from the State of Qatar (Case No. C-518-002).  The

---

[1] As of August 21, 2024, Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. was integrated into a new entity named QatarEnergy Marketing (1), a Qatari Private Shareholding Company.  QatarEnergy, the ultimate company parent of QatarEnergy Marketing (1), is also the ultimate company parent of QMC.  We provide documentation to support the name change in the **Attachment**, including a registration with the Ministry of Commerce and Industry, State of Qatar and an excerpt from QatarEnergy Marketing (1)'s articles of association.

period of investigation ("POI") was January 1, 2023, through December 31, 2023.  Notice of the final determination was published in the *Federal Register* on December 9, 2024.  *Melamine from Qatar*, 89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.) ("*Final CVD Determination*"); *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Melamine from Qatar* (C-518-002) (Dec. 2, 2024) ("*Final IDM*").

2.      Commerce published a CVD order, based on the *Final CVD Determination*, in the *Federal Register* on January 31, 2025.  *Melamine from Germany, Qatar, and Trinidad and Tobago*, 90 Fed. Reg. 8698 (Dep't Commerce Jan. 31, 2025) (CVD orders).

## JURISDICTION

3.      The U.S. Court of International Trade has jurisdiction over this action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c).

## STANDING OF PLAINTIFFS

4.      QMC is a Qatari producer of melamine and Muntajat is a Qatari exporter of melamine, the merchandise subject to the CVD order at issue.  Plaintiffs participated in Commerce's investigation that resulted in the contested finding.  Plaintiffs therefore are interested parties within the meaning of 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

5.      The CVD order at issue was published in the *Federal Register* on January 31,  2025.  Plaintiffs filed the Summons on February 28, 2025, within 30 days of the date of publication of the order.  Plaintiffs are filing this Complaint within 30 days of the date of filing the Summons.  Consequently, this action is timely under 19 U.S.C. § 1516a(a)(2)(A).

## PROCEDURAL HISTORY AND BACKGROUND

6.      On February 14, 2024, Cornerstone Chemical Company, the sole U.S. producer of melamine, filed a petition for antidumping duty ("AD") and CVD measures on imports of

melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago. *See* Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago (Feb. 14, 2024). Commerce initiated the CVD investigation on March 5, 2024. *Melamine from Germany, Qatar, and Trinidad and Tobago*, 89 Fed. Reg. 17381 (Dep't Commerce Mar. 11, 2024) (CVD investigation initiation notice); and

7.     On March 19, 2024, Commerce issued the CVD questionnaire, in which it selected QMC and Muntajat as the respondents in its CVD investigation. *See* Countervailing Duty Questionnaire (C-518-002) (Mar. 19, 2024) ("*Initial Questionnaire*"). Section III of the *Initial Questionnaire* requested various categories of information from QMC-Muntajat. *See Initial Questionnaire* at III-1–III-24.

8.     As relevant to this appeal, Section III contained a subsection concerning "Other Companies Subject to Investigation," for which a response was due earlier than other parts of Section III. *See id.* at III-1. Therein, Commerce requested that QMC-Muntajat ultimately submit "complete responses for certain 'cross-owned' affiliated companies." *Id.* at III-2. The *Initial Questionnaire* defines cross-ownership as follows:

> Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent)."

*Id.* at III-2– III-3.

9.     QMC-Muntajat submitted their response to the "Other Companies Subject to Investigation" subsection of Section III on April 5, 2024. *See generally* QMC-Muntajat Affiliated Companies Response (Apr. 5, 2024) ("*Affiliated Companies Response*"). QMC-Muntajat identified Qatar Fertiliser Company (P.S.C.) ("QAFCO"), Industries Qatar Q.P.S.C.

("Industries Qatar"), and QatarEnergy as the relevant cross-owned affiliates. *Affiliated Companies Response* at 4-5. As QMC-Muntajat explained further, QAFCO is the direct parent company of QMC, and also supplied urea solution, the primary input for the production of melamine, to QMC for such production. *Id.*

<u>Provision of Electricity and Water</u>

10.     In the State of Qatar, electricity and water are supplied by the state-owned Qatar General Electricity & Water Corporation ("Kahramaa"). Kahramaa sells electricity and water at various standard rates, including Bulk Industrial, a preferential Industrial rate, Commercial, and Residential. In response to Petitioner's CVD allegation, Commerce investigated whether electricity and water were provided for less than adequate remuneration ("LTAR"). Of the five responding companies, only QAFCO and QatarEnergy purchased electricity and water during the POI.

11.     QMC-Muntajat submitted the remainder of their responses to Section III, including complete questionnaire responses for QAFCO, Industries Qatar, and QatarEnergy. *See generally* QMC-Muntajat CVD Questionnaire Response (C-518-002) (May 10, 2024). In its response, QAFCO reported that it purchased electricity at the "Bulk Industrial" rate and that it purchased water at the Bulk Industrial and "Commercial" rates. *Section III Response* at Exhibits ELECTR_QAFCO-1, WATER_QAFCO-1. During the POI, QAFCO also purchased electricity at the "Residential" and Commercial rates, and water at the preferential "Industrial" and Residential rates. QAFCO, however, did not report these purchases of electricity and water, assuming that only purchases of utilities consumed for production purposes were required.

12.     In a post-preliminary CVD determination, Commerce calculated a preliminary combined subsidy rate of 0.48% for QAFCO's and QatarEnergy's purchases of electricity, and a preliminary subsidy rate of 0.10% for QAFCO's and QatarEnergy's purchases of water. *See*

Post-Preliminary Analysis Memorandum for the Countervailing Duty Investigation of Melamine from Qatar (C-518-002) (Sept. 12, 2024) at 7 & 9 ("*Post-Preliminary Decision Memo*"). Notably, whereas Commerce found that Kahramaa's provision of electricity and water at the Industrial and Commercial rates were "specific" under 19 U.S.C. § 1677(5A)(D)(i), the agency did not likewise find that Kahramaa's provision of electricity and water at the Residential rate was specific. *See id.* at 5-6, 8.

13.    Commerce conducted verification of QAFCO's reported information on Wednesday, September 25, 2024, and Thursday, September 26, 2024. *See* Commerce Memorandum, RE: Verification of the Questionnaire Responses of Qatar Melamine Company and Muntajat (C-518-002) (Oct. 29, 2024) at 1 ("*Verification Report*"). In the verification agenda, Commerce requested a reconciliation of QAFCO's purchases of electricity and water in March and September 2023 to the company's accounting system. Countervailing Duty Investigation of Melamine from Qatar; Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C Questionnaire Responses (C-518-002) (Sept. 12, 2024) at 9. In response, QAFCO prepared a reconciliation that tied the company's purchases of electricity and water – including the previously unreported purchases – to its accounting records for the POI (the "QAFCO Electricity & Water Reconciliation"). *See* QMC-Muntajat Case Brief (C-518-002) (Nov. 6, 2024), at Attachment to Appendix ("*Original Case Brief*").

14.    On September 25, 2024, "the Commerce verifiers reviewed the QAFCO Electricity & Water Reconciliation over an approximately two-hour period – without identifying any significant discrepancies" to QAFCO's Senior Accountant or outside counsel, Jay Campbell of White & Case LLP, who were both present during the verifiers' review of the reconciliation. *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶8).

15.     On the following day, September 26, 2024, the Commerce verifiers informed QAFCO's counsel "that Commerce management in Washington, DC, instructed them not to accept the QAFCO Electricity & Water Reconciliation for the record of the CVD investigation." *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶9).  In its verification report, however, Commerce noted the unreported electricity and water purchases as percentage shares of QAFCO's total electricity and water purchases, respectively.  *See Verification Report* at 16, 19.

16.     QMC-Muntajat submitted its case brief ("*Original Case Brief*") on November 6, 2024, which included an Appendix with a declaration signed by Respondents' counsel, Jay Campbell, describing the Commerce verifiers' review of the QAFCO Electricity & Water Reconciliation at verification, as well as a copy of the reconciliation itself.  *See generally Original Case Brief*. On November 8, 2024, Commerce rejected the *Original Case Brief* and instructed Respondents to refile it without the Appendix or any references thereto.  *See* Commerce Memorandum, RE: Countervailing Duty Investigation of Melamine from the State of Qatar: Rejection of Qatar Melamine Company and Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. Case Brief Filing (C-518-002) (Nov. 8, 2024).  In compliance with Commerce's instructions, QMC-Muntajat submitted a redacted version of their case brief on November 12, 2024.  *See* QMC-Muntajat Resubmitted Case Brief (C-518-002) (Nov. 12, 2024) ("*Resubmitted Case Brief*").

17.     In their case brief, QMC-Muntajat argued that Commerce should accept the QAFCO Electricity & Water Reconciliation for the record.  *See Resubmitted Case Brief* at 27-31. Commerce rejected Respondents' argument, deeming the QAFCO Electricity & Water Reconciliation to be "untimely new factual information."  Further, Commerce determined that QAFCO failed to cooperate to the best of its ability and, thus, that use of adverse facts available ("AFA") under 19 U.S.C. § 1677e(b) was warranted.  *See Final IDM* at 6-11, 27-29.

Commerce selected 8.00% as the AFA subsidy rate for both the provision of electricity and the provision of water, based on proprietary information presented in Kahramaa's 2023 Annual Tariff Review Report.  *See id.* at 11.

<u>Provision of Land Rights</u>

18.     The Government of Qatar ("GOQ") granted land rights (usufruct) to QatarEnergy over certain industrial cities, namely (1) Mesaieed Industrial City ("Mesaieed"), (2) Ras Laffan Industrial City ("Ras Laffan"), and (3) Dukhan Concession Area ("Dukhan").  The GOQ vested the usufruct rights to QatarEnergy through three decrees, namely: (1) Decree No. 59 of 1989 (concerning Mesaieed), (2) Decree No. 35 of 1994 (concerning Ras Laffan), and (3) Decree No. 55 of 1995 (concerning Dukhan).  *See Section III Response* at QATAREN-16 and Exhibits LAND-01-LAND-03.  Each decree granted the land rights to QatarEnergy for the life of the corporation.  *See id.*  Further, Council of Ministers' Resolution No. (19) of 2002 (the "Ports' Resolution") gave QatarEnergy rights over certain ports.  *See id.* at Exhibit LAND-05.

19.     In the post-preliminary determination, Commerce found that "the GOQ has granted QatarEnergy, for free, the rights to utilize industrial area land and ports for the company's benefit, including by leasing the relevant land areas and collecting rental income and port services income."  *Post-Preliminary Decision Memo* at 11.  Commerce also found that the land rights amounted to a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) in the form of revenue forgone, because QatarEnergy could earn income from land leases and port services on the designated industrial cities and ports.  *Id.* at 11.  In calculating the benefit of this program, Commerce considered the lease and port income earned by the Respondents, but disregarded QatarEnergy's expenses associated with the development, maintenance, and management of the industrial cities.  *See Resubmitted Case Brief* at 20-22.

20.     In their case brief, Respondents contested Commerce's preliminary calculation as distorted.  Rather, Respondents argued, "{t}o measure the actual economic benefit received by

QatarEnergy, the benefit calculation must include not only the rental and port income realized by QatarEnergy, but also the corresponding expenses it incurred to operate the industrial cities and ports." *Id.* at 20-22. Commerce, however, continued to disregard QatarEnergy's expenses associated with the development, maintenance, and management of the industrial cities in the final determination. *See Final IDM* at 21-26.

## STATEMENT OF CLAIMS

### Count 1

21.     Paragraphs 1 through 20 are incorporated by reference.

22.     Commerce "abuse{s} its discretion in refusing to accept updated data when there {i}s plenty of time for Commerce to verify or consider it." *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016). Here, "the Commerce verifiers reviewed the QAFCO Electricity & Water Reconciliation" (including listings of the previously unreported electricity and water purchases) "over an approximately two-hour period – without identifying any significant discrepancies" to QAFCO's Senior Accountant or outside counsel who were both present during the verifiers' review of the reconciliation. *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶8). Because it verified the accuracy of the reconciliation, Commerce abused its discretion by not accepting QAFCO's previously unreported purchases for the record and not including them in the subsidy rate calculations for the provision of electricity and provision of water programs.

### Count 2

23.     Paragraphs 1 through 20 are incorporated by reference.

24.     Commerce's selection of adverse facts available was unsupported by substantial evidence and not in accordance with law. "{T}he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F. Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,

216 F.3d 1027, 1032 (Fed. Cir. 2000). Consequently, an AFA rate "must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'" *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021) (quoting *F.Lii de Cecco*, 216 F.3d at 1032). Here, the 8.00% subsidy rate selected by Commerce for the provision of electricity and provision of water fails to reflect a reasonably accurate estimate of Respondents' actual subsidy rate, even including an amount to deter noncompliance. The proprietary information from Kahramaa's 2023 Annual Tariff Review Report on which Commerce relied does not reflect a subsidy rate in accordance with Commerce's regulation, 19 C.F.R. § 351.525(a). Moreover, the 8.00% subsidy rate is punitive and excessive, given that the preliminary rates for Respondents' combined purchases of electricity and water were 0.48% and 0.10%, respectively, and QAFCO's unreported purchases were low relative to its total purchases, as reflected in the verification report.

**Count 3**

25.    Paragraphs 1 through 20 are incorporated by reference.

26.    Commerce's benefit calculation for the Government of Qatar's provision of land rights to QatarEnergy is unsupported by substantial evidence and not in accordance with law. The *CVD Preamble* instructs that benefit – specifically, "revenue enhancement" – should be measured in an "economic or accounting sense{}." *Countervailing Duties*, 63 Fed. Reg. 65348, 65378 (Nov. 25, 1998) (final rule) ("*CVD Preamble*"). In 2023 alone, QatarEnergy incurred total expenses of nearly 2 billion Qatari Riyali to develop, maintain, and administer the industrial cities and ports. The true economic benefit to QatarEnergy from the lease and port income cannot be measured without also taking the corresponding costs that QatarEnergy incurred into account. In calculating the benefit of the State of Qatar's grant of land rights to QatarEnergy, however, Commerce, considered only the income earned by QatarEnergy from

land leases and port fees while ignoring the company's corresponding expenses. Consequently, Commerce's determination of the benefit for the provision of land rights is unsupported by substantial evidence and contrary to law.

## **PRAYER FOR RELIEF AND JUDGMENT**

WHEREFORE, Plaintiffs respectfully request that the Court:

(A) Enter judgment in favor of Plaintiffs;

(B) Hold and declare that Commerce's *Final CVD Determination* is unsupported by substantial evidence and otherwise not in accordance with law;

(C) Remand this matter to the Department to issue a revised final determination in conformity with the Court's decision; and

(D) Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

 /s/ Jay C. Campbell
Jay C. Campbell
Richard G. King
Ron Kendler

C. Alejandro Dilley
WHITE & CASE LLP
701 Thirteenth Street NW
Washington, DC 20005
(202) 626-3600

# ATTACHMENT

# Ministry of Commerce and Industry Registration

# Not Capable of Public Summary

# Articles of Association (Excerpt)

# Not Capable of Public Summary