**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| |
|---|
| QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.), |
| Plaintiffs, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| CORNERSTONE CHEMICAL COMPANY |
| Defendant-Intervenor. |

Court No. 25-00053

**PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC")

and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical

and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat")[1]

(collectively, "QMC-Muntajat" or "Plaintiffs") hereby move pursuant to Rule 56.2 of the United

---

[1] As of August 21, 2024, Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. was integrated into a new entity named QatarEnergy Marketing (1), a Qatari Private Shareholding Company. QatarEnergy, the ultimate company parent of QatarEnergy Marketing (1), is also the ultimate company parent of QMC. Plaintiffs provided documentation to support the name change, including a registration with the Ministry of Commerce and Industry, State of Qatar, and an excerpt from QatarEnergy Marketing (1)'s articles of association, in the Attachment to their Complaint. *See* ECF 18, 19.

States Court of International Trade for Judgment upon the Agency Record for remand of the final results by the Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of melamine from the State of Qatar (Case No. C-518-002). Notice of the final determination was published *Melamine from Qatar*, 89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.).

As set forth in the accompanying brief in support of this motion, and on the basis of the record made before Commerce in the underlying proceeding: (1) Commerce's rejection of a reconciliation of QMC's parent company's purchases of electricity and water during the period of investigation at verification constituted an abuse of discretion; (2) Commerce's resort to facts available and selection of a 16% subsidy rate as AFA for the provision of electricity and water was unsupported by substantial evidence and not made in accordance with law; and (3) Commerce's determination of benefit for the provision of land rights was not made in accordance with law.

Plaintiffs respectfully request this Court to grant judgment in their favor and to remand this action to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

  /s/ Jay C. Campbell
Jay C. Campbell
Richard G. King
Ron Kendler
C. Alejandro Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Qatar Melamine Company (a Qatari Private Shareholding Company) and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.)

Date: September 3, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.), | |
|                Plaintiffs, | Court No. 25-00053 |
| v. | |
|  UNITED STATES, | |
|               Defendant, | |
| and | |
| CORNERSTONE CHEMICAL COMPANY | |
|          Defendant-Intervenor. | |

## <u>ORDER</u>

Upon consideration of Plaintiffs' motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, the Court, having reviewed the papers and pleadings on file herein, and after due deliberation, it is hereby:

**ORDERED** that Plaintiffs' motion is granted; and it is further

**ORDERED** that this matter is remanded to the United States Department of Commerce for disposition consistent with the Court's final opinion.

**SO ORDERED.**

Dated: _____, 2025           _____
      New York, New York                   Jane A. Restani, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.), <br><br>         Plaintiffs, <br><br> v. <br><br>  UNITED STATES, <br><br>         Defendant, <br><br> and <br><br> CORNERSTONE CHEMICAL COMPANY <br><br>         Defendant-Intervenor. | Court No. 25-00053 <br><br> **NON-CONFIDENTIAL** <br> **Business Proprietary Information has been deleted from Pages 7, 24-27, 30, 39 and 40.** |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Jay C. Campbell
Richard G. King
Ron Kendler
C. Alejandro Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

September 3, 2025

**TABLE OF CONTENTS**

I.    STATEMENT PURSUANT TO USCIT R. 56.2(c)............................................................1

      A.    Administrative Determination Sought to Be Reviewed ...........................................1

      B.    Questions Presented and Summary of Argument ....................................................1

            1.    Did Commerce abuse its discretion by rejecting the QAFCO
                  Electricity & Water Reconciliation despite having reviewed and
                  examined it at verification without noting any discrepancies?....................1

            2.    Was Commerce's resort to facts available and selection of a sixteen
                  percent subsidy rate as AFA for the provision of electricity and water
                  supported by substantial evidence?............................................................2

            3.    Was Commerce's determination of benefit for the provision of land
                  rights made in accordance with law?.........................................................3

II.   STATEMENT OF FACTS ...........................................................................................3

      A.    CVD Investigation and *Initial Questionnaire*.........................................................3

      B.    Provision of Electricity and Water.......................................................................5

      C.    Provision of Land Rights ...................................................................................8

III.  STANDARD OF REVIEW ..........................................................................................9

IV.   ARGUMENT ............................................................................................................11

      A.    Commerce Abused Its Discretion by Reviewing, Examining, and
            Ultimately Rejecting the QAFCO Electricity & Water Reconciliation as
            Untimely ............................................................................................................11

            1.    Commerce must consider information presented at verification that
                  corrects, clarifies, or corroborates record information when there is
                  sufficient time to do so...............................................................................11

            2.    Commerce reviewed and verified the QAFCO Electricity & Water
                  Reconciliation, which corroborated and updated record information .......13

                  a.    The QAFCO Electricity & Water Reconciliation
                        corroborated record information and rectified an error in
                        judgment ........................................................................................14

                  b.    Commerce successfully reviewed and verified the QAFCO
                        Electricity & Water Reconciliation................................................15

c.    Additional case law involving analogous fact patterns further establishes that Commerce abused its discretion ..............18

3.    Conclusion ............................................................................21

B.    Commerce's Selection of a Sixteen Percent Subsidy Rate as AFA for the Provision of Electricity and Water Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ........................................22

1.    Legal background:  Commerce's use of facts available is limited to the specific information that is missing, and its use of an adverse inference must not be punitive and must comply with the statutory hierarchy ...........................................................................22

2.    The "subsidy rate" selected by Commerce bears no relation to a subsidy rate as defined under the law ........................................24

3.    Commerce's selection of 16% as an adverse "subsidy rate" was punitive ...................................................................................29

4.    In selecting AFA, Commerce impermissibly disregarded the statutory hierarchy ................................................................................32

C.    Commerce's Determination of Benefit for the Provision of Land Rights Is Contrary to Law ..................................................................................32

1.    Under the statute, the benefit may only be equivalent to the financial contribution where the latter is a grant or similar "gift-like transfer" .......33

2.    The statutory meaning of "benefit" in the context of the provision of land rights is synonymous with "profit" ...................................34

3.    Commerce's refusal to account for QatarEnergy's significant expenses violates the statutory meaning of "benefit" in the context of rental or port income forgone .................................................................38

V.    CONCLUSION AND RELIEF SOUGHT ........................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ass'n of Am. Sch. Paper Suppliers v. United States,*
  32 C.I.T. 1196 (2008) ...........................................................................20

*Atlantic Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984)............................................................10

*Bonney Forge Corp. v. United States,*
  560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) .........................................12

*Canadian Solar Inc. v. United States,*
  537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .........................................12

*Chaparral Steel Co. v. United States,*
  901 F.2d 1097 (Fed. Cir. 1990)..............................................................12

*Citic Trading Co. v. United States,*
  27 C.I.T. 356 (2003) .........................................................................19, 20

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938)..................................................................................9

*Delverde, SrL v. United States,*
  202 F.3d 1360 (Fed. Cir. 2000)..............................................................10

*Diamond Sawblades Manufacturers' Coalition v. United States,*
  986 F.3d 1351 (Fed. Cir. 2021)..............................................................23

*Essar Steel Ltd. v. United States,*
  678 F.3d 1268 (Fed. Cir. 2012)..............................................................23

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States,*
  216 F.3d 1027 (Fed. Cir. 2000)........................................................24, 29

*Fischer S.A. Comercio v. United States,*
  34 C.I.T. 334, 700 F. Supp. 2d 1364 (2010)............................12, 13, 19

*Gallant Ocean (Thailand) Co. v. United States,*
  602 F.3d 1319 (Fed. Cir. 2010)..................................................24, 29, 31

*Goodluck India Ltd. v. United States,*
  11 F.4th 1335 (Fed. Cir. 2021) .................................................13, 16, 17

*Gov't of Sri Lanka v. United States,*
   308 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ................................................34, 42, 43

*Huaiyin Foreign Trade Corp. v. United States,*
   322 F.3d 1369 (Fed. Cir. 2003) ................................................................................10

*Huvis Corp. v. United States,*
   570 F.3d 1347 (Fed. Cir. 2009) ..................................................................................9

*Hyundai Elec. & Energy Sys. Co. v. United States,*
   15 F.4th 1078 (Fed. Cir. 2021) .................................................................................12

*Hyundai Steel Co. v. United States,*
   Court No. 21-00304, Slip Op. 23-142 (CIT September 26, 2023) ..........................42

*Hyundai Steel Co. v. United States,*
   651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023),
   *aff'd* 2025 U.S. App. LEXIS 11367 (Fed. Cir.) (May 12, 2025)................40, 41, 42

*Hyundai Steel Co. v. United States,*
   658 F. Supp. 3d 1331 (Ct. Int'l Trade 2023) .......................................................35, 41

*Jiaxing Brother Fastener Co. v. United States,*
   380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ..........................................................10

*Kisor v. Wilkie,*
   588 U.S. 558 (2019)..................................................................................................38

*Lingyi Chengen Imp. & Exp. Co. v. United States.*
   433 F. Supp. 3d 1278, 1280 (Ct. Int'l Trade 2020) ............................................18, 19

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) .................................................................................................10

*Max Fortune Indus. Co. v. United States,*
   37 C.I.T. 549 (2013) ............................................................................................20, 21

*Micron Tech v. United States,*
   117 F.3d 1386 (Fed. Cir. 1997)................................................................................11

*Mid Continent Steel & Wire, Inc. v. United States,*
   941 F.3d 530 (Fed. Cir. 2019)..................................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)....................................................................................................10

*NSK Corp. v. United States,*
   33 C.I.T. 1185, 637 F. Supp. 2d 1311 (2009)..........................................................10

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995)........................................................................13, 17

*Oman Fasteners, LLC v. United States*,
    125 F.4th 1068 (Fed. Cir. 2025) ...........................................................23, 29, 31

*Papierfabrik August Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016)...................................................................13, 16, 17

*Shandong Huarong Mach. Co. v. United States*,
    435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ...........................................23, 28, 29

*Ticaret A.S. v. United States*,
    633 F. Supp. 3d 1276 (Ct. Int'l Trade 2023) .......................................................38

*Timken U.S. Corp. v. United States*,
    434 F.3d 1345 (Fed. Cir. 2006)...........................................................13, 15, 16, 17

*TMK IPSCO v. United States*,
    179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ................................................19, 20

*Ulasim Sanayi, A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ............................................ passim

*Ventura Coastal, LLC v. United States*,
    2025 Ct. Int'l Trade LEXIS 83, Slip Op. 2025-79 (June 24, 2025)........................10

*Wilmar Trading PTE Ltd. v. United States*,
    466 F. Supp. 3d 1344 (Ct. Int'l Trade 2020) .......................................................33

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011)..................................................................23, 29

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i)...................................................................................9

19 U.S.C. § 1677(5)(B)...........................................................................................33

19 U.S.C. § 1677(5)(D)(ii)....................................................................................9, 35

19 U.S.C. § 1677(5)(D)(iv)......................................................................................28

19 U.S.C. § 1677(5)(E)................................................................................33, 35, 41

19 U.S.C. § 1677(5)(E)(i)-(iv)...........................................................................33, 35

19 U.S.C. § 1677(5A)(D)(i)......................................................................................6

19 U.S.C. § 1677(5A)(D)(iii)(II) ...........................................................................6

19 U.S.C. § 1677e(a) ..........................................................................................23

19 U.S.C. § 1677e(b) ............................................................................................8

19 U.S.C. § 1677e(b)(1) .....................................................................................23

19 U.S.C. § 1677e(d)(1)(A) ...............................................................3, 22, 24, 32

19 U.S.C. § 1677m(i)(1) .....................................................................................11

19 U.S.C. § 3512 .................................................................................................37

19 C.F.R. § 351.503 ..........................................................................34, 35, 37, 38

19 C.F.R. § 351.503(b)(1) ..................................................................................37

19 C.F.R. § 351.504 ...........................................................................................34

19 C.F.R. § 351.504(a) .......................................................................................34

19 C.F.R. §§ 351.504–351.521 ................................................................34, 35, 37

19 C.F.R. § 351.511(a)(1) ..................................................................................28

19 C.F.R. § 351.511(a)(2) ..................................................................................28

19 C.F.R. § 351.512(a)(1) ..................................................................................36

19 C.F.R. § 351.525(a) .......................................................................................28

## LEGISLATIVE MATERIALS

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
    H.R. Rep. No. 103-826(I),
    reprinted in 1994 U.S.C.C.A.N. 4040 .......................................23, 29, 37

## ADMINISTRATIVE DETERMINATIONS

*Countervailing Duties*,
    63 Fed. Reg. 65348 (Nov. 25, 1998) .................................................37, 38

*Melamine from Germany, Qatar, and Trinidad and Tobago*,
    89 Fed. Reg. 17381 (Dep't Commerce Mar. 11, 2024) (CVD investigation initiation notice)..4

*Melamine from Qatar*,
    89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.),
    and accompanying Issues and Decision Memorandum ................................. passim

**MISCELLANEOUS**

BLACK'S LAW DICTIONARY 188, 1404 (10th. ed. 2014)...................................................36

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 992 (11th ed. 2003) ........................................36

Oxford English Dictionary (online edition),
    https://www.oed.com/dictionary/profit_n?tab=meaning_and_use#28099986 (last accessed
    Sept. 3, 2025) ..............................................................................................................36

## I.    STATEMENT PURSUANT TO USCIT R. 56.2(C)

### A.    Administrative Determination Sought to Be Reviewed

Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat")[1] (collectively, "QMC-Muntajat," "Respondents," or "Plaintiffs") contest the final determination of the Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of melamine from the State of Qatar (Case No. C-518-002). *Melamine from Qatar*, 89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.) (P.R. 285) ("*Final CVD Determination*"); *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Melamine from Qatar* (C-518-002) (Dec. 2, 2024) (P.R. 282) ("*Final IDM*").

### B.    Questions Presented and Summary of Argument

#### 1.    Did Commerce abuse its discretion by rejecting the QAFCO Electricity & Water Reconciliation despite having reviewed and examined it at verification without noting any discrepancies?

Yes.  As a general matter, Commerce has discretion to conduct verification, and will not accept new factual information at verification.  The courts, however, have established a well-settled rule, based on Commerce's practice, whereby if (1) such information is necessary to correct, clarify, or corroborate record information; and (2) Commerce has sufficient time to review and

---

[1] As of August 21, 2024, Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. was integrated into a new entity named QatarEnergy Marketing (1), a Qatari Private Shareholding Company.  QatarEnergy, the ultimate company parent of QatarEnergy Marketing (1), is also the ultimate company parent of QMC.  Plaintiffs provided documentation to support the name change, including a registration with the Ministry of Commerce and Industry, State of Qatar, and an excerpt from QatarEnergy Marketing (1)'s articles of association, in the Attachment to their Complaint.  *See* ECF 18, 19.

verify the information, then rejection of the information is unwarranted and amounts to an abuse of discretion. Here, a reconciliation of QMC's parent company's purchases of electricity and water during the period of investigation ("POI") (the "QAFCO Electricity & Water Reconciliation") met both elements of this rule. The QAFCO Electricity & Water Reconciliation contained information that had been filed on the record, as well as new information that corroborated the previously filed information. The QAFCO Electricity & Water Reconciliation also corrected an earlier error in QAFCO's judgment. Moreover, because Commerce, in fact, reviewed and verified the QAFCO Electricity & Water Reconciliation, it certainly had sufficient time to do so. Thus, consistent with this court's precedent, Commerce's rejection of the QAFCO Electricity & Water Reconciliation constituted an abuse of discretion.

> **2.    Was Commerce's resort to facts available and selection of a sixteen percent subsidy rate as AFA for the provision of electricity and water supported by substantial evidence?**

No. Beyond the statutory requirements for the application of facts available, the Statement of Administrative Action ("SAA") and relevant case law establish that Commerce may only replace missing information with facts available in a manner that is specific to, and most probative of, the missing information. Further, with respect to the application of an adverse inference (*i.e.*, adverse facts available, or "AFA"), courts have repeatedly held that Commerce may not apply an adverse inference that results in a "punitive, aberrational, or uncorroborated" rate. Commerce's application of a 16% subsidy rate in this case – 8% for the provision of electricity and an additional 8% for the provision of water – violates both requirements: The 8% "subsidy rate" used for electricity and water, respectively, bore no relation to the subsidy rate for the government's provision of a good, as defined by the statute and Commerce's regulations, and was punitively high. Moreover, in selecting the 8% rate as AFA, Commerce impermissibly disregarded the

hierarchy for the selection of AFA in CVD proceedings imposed by the statute, 19 U.S.C. § 1677e(d)(1)(A). Consequently, Commerce's applications of facts available and an adverse inference were unsupported by substantial evidence and are not in accordance with law.

> **3.    Was Commerce's determination of benefit for the provision of land rights made in accordance with law?**

No. In the *Final CVD Determination*, Commerce concluded that, by granting industrial land and port rights to QatarEnergy, the Government of Qatar ("GOQ") provided a financial contribution in the form of rental and port revenue foregone, and QatarEnergy received a benefit in the amount of rental income and port services fees collected during the POI from third parties with respect to the properties in question. That benefit, according to Commerce, was the entirety of income collected by QatarEnergy from rent and port services fees. Yet, QatarEnergy incurred significant costs to develop, maintain, and manage the industrial cities on this land – costs that Commerce refused to consider in calculating the benefit. Because neither the statute nor the regulation defines "benefit" in the context of a financial contribution involving rental or port services revenue forgone, the Court must look to the plain and ordinary meaning of the term "benefit," along with relevant interpretive guidance in the SAA, Commerce's regulation, and the *CVD Preamble*. Recourse to such sources establishes that the best meaning of "benefit" in the context of rental or port services revenue forgone is synonymous with "profit." This definition is further supported by applicable case precedent. Commerce's benefit determination in this case is therefore contrary to law.

## II.    STATEMENT OF FACTS

### A.    CVD Investigation and *Initial Questionnaire*

On February 14, 2024, Cornerstone Chemical Company, the sole U.S. producer of melamine, filed a petition for antidumping duty ("AD") and CVD measures on imports of

melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago. *See Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago* (Feb. 14, 2024) (C.R. 1–42 / P.R. 1–41). Commerce initiated the CVD investigation on March 5, 2024. *Melamine from Germany, Qatar, and Trinidad and Tobago*, 89 Fed. Reg. 17381 (Dep't Commerce Mar. 11, 2024) (CVD investigation initiation notice) (P.R. 56).

On March 19, 2024, Commerce issued the CVD questionnaire to QMC and Muntajat, the mandatory respondents. *See* Countervailing Duty Questionnaire (C-518-002) (Mar. 19, 2024) (P.R. 60) ("*Initial Questionnaire*"). Section III of the *Initial Questionnaire* requested various categories of information from QMC-Muntajat. *See id.* at III-1–III-24.

Section III contained a subsection concerning "Other Companies Subject to Investigation," for which a response was due earlier than other parts of Section III. *See id.* at III-1. Therein, Commerce requested that QMC-Muntajat ultimately submit "complete responses for certain 'cross-owned' affiliated companies." *Id.* at III-2. The *Initial Questionnaire* defines cross-ownership as follows:

> Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent)."

*Id.*

QMC-Muntajat submitted their response to the "Other Companies Subject to Investigation" subsection of Section III on April 5, 2024. *See generally* QMC-Muntajat Affiliated Companies Response (Apr. 5, 2024) (C.R. 44 / P.R. 68) ("*Affiliated Companies Response*").

QMC-Muntajat identified Qatar Fertiliser Company (P.S.C.) ("QAFCO"), Industries Qatar Q.P.S.C. ("Industries Qatar"), and QatarEnergy as the relevant cross-owned affiliates for purposes of responding to the *Initial Questionnaire*. *Id.* at 4-5. As QMC-Muntajat explained further, QAFCO is the direct parent company of QMC, and also supplied urea solution, the primary input for the production of melamine, to QMC for such production. *Id.*

     **B.**     **Provision of Electricity and Water**

In the State of Qatar, electricity and water are supplied by the state-owned Qatar General Electricity & Water Corporation ("Kahramaa"). Kahramaa sells electricity and water at various standard rates, including "Bulk Industrial," "preferential Industrial," "Commercial," and "Residential." In response to Petitioner's CVD allegation, Commerce investigated whether electricity and water were provided for less than adequate remuneration ("LTAR"). Of the five responding cross-owned companies, only QAFCO and QatarEnergy purchased electricity and water during the POI.

On May 10, 2024, QMC-Muntajat submitted the remainder of their responses to Section III, including complete questionnaire responses for QAFCO, Industries Qatar, and QatarEnergy. *See generally* QMC-Muntajat CVD Questionnaire Response (C-518-002) (May 10, 2024) (C.R. 45–103 / P.R. 82–93) ("*Section III Response*"). In its response, QAFCO reported that it purchased electricity at the Bulk Industrial rate and that it purchased water at the Bulk Industrial and Commercial rates. *Section III Response* at Exhibits ELECTR_QAFCO-1, WATER_QAFCO-1. During the POI, QAFCO also purchased electricity and water for its plant workers' residences and recreational club (at Residential and Commercial rates), as well as potable water for personal hygiene at the ammonia plant (at the preferential Industrial rate). *See* QMC-Muntajat Case Brief (C-518-002) (Nov. 6, 2024), at Attachment to Appendix (Decl. of J. Campbell at ¶¶5-6) (C.R.

358–368 / P.R. 265–272) ("*Original Case Brief*").   QAFCO, however, did not report these purchases of electricity and water because it thought that only purchases of utilities consumed for production purposes were required.  *See id.* at ¶7.

In a post-preliminary CVD determination, Commerce calculated a preliminary combined subsidy rate of 0.48% for QAFCO's and QatarEnergy's purchases of electricity combined, and a preliminary subsidy rate of 0.10% for QAFCO's and QatarEnergy's purchases of water combined. *See* Post-Preliminary Analysis Memorandum for the Countervailing Duty Investigation of Melamine from Qatar (C-518-002) (Sept. 12, 2024) at 7, 9 (P.R. 248) ("*Post-Preliminary Decision Memo*").  Notably, whereas Commerce found that Kahramaa's provision of electricity and water at the Industrial and Commercial rates were "specific" under 19 U.S.C. § 1677(5A)(D)(i) and 1677(5A)(D)(iii)(II), respectively, the agency did not likewise find that Kahramaa's provision of electricity and water at the Residential rate was specific.  *See id.* at 5-6, 7-8.

Commerce conducted verification of QAFCO's reported information on Wednesday, September 25, 2024, and Thursday, September 26, 2024.  *See* Commerce Memorandum, RE: Verification of the Questionnaire Responses of Qatar Melamine Company and Muntajat (C-518-002) (Oct. 30, 2024) at 1 (C.R. 355 / P.R. 260) ("*QMC-Muntajat Verification Report*").  In the verification agenda, Commerce requested a reconciliation of QAFCO's purchases of electricity and water in March and September 2023 to the company's accounting system. *See* Countervailing Duty Investigation of Melamine from Qatar; Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C Questionnaire Responses (C-518-002) (Sept. 12, 2024) at 9 (P.R. 247) ("*Verification Agenda*"). In response, QAFCO prepared a reconciliation that tied the company's purchases of electricity and water – including the previously unreported purchases – to its accounting records for the POI (the

"QAFCO Electricity & Water Reconciliation"). *See Original Case Brief* at Attachment to Appendix.

On September 25, 2024, "the Commerce verifiers reviewed the QAFCO Electricity & Water Reconciliation over an approximately two-hour period – without identifying any significant discrepancies" to QAFCO's Senior Accountant or outside counsel, Jay Campbell of White & Case LLP, who were both present during the verifiers' review of the reconciliation. *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶8).

On the following day, September 26, 2024, the Commerce verifiers informed QAFCO's counsel "that Commerce management in Washington, DC, instructed them not to accept the QAFCO Electricity & Water Reconciliation for the record of the CVD investigation." *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶9). In its verification report, however, Commerce noted the unreported electricity and water purchases as percentage shares of QAFCO's total electricity and water purchases, respectively ([   ]% for electricity and [   ]% for water). *See QMC-Muntajat Verification Report* at 16, 19.

QMC-Muntajat submitted its case brief ("*Original Case Brief*") on November 6, 2024, which included an Appendix with a declaration signed by Respondents' counsel, Jay Campbell, describing the Commerce verifiers' review of the QAFCO Electricity & Water Reconciliation at verification, as well as a copy of the reconciliation itself. *See generally Original Case Brief*. On November 8, 2024, Commerce rejected the *Original Case Brief* and instructed Respondents to refile it without the Appendix or any references thereto. *See* Commerce Memorandum, RE: Countervailing Duty Investigation of Melamine from the State of Qatar: Rejection of Qatar Melamine Company and Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. Case Brief Filing (C-518-002) (Nov. 8, 2024) (P.R. 274). In compliance

with Commerce's instructions, QMC-Muntajat submitted a redacted version of their case brief on November 12, 2024. *See* QMC-Muntajat Resubmitted Case Brief (C-518-002) (Nov. 12, 2024) (C.R. 369 / P.R. 277) ("*Resubmitted Case Brief*").

In their case brief, QMC-Muntajat argued that Commerce should accept the QAFCO Electricity & Water Reconciliation for the record. *See Resubmitted Case Brief* at 27-31. Commerce rejected this argument, deeming the QAFCO Electricity & Water Reconciliation to be "untimely new factual information." *Final IDM* at 5, 29-30. Further, Commerce determined that QAFCO failed to cooperate to the best of its ability and, thus, that use of AFA under 19 U.S.C. § 1677e(b) was warranted. *See id.* at 6-11, 27-30. Commerce selected 8% as the AFA subsidy rate for both the provision of electricity and the provision of water, based on proprietary information presented in Kahramaa's 2023 Annual Tariff Review Report. *See id.* at 11.

C.    **Provision of Land Rights**

The GOQ granted land rights (usufruct) to QatarEnergy over certain industrial cities, namely (1) Mesaieed Industrial City ("Mesaieed"), (2) Ras Laffan Industrial City ("Ras Laffan"), and (3) Dukhan Concession Area ("Dukhan"). The GOQ vested the usufruct rights to QatarEnergy through three decrees, namely: (1) Decree No. 59 of 1989 (concerning Mesaieed), (2) Decree No. 35 of 1994 (concerning Ras Laffan), and (3) Decree No. 55 of 1995 (concerning Dukhan). *See Section III Response* at QATAREN-16, Exhibits LAND-01–LAND-03. Each decree granted the land rights to QatarEnergy for the life of the corporation. *See id.* Further, Council of Ministers' Resolution No. (19) of 2002 (the "Ports' Resolution") gave QatarEnergy rights over certain ports. *See id.* at Exhibit LAND-05.

In the post-preliminary determination, Commerce found that "the GOQ has granted QatarEnergy, for free, the rights to utilize industrial area land and ports for the company's benefit,

including by leasing the relevant land areas and collecting rental income and port services income."

*Post-Preliminary Decision Memo* at 11. Commerce also found a financial contribution under 19

U.S.C. § 1677(5)(D)(ii) in the form of revenue forgone because, but for its grant of land rights to

QatarEnergy, the GOQ could have collected the income from land leases and port services earned

from management of the designated industrial cities and ports. *Id.* In calculating the benefit for

this program, Commerce considered the lease and port services income earned by QatarEnergy,

but disregarded the expenses QatarEnergy incurred to develop, maintain, and manage the industrial

cities and ports. *See Resubmitted Case Brief* at 20-22.

In their case brief, Respondents contested Commerce's preliminary calculation as

distorted. Respondents argued that, to "measure the actual economic benefit received by

QatarEnergy, the benefit calculation must include not only the rental and port income realized by

QatarEnergy, but also the corresponding expenses it incurred to operate the industrial cities and

ports." *Id.* Commerce, however, continued to disregard QatarEnergy's expenses associated with

the development, maintenance, and management of the industrial cities in the *Final CVD*

*Determination. See Final IDM* at 21-26.

## III.    STANDARD OF REVIEW

The Court will find a determination by Commerce to be unlawful if it is unsupported by

substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C.

§ 1516a(b)(1)(B)(i).

"Substantial evidence "means 'more than a mere scintilla' and 'such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Huvis Corp. v. United*

*States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938); *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed.

Cir. 1994)).  Commerce must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

As a result, a determination that fails "to consider or discuss record evidence which supports an alternative conclusion" or "an important aspect of the problem" is not supported by substantial evidence and the "court will not accept" such a determination.  *See Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1360-61 n.26 (Ct. Int'l Trade 2019) (citations omitted); *NSK Corp. v. United States*, 33 C.I.T. 1185, 1190, 637 F. Supp. 2d 1311, 1318 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

With respect to whether a decision by Commerce is in accordance with law, the Court "must exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  This means that the Court must employ the "best reading of the statute," which is "the reading the court would have reached if no agency were involved." *Id.* at 400 (internal quotation marks and citation omitted).  "In doing so, courts use the traditional tools of statutory interpretation, examining the 'statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Ventura Coastal, LLC v. United States*, 2025 Ct. Int'l Trade LEXIS 83 at 10, Slip Op. 2025-79 (June 24, 2025) (quoting *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)).

IV.    **ARGUMENT**

A.    **Commerce Abused Its Discretion by Reviewing, Examining, and Ultimately Rejecting the QAFCO Electricity & Water Reconciliation as Untimely**

The record of this investigation and relevant precedent establish that Commerce's rejection of the QAFCO Electricity & Water Reconciliation was an abuse of discretion. Commerce will accept new factual information at verification under certain circumstances, namely when the information is necessary to correct, clarify, or corroborate information already on the record. The courts have established that, if such information is presented to Commerce with sufficient time to review and verify it, then rejection thereof amounts to an abuse of the discretion afforded to Commerce to conduct verification. Here, the QAFCO Electricity & Water Reconciliation itself, as well as the circumstances surrounding its submission and Commerce's review of it, all establish that Commerce abused its discretion by rejecting the Reconciliation.

1.    **Commerce must consider information presented at verification that corrects, clarifies, or corroborates record information when there is sufficient time to do so**

Although Commerce retains discretion to determine how it will conduct verification, it may not reject new information presented at verification where two requirements are met: (1) such information is necessary to correct, clarify, or corroborate record information; and (2) Commerce has sufficient time to review and verify the information. If Commerce nevertheless rejects such information under these circumstances, then that rejection amounts to an abuse of discretion.

Under the statute, Commerce "shall verify all information relied upon in making . . . a final determination in an investigation . . . ." 19 U.S.C. § 1677m(i)(1). Although the statute requires Commerce to conduct verification, it does not establish the specific standards or requirements for doing so. Accordingly, the court "review{s} verification procedures employed by Commerce in an investigation for abuse of discretion . . . ." *Micron Tech v. United States*, 117 F.3d 1386, 1396

(Fed. Cir. 1997); *see also*, *e.g.*, *Bonney Forge Corp. v. United States*, 560 F. Supp. 3d 1303, 1310 (Ct. Int'l Trade 2022).

In relevant part, this case concerns Commerce's refusal to accept information presented and examined at verification. Although Commerce generally will decline to accept new factual information presented at verification, it will accept such information "when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record." *See*, *e.g.*, *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021).

More fundamentally, "CVDs are intended to be remedial rather than punitive in nature" and "Commerce has a duty to determine CVD rates as accurately as possible." *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1394-95 (Ct. Int'l Trade 2021) (citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103 (Fed. Cir. 1990); *Içdaş Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2021)). It follows that, given these overarching statutory obligations, Commerce must ensure that the data used to calculate CVD rates are accurate, and therefore should utilize new information presented by a respondent that corrects, corroborates, or clarifies information on the record.

To this end, both this court and the Court of Appeals for the Federal Circuit ("Federal Circuit") have consistently held that "Commerce abuses its discretion by rejecting corrective information, which includes submissions to correct information already provided to Commerce . . . or to clarify information already in the record . . . ." *Içdaş Celik*, 498 F. Supp. 3d at 1361 (internal brackets and quotation marks omitted) (quoting *Fischer S.A. Comercio v. United States*, 34 C.I.T. 334, 344, 348, 700 F. Supp. 2d 1364, 1373, 1376-77 (2010)). The courts have further held that

Commerce abuses its discretion "by refusing to accept updated data *when there is plenty of time for Commerce to verify or consider it*." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021) (emphasis added, internal brackets and quotation marks omitted) (quoting *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016); citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995); *Fischer*, 34 C.I.T. at 347-349, 700 F. Supp. 2d at 1370-71).

Relatedly, "Commerce abuses its discretion where it denies corrections involving a straightforward mathematical adjustment that would neither have required beginning anew nor have delayed making the final determination." *İçdaş Çelik*, 498 F. Supp. 3d at 1361 (citing *Timken U.S. Corp.*, 434 F.3d at 1353; *NTN Bearing*, 74 F.3d at 1208; *Fischer*, 34 C.I.T. at 347, 700 F. Supp. 2d at 1375-76). Indeed, the Federal Circuit has underscored that Commerce "is free to correct *any type of importer error–clerical, methodology, substantive, or one in judgment*–in the context of making {a} determination, *provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections*." *Timken U.S. Corp*, 434 F.3d at 1353 (emphasis added).

### 2. Commerce reviewed and verified the QAFCO Electricity & Water Reconciliation, which corroborated and updated record information

In light of the applicable precedent and principles, Commerce abused its discretion by rejecting the QAFCO Electricity & Water Reconciliation. First, the record establishes that the information included in the Reconciliation corroborated information already on the record and also rectified an error in judgment. Second, and irrespective of the nature of the submission, Commerce not only had time to review and verify this information – *it actually did so*. Consequently, and

consistent with relevant precedent, Commerce's rejection of the Reconciliation was an abuse of discretion.

> a.    **The QAFCO Electricity & Water Reconciliation corroborated record information and rectified an error in judgment**

As discussed in the Statement of Facts above, QMC-Muntajat fully cooperated with Commerce's investigation by submitting a complete response to Section III of the CVD Questionnaire, which included disclosure and supporting documentation of QAFCO's purchases of electricity at the Bulk Industrial rate and water at the Bulk Industrial and Commercial rates. *Section III Response* at Exhibits ELECTR_QAFCO-1, WATER_QAFCO-1. Subsequently, in its verification agenda, Commerce requested that QAFCO reconcile its purchases of electricity and water in March and September 2023 to the company's accounting system. *See Verification Agenda* at 9. QAFCO prepared the QAFCO Electricity & Water Reconciliation in response to Commerce's request.

Importantly, the QAFCO Electricity & Water Reconciliation included information that QMC-Muntajat previously had submitted in their *Section III Response*. Specifically, it included (1) QAFCO's Bulk Industrial purchases of electricity, which QAFCO had reported in Exhibit ELECTR_QAFCO-1; and (2) QAFCO's Bulk Industrial and Commercial purchases of water, which QAFCO had reported in Exhibit WATER_QAFCO-1. Moreover, consistent with Commerce's instructions, QAFCO reconciled these purchases – including those made in March and September 2023 – to its accounting system. *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶¶5-6), Attachment (page titled "Reconciliation of Electricity and Water").

The reconciliation also necessarily included information regarding QAFCO's previously unreported purchases of electricity and water for its plant workers' residences and recreational club, as well as potable water for personal hygiene at the ammonia plant. *See id.* at Appendix,

Attachment (page titled "Reconciliation of Electricity and Water"). QAFCO had not submitted this information previously because, as its Senior Accountant explained to Commerce, QAFCO thought that "it was required to report only purchases of electricity and water for production operations (consistent with its reporting of QMC's electricity and water costs in the parallel antidumping duty investigation of Melamine from Qatar . . . ." *Id.* at Appendix (Decl. of Jay Campbell at ¶7).

As an initial matter, the new information contained in the QAFCO Electricity & Water Reconciliation constituted information "requested by the verifiers . . . to corroborate, support, and clarify factual information already on the record" because it supported and clarified the information already on the record regarding QAFCO's electricity and water purchases. *See Original Case Brief* at 28-29 (quoting *Verification Agenda* at 9). Moreover, given QAFCO's misunderstanding of its reporting requirements with respect to electricity and water purchases, its omission of certain purchases reflected, at worst, an error in judgment. As QAFCO explained to the Commerce verifiers, it originally had "reported its electricity and water purchases in good faith, and did not intend to omit record information." *Id.* at 29.

The courts have recognized that rejection by Commerce of such information at verification constitutes an abuse of discretion where Commerce had time to review or verify the information. *See, e.g., Timken U.S. Corp*, 434 F.3d at 1353; *İçdaş Celik*, 498 F. Supp. 3d at 1361. As demonstrated below, Commerce had sufficient time.

      **b.**    **Commerce successfully reviewed and verified the QAFCO Electricity & Water Reconciliation**

Meeting the "corroboration" and/or "error of judgment" requirement is only half the equation. As the courts have emphasized, for Commerce to abuse its discretion, it must also reject the "updated data when there is plenty of time for Commerce to verify or consider it." *See, e.g.,*

*Goodluck India*, 11 F.4th at 1342; *Papierfabrik August Koehler*, 843 F.3d at 1384. Here, not only was there enough time for Commerce to do so in theory; in fact, Commerce both examined ***and*** verified the QAFCO Electricity & Water Reconciliation.

Specifically, "the Commerce verifiers reviewed the QAFCO Electricity & Water Reconciliation over an approximately two-hour period – without identifying any significant discrepancies" to either QAFCO's external counsel or its Senior Accountant. *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶8). Despite this, on the next day the Commerce verifiers stated that "Commerce management in Washington, DC instructed them not to accept the QAFCO Electricity & Water Reconciliation for the record of the CVD investigation." *Id.* (Decl. of Jay Campbell at ¶9). Moreover, while rejecting the QAFCO Electricity & Water Reconciliation itself, Commerce nevertheless noted in its verification report the unreported electricity and water purchases as percentage shares of QAFCO's total electricity and water purchases during the POI – further reinforcing that it had sufficient time to review and analyze the information, and had indeed done so. *See QMC-Muntajat Verification Report* at 16, 19.

Commerce's examination, followed by its abrupt rejection the next day, of the QAFCO Electricity & Water Reconciliation qualifies as exactly the type of behavior that the courts have deemed an abuse of discretion. Both this court and the Federal Circuit have emphasized that Commerce's rejection of new information presented at verification is an abuse of discretion where (1) there is sufficient time for Commerce to review the information before the final determination, *see, e.g.*, *Goodluck India*, 11 F.4th at 1342; *Papierfabrik August Koehler*, 843 F.3d at 1384, and (2) the respondent brings the information to Commerce's attention "before Commerce issues its final results and adequately proves the need for the requested corrections." *Timken U.S. Corp*, 434 F.3d at 1353; *Içdaş Celik*, 498 F. Supp. 3d at 1361. The courts have further emphasized that

**NON-CONFIDENTIAL VERSION**

Commerce abuses its discretion in situations where the information in question involves a "straightforward mathematical adjustment that would neither have required beginning anew nor have delayed making the final determination." *Timken U.S. Corp*, 434 F.3d at 1353; *NTN Bearing*, 74 F.3d at 1208; *Içdaş Celik*, 498 F. Supp. 3d at 1361.

The facts of this case satisfy these requirements. The nature of the information (*i.e.*, modest purchase volumes included in the reconciliation) involved a straightforward mathematical adjustment. *See Original Case Brief* at Appendix, Attachment (page titled "Reconciliation of Electricity and Water"). QAFCO brought the information to Commerce's attention well before the *Final CVD Determination*, and proved the need for it, in light of Commerce's request for the reconciliation. *See Verification Agenda* at 9. Moreover, Commerce completed its review of the information during verification, well in advance of the final determination. *See Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶8). The only reason that the Commerce verifiers declined to accept the QAFCO Electricity & Water Reconciliation as a verification exhibit was because Commerce management instructed the verifiers to do so. *Id.* at Appendix (Decl. of Jay Campbell at ¶9).

The courts have been clear: Untimeliness is not a shield against the acceptance of new information, provided that information corrects, corroborates, or clarifies information already on the record, and a respondent presents the information with sufficient time for Commerce to review or verify it well before the final determination. *See, e.g., Goodluck India*, 11 F.4th at 1342; *Papierfabrik August Koehler*, 843 F.3d at 1384; *Timken U.S. Corp*, 434 F.3d at 1353; *Içdaş Celik*, 498 F. Supp. 3d at 1361. This is particularly true where Commerce's examination of the new information will not require delay of the final determination, and even more so if the information implicates a straightforward mathematical adjustment. *See id.* The QAFCO Electricity & Water

Reconciliation met these requirements. Consequently, Commerce's decision to reject the reconciliation, despite having examined and verified it, constituted an abuse of discretion.

### c. Additional case law involving analogous fact patterns further establishes that Commerce abused its discretion

Additional court precedent involving factual scenarios similar to those in this case, and in which the Court found an abuse of discretion, reinforces the conclusion that Commerce's rejection of the QAFCO Electricity & Water Reconciliation was unwarranted and that Commerce abused its discretion.

For example, *Linyi Chengen Imp. & Exp. Co. v. United States* concerned an AD investigation of hardwood plywood products from China in which Commerce requested at verification that respondent Lingyi Chengen provide "the Chinese National Standard used to calculate the volume of purchased logs. Linyi Chengen attempted to provide a 12-page document representing the Chinese National Standard used . . . but Commerce accepted only a two-page excerpt of that document into evidence containing a conversion table." 433 F. Supp. 3d 1278, 1280 (Ct. Int'l Trade 2020). Commerce rejected the other 10 pages as new factual information; found that "Linyi Chengen provided incomplete information regarding volume calculations, conversions, and formulas"; and concluded that Linyi Chengen failed to establish that it applied the Chinese National Standard in calculating its log volumes." *Id.*

Lingyi Chengen challenged Commerce's determination. This court deemed Commerce's rejection of the remaining 10 pages unreasonable, because "the 12-page complete document" constituted "information corroborating, supporting, or clarifying information already on the record (regarding Linyi Chengen's method of calculating log volumes) that should be accepted pursuant to Commerce's past practices at verification, rather than viewing the pages as prohibited new factual information." *Id.* at 1285. As the court elaborated, it was "unreasonable for Commerce to

refuse to consider the entirety of the document purporting to be the Chinese National Standard, when the document is readily available and highly relevant." *Id.* (citing *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544-45 (Fed. Cir. 2019), in which the Federal Circuit stated that "it can be unreasonable for an agency to refuse to obtain readily available, highly relevant information.").

Here, the same holds true for the QAFCO Electricity & Water Reconciliation: It was readily available, highly relevant, and Commerce actually examined it – such that its rejection from the record was unreasonable "pursuant to Commerce's past practices at verification . . . ." *Id.*; *see also Citic Trading Co. v. United States*, 27 C.I.T. 356, 373 (2003) (not reported in F. Supp. 2d) ("Commerce specifically told one of the respondents in the case that new information corroborating, supporting or clarifying the record would be accepted during verification. The list offered by Plaintiffs would fulfill that precise purpose . . . . Consequently, this court finds Commerce's decision to reject Plaintiffs' list submission unsupported by the evidence."); *cf. also Fischer*, 34 C.I.T. at 336, 700 F. Supp. 2d at 1367 ("Commerce relied on Fischer's mistaken reporting of an incorrect conversion factor and, as a result, calculated an inaccurate gross unit price for Fischer's United States NFC sales, and . . . Commerce abused its discretion when it rejected materials Fischer submitted after the preliminary results of the investigation, which reliably established the mistake and demonstrated the correct conversion factor.").

Along the same lines, the court has affirmed Commerce's acceptance of new information at verification, despite petitioners' claims that such acceptance was unreasonable. For example, in *TMK IPSCO v. United States*, Commerce discovered at verification in the CVD investigation of oil country tubular goods from China that respondent "Changbao's reported sales reflected not

only its own sales, but also the sales of all its subsidiaries." 179 F. Supp. 3d 1328, 1354 (Ct. Int'l Trade 2016). Plaintiff, the petitioner, argued that "by accepting Changbao's explanation at verification that its reported sales included its own sales as well as of its subsidiaries, Commerce improperly accepted untimely new factual information." *Id.* The court disagreed. *See id.* at 1354, 1354 n.34 (citing *Citic Trading Co.* 27 C.I.T. at 356). Along these same lines, Commerce should have accepted the QAFCO Electricity & Water Reconciliation in this case, particularly given that the court has affirmed Commerce's acceptance of such information in other cases. *See Ass'n of Am. Sch. Paper Suppliers v. United States*, 32 C.I.T. 1196, 1215-17 (2008) (not reported in F. Supp. 2d) ("Commerce correctly accepted Kejriwal's G&A analysis submission provided to the Department at the time of verification. It is within Commerce's discretion to accept such information, particularly when Commerce reasonably believes the information clarifies and corroborates previously submitted information.") (citation omitted).

Moreover, where the Court has affirmed Commerce's rejection of new information at verification, it has done so based on highly distinguishable facts. For example, *Max Fortune Indus. Co. v. United States* involved an anticircumvention inquiry involving the AD order on certain tissue paper from China and imports from Vietnam during the period January 1, 2005 to April 23, 2010. *See* 37 C.I.T. 549, 551 (2013) (not reported in F. Supp. 2d). In relevant part, respondent Max Fortune Vietnam ("MFVN") reported that, since "January 1, 2008, it did not convert in Vietnam any jumbo rolls and cut sheet of tissue paper from China" and "had not imported any Chinese-origin jumbo rolls." *Id.* at 550 (internal quotation marks omitted). At verification, "Commerce discovered that there were, in fact, Chinese jumbo rolls in MFVN's inventory as late as March 2010." *Id.* Although MFVN "offered to provide documentation that pertained to the Chinese jumbo rolls{,}" it did so "{o}n the last hour of the last day of verification in Vietnam,"

20

and Commerce "refused to accept this information because there was insufficient time to test the data for accuracy and completeness." *Id.*

The court affirmed Commerce's rejection specifically because Commerce did not have enough time to review and verify the data. As the court observed, "MFVN attempted to offer new information that Commerce did not have time to verify because it was submitted on the last hour of the last day of verification." *Id.* at 555. The court thus held that "Commerce properly exercised its discretion in rejecting the late-submitted information." *Id.* In contrast, QMC-Muntajat presented the QAFCO Electricity & Water Reconciliation on the fourth day of a five-day verification, which was the first day on which Commerce reviewed QAFCO's electricity and water purchases; Commerce examined the reconciliation on that same day; and then Commerce rejected it a day later, on the last day of verification. *Original Case Brief* at Appendix (Decl. of Jay Campbell at ¶¶2, 8-9). The court's rationale for holding that Commerce properly exercised its discretion in *Max Fortune* does not apply in this case.

### 3.    Conclusion

In summary, and in accordance with applicable case law, Commerce abused its discretion by rejecting the QAFCO Electricity & Water Reconciliation because (1) the reconciliation was corroborative of information already on the record and corrective of an error in judgment and (2) not only was there sufficient time for Commerce to review the reconciliation at verification, Commerce, in fact, examined the reconciliation at verification without identifying any discrepancies or errors.

B.    **Commerce's Selection of a Sixteen Percent Subsidy Rate as AFA for the Provision of Electricity and Water Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

Commerce's derivation and application of a 16% subsidy rate as AFA for the provision of water and electricity for LTAR should not be sustained. In applying facts available, Commerce may only use specific information that is most probative of the information missing from the record. Moreover, Commerce may not apply an adverse inference that results in a "punitive, aberrational, or uncorroborated" rate. Commerce's application of a 16% subsidy rate here violates both requirements because the 8% rate – used for the provision of electricity and the provision of water, respectively – bore no relation to a subsidy rate for the provision of a good for LTAR and was punitively high. Lastly, Commerce failed to select AFA permissible under the statutory hierarchy enumerated at 19 U.S.C. § 1677e(d)(1)(A). For these reasons, Commerce's application of facts available and an adverse inference is unsupported by substantial evidence and otherwise not in accordance with law.

1.    **Legal background: Commerce's use of facts available is limited to the specific information that is missing, and its use of an adverse inference must not be punitive and must comply with the statutory hierarchy**

Commerce's use of facts available and adverse inferences are subject to important limitations and qualifications. Specifically, Commerce may only use facts available as a substitute for the specific information that is missing from the record. Moreover, its use of an adverse inference – even recognizing that AFA is meant to deter noncompliance – may not be punitive. Finally, the subsidy rate selected by Commerce as AFA must conform with the requirements of 19 U.S.C. § 1677e(d)(1)(A).

Commerce may apply facts available when necessary information is missing from the record, because the respondent "withholds" it; "fails to provide" it "in the form and manner

requested"; "significantly impedes" the proceeding; or provides information that "cannot be verified . . . ." 19 U.S.C. § 1677e(a). Commerce may apply an adverse inference in choosing facts available (*i.e.*, apply AFA) only if the respondent "failed to cooperate by not acting to the best of its ability to comply with" Commerce's requests for information. 19 U.S.C. § 1677e(b)(1).

The courts have further elaborated on the legal requirements for Commerce's application of facts available and AFA. In particular, the use of facts available, with or without an adverse inference, is limited to filling the gap "*only* with respect to the specific information that a respondent failed to provide." *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1273 (Ct. Int'l Trade 2006) (emphasis added); *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (holding that "the gap in the record is the quantity" and therefore Commerce could apply partial AFA "only in selecting the quantity" of select sales for purposes of calculating the dumping margin). Similarly, the SAA directs that, in selecting facts available, Commerce must "make {its} determination{} based on all evidence of record, weighing the record evidence to determine *that which is most probative of the issue under consideration*." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I), at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198 ("SAA") (emphasis added).

With respect to the application of an adverse inference, the Federal Circuit has "long held that the inference that Commerce may use in selecting from the facts otherwise available must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent for noncompliance." *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1086 (Fed. Cir. 2025) (citing *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021); *Essar Steel Ltd. v. United States*, 678 F.3d 1268,

1276 (Fed. Cir. 2012); *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010); *F.lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).  Importantly, Commerce's choice of AFA, even taking deterrence into account, must **not result in "*punitive, aberrational, or uncorroborated margins***."  *F.Lii de Cecco di Filippo Fara S. Martino*, 216 F.3d at 1032 (emphasis added); *see also Gallant Ocean (Thailand) Co.*, 602 F.3d at 1324 ("This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter . . . future non-compliance").

Finally, in a CVD proceeding, the statute permits Commerce to select the following as AFA:  (1) "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country;" or, if no such rate is available, (2) "a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use . . . ."  19 U.S.C. § 1677e(d)(1)(A).

> ### 2. The "subsidy rate" selected by Commerce bears no relation to a subsidy rate as defined under the law

The purported "subsidy rate" that Commerce derived from the record is wholly unrelated to a subsidy rate for the provision of a good (here, electricity and water) for LTAR, as defined by the statute and Commerce's regulation, thereby violating the requirement that the selection of facts available be based on the "specific information" that a respondent did not provide.  Consequently, Commerce's selection of AFA for the provision of electricity and water is unsupported by substantial evidence.

In the *Final CVD Determination*, Commerce explained that it selected as AFA the "the highest [        ]" for the provision of electricity and water at the commercial rate in Qatar, which amounted to a simple average of 8% that Commerce applied to each program (for a total

rate of 16%).  *See Final Determination Calculations for Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.* (C-518-002) (Dec. 2, 2024) at 3-4 (C.R. 372 / P.R. 283) ("*Final Calculation Memo*").  Commerce derived the 8% rate from Kahramaa's 2023 Annual Tariff Review Report ("*Annual Tariff Report*"), which was submitted as part of the GOQ's response to Section II of the *Initial Questionnaire*.  *See* GOQ CVD Questionnaire Response (C-518-002) (May 14, 2024) at Exhibit SOQ-KAHRA-06 (C.R. 104–137 / P.R. 94–119) ("*Section II Response*").  The GOQ's overall policy regarding tariffs for electricity and water was explained in another document, the "Kahramaa Tariff Policy," which was submitted in the same questionnaire response ("*Kahramaa Tariff Policy*").  *See id.* at Exhibit SOQ-KAHRA-04.  Together, these documents establish that the Kahramaa [                    ] selected by Commerce as AFA is entirely different from the subsidy rate that Commerce is directed to calculate in a CVD investigation under the statute and applicable regulation.

As the GOQ explained in its questionnaire response, Kahramaa calculates a "[

]" for electricity and water, respectively, that reflects [


].  *See* GOQ CVD Post Preliminary Questionnaire Response (C-518-002) (Aug. 7, 2024) at 2-3 (electricity) & 4 (water) (C.R. 269–286 / P.R. 230–234) ("*Post-Preliminary Questionnaire Response*").  The [                    ] is higher than the actual tariff rates that Kahramaa charges to its customers.  *See id.*  In light of this difference, and so that Kahramaa could [                    ], Qatar's Ministry of Finance ("MOF") [


].  *See Section II Response*,

**NON-CONFIDENTIAL VERSION**

Exhibit SOQ-KAHRA-04 at 8, 10; *see also Post-Preliminary Questionnaire Response* at 2-3 (electricity), 4 (water) & Exhibit SOQ-KHARA-35 ([                ]).

The total "subsidy" is the [                ] the MOF to [

                                                    ].  *See Section II Response*, Exhibit SOQ-KAHRA-04 at 10 ("[

]"); *see also id.*, Exhibit SOQ-KAHRA-06 at 7 (defining [

]).

In the *Annual Tariff Report*, Kahramaa [

]  *Id.*, Exhibit SOQ-KAHRA-06 at 4.  With the [

], the total year-2024 subsidy amount (*i.e.*, the sum of the [                ] paid by the MOF for all consumer sectors) would amount to QAR [                ] for electricity and QAR [                ] for water.  *Id.*, Exhibit SOQ-KAHRA-06 at 7.  In Appendix F of the *Annual Tariff Report* ([                                        ]), Kahramaa provided a table showing the subsidy amounts [

                                                    ].  *Id.*, Exhibit SOQ-KAHRA-06 at 19.

In pertinent part, Appendix F projected that [

], and that [

]. *Id.* From this information, Commerce derived the 8% subsidy rate, as described below:

> With respect to the provision of electricity and water LTAR programs, which pertain to provision of a good at LTAR, we applied an adverse inference that QMC/Muntajat consumed these utilities at the highest [          ] provided under a tariff category which QMC/Muntajat reported using (*i.e.*, the commercial rate) listed in Kahramaa's 2023 Annual Tariff Review Report. The highest [          ] for the provision of water in Qatar at the commercial rate is listed as [     ] percent. The highest [          ] for the provision of electricity in Qatar at the commercial tariff rate is listed as [   ] percent. The specific rates described above are business proprietary information (BPI). In order to prevent the release of BPI, we took a simple average of the above-described water and electricity rates:
>
> ([   ] percent water tariff + [    ] percent electricity tariff) / 2 = 8 percent utility tariff
>
> We considered this average utility tariff rate to apply to both programs. Accordingly, we are applying as AFA a 8-percent rate to the provision of water for LTAR program and an 8-percent rate to the provision of electricity for LTAR program.

*Final Calculation Memo* at 3-4.

In summary, the 8% "subsidy rate" derived by Commerce as AFA for the provision of electricity and water is the simple average of (1) [



] and (2) [



], as detailed in the *Annual Tariff Report*. For the reasons discussed below, the 8% rate is wholly unrelated to the "subsidy rate" Commerce is required to calculate under the statute and regulation for goods provided for LTAR. Consequently, the 8% rate (16% combined for electricity and water) selected by Commerce as AFA fails to fill the gap "**only** with respect to the specific information that

{QAFCO} failed to provide" (*i.e.*, its unreported purchases of electricity and water for non-production purposes). *Shandong Huarong*, 435 F. Supp. 2d at 1273.

First, the 8% "subsidy rate" is not a subsidy provided to electricity and water consumers at all. Rather, it reflects a subsidy paid by Qatar's MOF to Kahramaa, the state-owned supplier of electricity and water. Second, the 8% rate is not even a "subsidy rate." Instead, the 8% rate is equivalent to (1) the subsidy amount to be paid by the MOF to Kahramaa for electricity/water consumption in the Commercial sector *divided by* (2) the total subsidy amount to be paid by the MOF to Kahramaa for electricity/water consumption across all sectors. According to Commerce, the "subsidy rates" from the *Annual Tariff Report* were "the most accurate measure of the extent of subsidization on the record to apply as AFA." *Final Calculation Memo* at 3. In fact, however, the 8% rate has nothing to do with the amount of subsidization received by QAFCO – or any other consumer of electricity and water in Qatar. For these reasons, Commerce's selection of the 8% rate as AFA for both the provision of electricity and water is unsupported by substantial evidence.

Third, the 8% rate is completely unrelated to the subsidy rate that Commerce is required to calculate for the government's provision of a good under the statute and regulation. Under 19 U.S.C. § 1677(5)(D)(iv), the government's provision of a good confers a benefit if it is provided for LTAR. *See also* 19 C.F.R. § 351.511(a)(1). Under the applicable regulation, Commerce normally determines whether a good was provided for LTAR by comparing the price paid for the government-provided good to a benchmark (*i.e.*, market-based) price. *See* 19 C.F.R. § 351.511(a)(2). Next, to calculate the subsidy rate, Commerce is required to divide the benefit by the relevant sales value. *See* 19 C.F.R. § 351.525(a). The 8% rate that Commerce selected as AFA, as described above, has nothing to do with any of these requirements.

As discussed above in **Section IV.B.1**, the SAA directs Commerce to use facts available that are "most probative of the issue under consideration." SAA, H.R. Rep. No. 103-826(I), at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198. Moreover, this court and the Federal Circuit have held that only the "specific information that a respondent failed to provide" may be used as facts available. *Shandong Huarong*, 435 F. Supp. 2d at 1273; *see also Zhejiang Dunan Hetian Metal Co.*, 652 F.3d at 1348. Here, Commerce's use of a purported "subsidy rate" based on Appendix F of the *Annual Tariff Report* fails this standard, because it is not remotely probative of the actual subsidy rate, as defined by the statute and Commerce's regulations. Nor, as noted above, is the 8% rate related to the specific information that is missing from the record (*i.e.*, QAFCO's previously unreported purchases of water and electricity for residential, recreational, and personal hygiene consumption that Commerce removed from the record when it rejected the QAFCO Electricity & Water Reconciliation). For these reasons, Commerce's selection of 8% rate as AFA is unsupported by substantial evidence.

### 3.    Commerce's selection of 16% as an adverse "subsidy rate" was punitive

The courts have held that an adverse inference "must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent for noncompliance." *Oman Fasteners, LLC*, 125 F.4th at 1086 (citations omitted). Even taking deterrence into account, Commerce's choice of AFA must ***not result in "punitive, aberrational, or uncorroborated margins***." *F.Lii de Cecco*, 216 F.3d at 1032 (emphasis added); *see also Gallant Ocean (Thailand) Co.*, 602 F.3d at 1324. Here, Commerce's selection of an AFA rate for the provision of electricity and water was also punitive and, thus, unsupported by substantial evidence.

In the post-preliminary determination, Commerce preliminarily determined that QMC-Muntajat's actual subsidy rates for electricity and water were 0.48% and 0.10%, respectively.

*Post-Preliminary Decision Memo* at 7, 9. These subsidy rates were based on both QAFCO's and QatarEnergy's purchases of electricity and water during the POI. Although these subsidy rates do not include QAFCO's additional purchases reported at verification in the QAFCO Electricity & Water Reconciliation, the record establishes that these additional purchases were relatively low.

As Commerce recognized in its verification report, "the unreported electricity represent{ed} approximately [ ] percent of QAFCO's total electricity consumption during the POI" and "the unreported water consumption represent{ed} approximately [ ] percent of QAFCO's total water consumption during the POI." *QMC-Muntajat Verification Report* at 16, 19. Overall, as seen in the QAFCO Electricity & Water Reconciliation, of the total QAR [           ] spent on the purchase of electricity and water, QAFCO spent a total of QAR [         ] on electricity and water for residential and non-production-related consumption, or just [   ]% of the total electricity and water purchases. *Original Case Brief* at Appendix, Attachment (page titled "Reconciliation of Electricity and Water"); *Post-Preliminary Decision Memo* at 7, 9. This percentage is even lower when QatarEnergy's purchases of electricity and water are considered.

The 8% rate selected by Commerce as AFA is ***17 times*** (*i.e.*, 8 divided by 0.48) the actual subsidy rate for electricity (excluding the small volume of QAFCO's unreported electricity purchases) and ***80 times*** (*i.e.*, 8 divided by 0.10) the actual subsidy rate for water (excluding the small volume of QAFCO's unreported water purchases). Even taking into account a "built-in increase intended as a deterrent for noncompliance{,}" the 8% rate is simply not a "reasonably accurate estimate of the respondent's actual rate" and is clearly punitive on its face. The courts have found as much.

NON-CONFIDENTIAL VERSION

For example, in the AD administrative review at issue in *Oman Fasteners, LLC*, Commerce previously had calculated dumping margins of 0.63% to 9.10% but applied as AFA a dumping margin of 154.33% (*i.e.*, anywhere from 17 to 245 times the calculated margins). *See* 125 F.4[th] at 1078. The Federal Circuit found that Commerce's AFA dumping margin of 154.33% constituted "a gross departure from the established principle that Commerce, when applying the adverse-inference provision, must pursue accuracy, with any departure limited to what is needed to deter noncompliance with Commerce rules and orders." *Id.* at 1086.

Similarly, in the AD administrative review underlying *Gallant Ocean (Thailand) Co.*, Commerce applied an AFA dumping margin of 57.64% to the respondent – "more than ten times higher than the average dumping margin for cooperating respondents" and "five times higher than the highest rate applied to a cooperating respondent." 602 F.3d at 1324. The Federal Circuit deemed this rate "punitive, aberrational, or uncorroborated, . . . and excessive in view of the cooperative respondents' dumping rates{,}" adding that even a rate just "over five times the highest rate imposed on similar products is ***far beyond*** an amount sufficient to deter Gallant and other uncooperative respondents from future non-compliance." *Id.* (citation and internal quotation marks omitted, emphasis added).

The facts and circumstances of this case are similar to those in which the courts have found Commerce's selection of AFA rates to be unreasonably high and, thus, punitive. In such cases, the Federal Circuit concluded that the punitive nature of the high dumping margins rendered Commerce's selection of AFA to be unsupported by substantial evidence. *See Oman Fasteners, LLC*, 125 F.4th at 1085 ("applying an adverse inference to select the {punitive} 154.33% rate was unsupported by the required substantial evidence"); *Gallant Ocean (Thailand) Co.*, 602 F.3d at 1325 ("{S}ubstantial evidence does not support the unreasonably high AFA rate imposed against

Gallant."). Here, the 16% subsidy rate applied by Commerce as AFA was unreasonably punitive, and, consequently, unsupported by substantial evidence.

### 4. In selecting AFA, Commerce impermissibly disregarded the statutory hierarchy

In a CVD proceeding, the statute permits Commerce to select the following as AFA: (1) "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country;" or, if no such rate is available, (2) "a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use . . . ." 19 U.S.C. § 1677e(d)(1)(A). Here, however, Commerce "determine{d} that the rate derived from the AFA hierarchy {under the statute} is not an appropriate rate to use in the instant investigation, based on the uniqueness of the facts of this case and information on the record of this proceeding." *Final IDM* at 11. Contrary to Commerce's explanation, the statute does not provide for any exceptions to the "AFA hierarchy" for CVD proceedings. Consequently, Commerce's selection of the 8% rate (16% for electricity and water combined) is not in accordance with law.

### C. Commerce's Determination of Benefit for the Provision of Land Rights Is Contrary to Law

Commerce's benefit determination for the provision of land rights is contrary to law because it simplistically considered the financial contribution (*i.e.*, revenue forgone by the GOQ in granting land rights to QatarEnergy) to constitute the benefit, without accounting for the significant costs borne by QatarEnergy to develop, maintain, and manage the industrial cities on the land in question. The statute indicates that a benefit may only be equivalent to the financial contribution itself where the financial contribution is a grant or similar "gift-like transfer." Moreover, because neither the statute nor the regulation defines "benefit" in the context of a

**NON-CONFIDENTIAL VERSION**

financial contribution involving rental or port services revenue forgone, the Court must look to the plain and ordinary meaning of the term "benefit," along with relevant interpretive guidance in the SAA, Commerce's regulation, and the *CVD Preamble*. Recourse to such sources, as well as relevant case law, establishes that the best meaning of "benefit" in the context of rental or port services revenue forgone is synonymous with "profit." Commerce's failure to utilize this definition renders its benefit determination contrary to law.

**1.    Under the statute, the benefit may only be equivalent to the financial contribution where the latter is a grant or similar "gift-like transfer"**

The statute defines "benefit" as one of the essential components of a subsidy, along with a financial contribution. *See* 19 U.S.C. § 1677(5)(B). Because the statutory concepts of benefit and financial contribution are distinct (in all instances other than a grant or similar gift-like transfer), Commerce must derive and calculate the benefit for rental or port services revenue forgone, rather than simply consider the benefit to be equivalent to the financial contribution.

A subsidy exists when an authority provides a financial contribution to a person, which in turn confers a benefit to that person. 19 U.S.C. § 1677(5)(B). "Commerce must make distinct findings as to the elements of financial contribution and benefit." *Wilmar Trading PTE Ltd. v. United States*, 466 F. Supp. 3d 1344, 1355-56 (Ct. Int'l Trade 2020) (citations omitted). Put differently, the "benefit derived from a countervailable subsidy is measured according to the type of financial contribution made." *Id.* at 1356 (citing 19 U.S.C. § 1677(5)(E)). This is evident from the structure of the statute, which specifically defines the benefit for four different financial contributions – equity infusions; loans; loan guarantees; and the provision or purchase of goods or services. *See* 19 U.S.C. § 1677(5)(E)(i)-(iv).

With respect to each of these financial contributions, the statute makes clear that the benefit is distinct from the financial contribution itself. *See id.* The only instance, in either the statute or

Commerce's regulation, where a benefit equals the financial contribution is where the financial contribution takes the form of a grant. 19 C.F.R. § 351.504(a) ("In the case of a grant, a benefit exists in the amount of the grant."). This makes sense, because, as this court explained in in *Gov't of Sri Lanka v. United States*, a grant is a "gift-like transfer" whereby the recipient receives the entirety of the contribution. *See* 308 F. Supp. 3d 1373, 1383 (Ct. Int'l Trade 2018).

In contrast, the other forms of financial contribution require Commerce to calculate the benefit as derived from the initial financial contribution. *Compare* 19 C.F.R. § 351.504 (grants) *with* 19 C.F.R. §§ 351.503 (general rule); 351.505 (loans); 351.506 (loan guarantees); 351.507 (equity); 351.508 (debt forgiveness); 351.509 (direct taxes); 351.510 (indirect taxes and import charges); 351.511 (provision of goods or services); 351.512 (purchase of goods); 351.513 (worker-related subsidies); 351.514 (export subsidies); 351.515 (internal transport and freight charges for export shipments); 351.516 (price preferences for inputs used in the production of goods for export); 351.517 (exemption or remission upon export of indirect taxes); 351.518 (exemption, remission, or deferral upon export of prior-stage cumulative indirect taxes); 351.519 (remission or drawback of import charges upon export); 351.520 (export insurance); 351.521 (indirect taxes and import charges on capital goods and equipment (export programs).

###### 2.    The statutory meaning of "benefit" in the context of the provision of land rights is synonymous with "profit"

Because neither the statute nor the regulation defines benefit in the context of a financial contribution involving rental or port services revenue forgone, recourse to the plain and ordinary meaning of the term "benefit" – along with relevant interpretive guidance in the SAA, Commerce's regulation, and the *CVD Preamble* – is necessary. These sources all establish that the definition of "benefit" in this context is synonymous with "profit."

NON-CONFIDENTIAL VERSION

In the investigation at issue, Commerce categorized the GOQ's provision of land rights as a financial contribution involving the "foregoing or not collecting revenue that is otherwise due," pursuant to 19 U.S.C. § 1677(5)(D)(ii), because "the GOQ's granting of usufruct rights to QatarEnergy included the right to collect land lease and port income from these areas, which would otherwise have been collected by the GOQ absent the delegation of these rights to QatarEnergy by decree." *Final IDM* at 22 (citation omitted). As the benefit conferred, Commerce used "the amount of revenue QatarEnergy collected from rental payments and port fees." *Post-Preliminary Decision Memo* at 11.

Although, as discussed above, the statue defines benefit in the context of four specific types of financial contributions, *see* 19 U.S.C. § 1677(5)(E)(i)-(iv), and the regulation expands to several more, *see* 19 C.F.R. §§ 351.504–351.521, neither the statute nor the regulation defines benefit for rental and port income at issue in this case. Thus, the relevant question is whether Commerce correctly interpreted the term "benefit" in this context.

To define benefit in the context of rental or port income forgone, this Court should therefore turn to the plain and ordinary meaning of "benefit," as well as the SAA and Commerce's regulation defining benefit generally (*i.e.*, 19 C.F.R. § 351.503). Starting with plain meaning, this court has recognized in a case likewise concerning a financial contribution involving land rights that the "plain and obvious import of the statute is that a countervailable 'benefit' 'normally' requires . . . 'a *benefit* to the recipient'" and that a "benefit" is an "advantage, ***profit***, {or} good." *Hyundai Steel Co. v. United States*, 658 F. Supp. 3d 1331, 1335 (Ct. Int'l Trade 2023) (italics original to opinion, bold italics added) (quoting 19 U.S.C. § 1677(5)(E); Oxford English Dictionary (online edition)). The very same dictionary upon which this court relied in *Hyundai Steel* defines "profit" as a "financial gain, *esp.* the difference between the amount earned and the amount spent in buying,

operating, or producing something." Oxford English Dictionary (online edition), https://www.oed.com/dictionary/profit_n?tab=meaning_and_use#28099986 (last accessed Sept. 3, 2025).

These plain meaning definitions of "benefit" and "profit" are ubiquitous, both among general and specialty (*i.e.*, legal) dictionaries. *See, e.g.*, BLACK'S LAW DICTIONARY 188, 1404 (10th ed. 2014) (defining "benefit" as "profit or gain" and "profit" as the "excess of revenues over expenditures in a business transaction"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 992 (11th ed. 2003) (defining "profit" as the "excess of returns over expenditure in a transaction or series of transactions"). Thus, in the absence of a clear definition in the statute, the plain meaning of the term "benefit" for rental or port revenue forgone is synonymous with "profit," which necessarily implicates accounting for the "amount spent" or "expenditures" incurred in receiving the "gain" or "advantage."

Importantly, the definitions of "benefit" in the context of other financial contributions recognize similar principles. For example, in the context of a government purchase of goods, where the financial contribution exists when an authority purchases goods from the respondent, the "benefit exists to the extent that such goods are purchased *for more than adequate remuneration*" – rather than the entire purchase price paid by the authority. *See* 19 C.F.R. § 351.512(a)(1) (emphasis added). In other words, in the context of a government's purchase of goods, the benefit is not equated with the revenue received by the respondent from its sale of goods to the government. Instead, the benefit is something less than that – reflecting the advantage or financial gain to the respondent. Likewise, the benefit associated with rental or port income forgone must not be equivalent to the amount of revenue itself.

### NON-CONFIDENTIAL VERSION

Other tools of statutory interpretation support the definition of "benefit" as synonymous with "profit" in the context of a financial contribution involving rental or port revenue forgone. The SAA, which is the "authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act" (*i.e.*, including the CVD statute) "in any judicial proceeding in which a question arises concerning such interpretation or application{,}" 19 U.S.C. § 3512, likewise does not define "benefit" in the context of a financial contribution involving rental or port income forgone. *See* SAA, H.R. Rep. No. 103-826(I), at 927-28, reprinted in 1994 U.S.C.C.A.N. 4040, 4256-57. The SAA does, however, state that Commerce would "issue regulations setting forth the details of the methodologies used to identify and measure the benefit of a subsidy." *Id.* at 928.

As discussed above in **Section IV.C.1**, the individual regulatory provisions, *i.e.*, 19 C.F.R. § 351.504 through § 351.521, do not define the benefit for rental or port revenue forgone. Moreover, while 19 C.F.R. § 351.503 defines benefit in general terms, it only states that, for "other government programs," Commerce "normally will consider a benefit to be conferred where a firm . . . receives more revenues than it otherwise would earn" – a concept that Commerce refers to as "revenue enhancement." 19 C.F.R. § 351.503(b)(1); *Countervailing Duties*, 63 Fed. Reg. 65348, 65360 (Nov. 25, 1998) (final rule) (referring to the discussion of this concept in 19 C.F.R. § 351.503 as "revenue enhancement") ("*CVD Preamble*").

Although QatarEnergy did receive "more revenues than it otherwise would earn" because of the GOQ's provision of land rights, additional interpretive guidance (as with the SAA and the statute) provides important context to this concept of "revenue enhancement" discussed in the general definition of benefit under 19 C.F.R. § 351.503. In particular, the *CVD Preamble* is Commerce's "official regulatory interpretation that expresses {its} authoritative departmental

position to an interpretation of its underlying regulation." *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 633 F. Supp. 3d 1276, 1280 (Ct. Int'l Trade 2023) (citing *Kisor v. Wilkie*, 588 U.S. 558, 575-77 (2019)).

In discussing Commerce's overall approach toward defining and interpreting benefit in the context of "revenue enhancement" under 19 C.F.R. § 351.503, the *CVD Preamble* explains that benefit should be measured in an "economic or accounting sense{.}" *CVD Preamble*, 63 Fed. Reg. at 65360. It follows that profit, an essential "economic or accounting" concept, is key to the definition of benefit in the context of a financial contribution involving the provision of land rights.

### 3. Commerce's refusal to account for QatarEnergy's significant expenses violates the statutory meaning of "benefit" in the context of rental or port income forgone

Because Commerce refused to account for QatarEnergy's significant expenses in defining the benefit resulting from the GOQ's provision of land rights, and because "benefit" in that context is synonymous with "profit," Commerce's determination is contrary to law.

The record establishes that QatarEnergy incurred significant expenses to develop, maintain, and administer the industrial cities and ports, which was necessary to collect the rental payments and port fees. *See, e.g.*, Commerce Memorandum, RE: Verification of the Questionnaire Responses of the Government of Qatar (C-518-002) (Oct. 30, 2024) at 16 (describing costs incurred and services provided by QatarEnergy in the industrial cities, and how costs are recovered through lease and infrastructure fees), 18-19 (describing QatarEnergy's decision to revise land tariffs and port services tariffs to cover costs and obtain a return on infrastructure investments) (C.R. 356 / P.R. 261)("*GOQ Verification Report*"); *QMC-Muntajat Verification Report* at 12, 14 (explaining how QatarEnergy records expenses for developing the land and ports); QMC-Muntajat Response to Section III Supplemental Questionnaire (C-518-002) (June 27, 2024) at 61, Exhibit

LAND-08 (QatarEnergy Port Management Expenditures Incurred) (C.R. 175–242 / P.R. 167–191); Letter from White & Case LLP to the Department, RE: Reconciliations in Response to the Second Post-Preliminary Supplemental Questionnaire (C-518-002) (Sept. 3, 2024) at Exhibits LAND-24 and LAND-25 (details of the capital expenditures, operating expenditures, and manpower expenditures incurred by QatarEnergy in relation to the three Industrial Cities and ports) (C.R. 293–302 / P.R. 244–245).

As QatarEnergy explained further to Commerce, in 2023 alone, it incurred total expenses of QAR [          ] to develop, maintain, and administer the industrial cities and ports. *Original Case Brief* at 22 (citations omitted). Under the definition of "benefit" applicable to a financial contribution involving rental or port revenue forgone, as discussed above in **Section IV.C.2**, Commerce should have taken these costs into account when determining the benefit here. Along the same lines, as QatarEnergy further explained to Commerce, the rental income collected by QatarEnergy in 2023 included rental income relating to leasing activity from prior years, and likewise should have been accounted for to reach an accurate figure for only 2023 (*i.e.* the POI). *Id.* (citations omitted).

In short, as QatarEnergy demonstrated to Commerce, the ***actual*** benefit, in light of this best reading of "benefit" in the context of rental and port income forgone, was as follows:

| | |
|---|---|
| POI revenue collected (rental and port income) (*i.e.*, benefit ultimately used by Commerce in the *Final CVD Determination*) | QAR [          ] |
| QAFCO lease payment to QatarEnergy for POI | ***minus*** [          ] |
| POI expenses incurred by QatarEnergy | ***minus*** QAR [          ] |
| POI revenue collected that relates to pre-2023 lease activity | ***minus*** QAR [          ] |
| **Actual Benefit (*i.e.*, Profit)** | ***equals*** QAR [          ] |

*See id.* at 23 (citations omitted). That the benefit used by Commerce was [            ] the actual benefit, when taking QatarEnergy's expenses into account, speaks to the unreasonableness of Commerce's decision. Because Commerce did not factor these expenses into the benefit calculation for rental and port revenue forgone, Commerce's benefit calculation is contrary to law.

In the *Final CVD Determination*, Commerce claimed that its support was grounded in a permissible legal interpretation by citing to one case, an administrative review of the CVD order on hot-rolled steel from Korea, which addressed "similar arguments" concerning a similar program. *See Final IDM* at 25. As Commerce explained:

> In *Hot-Rolled Steel from Korea*, the Government of Korea (GOK) entered an agreement with the respondent for construction of harbor facilities. The respondent financed the construction, but the ownership of the port facility ultimately reverted to the GOK. As part of the agreement, the respondent was granted the right to manage and operate the port, including the right to collect certain port fees. These fees would otherwise be collected by the GOK. Thus, Commerce considered this program to be revenue forgone, as Hyundai Steel was granted the right to collect fees that would otherwise have been due to the GOK. Similarly, here the GOQ granted QatarEnergy the right to manage, operate, and administer land and ports in certain industrial cities, thus granting QatarEnergy the right to collect income generated from these activities. . . . In *Hot-Rolled Steel from Korea*, Commerce declined to offset the benefit Hyundai Steel Received by any of the costs it incurred in constructing the port.

*Id.* at 25-26. Commerce made a point of noting that its "decision to countervail this program was ultimately sustained." *Id.* (citing *Hyundai Steel Co. v. United States*, 651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023), *aff'd* 2025 U.S. App. LEXIS 11367 (Fed. Cir.) (May 12, 2025) ("*Hyundai HR*")). Yet, other applicable precedent from this court reinforces the conclusion that Commerce's decision in this case was contrary to law.

Specifically, just one month after affirming Commerce's benefit determination in *Hyundai HR*, the court evaluated Commerce's reasoning with respect to the ***exact same program and the exact same respondent*** in the CVD administrative review of corrosion-resistant steel from Korea,

*Hyundai Steel v. United States* ("*Hyundai CORE*") – and reached the exact opposite conclusion. *See* 658 F. Supp. 3d at 1336.

In the review underlying *Hyundai CORE*, Commerce again considered the fees collected by Hyundai to constitute revenue foregone by the GOK and determined that the benefit was "the berthing income and the harbor facility usage fees that Hyundai Steel reported . . . ." *Id.* at 1333-34. As the court recognized, however, under the same port-usage program raised in *Hyundai HR*, Hyundai incurred significant expenses by building "a wharf at North Incheon Harbor between 2003 and 2006" and, under "normal market conditions, private companies don't gratuitously build government-owned infrastructure . . . ." *Id.* at 1336.

In the administrative review underlying *Hyundai CORE*, and similar to the facts of this case, "Commerce determined that it was not required to consider Hyundai's costs in constructing the port facilities to determine whether the company received a benefit and refused to consider whether the company's port-usage rights accurately reflected the costs of constructing the facility." *Id.* The court concluded that Commerce's approach contravened the statute, relying on the definition discussed above in **Section IV.C.2** and included again below:

> The plain and obvious import of the statute is that a countervailable "benefit" "normally" requires, well, "a *benefit* to the recipient." 19 U.S.C. § 1677(5)(E) (emphasis added). A benefit is an "advantage, profit, good." Oxford English Dictionary (online edition). If there's no advantage, profit, or good to the recipient from the government program at issue, then there's no countervailable benefit for purposes of the statute, unless an applicable exception applies (and the government makes no such contention here) . . . .

> In {refusing to consider Hyundai's costs to determine whether the company received a benefit}, ***the Department erred as a matter of law***. If, as Hyundai contends, the value of its port-usage rights did not exceed its construction costs, then the company received no "advantage, profit, or good," and thus no countervailable benefit. The court accordingly remands for the Department to make that determination.

*Id.* at 1335-36 (internal brackets omitted, italics original, bold italics added). Although the court found in *Hyundai CORE* that Hyundai received no benefit at all, the principle nevertheless applies: In the context of rental or port revenue, Commerce must consider the costs to the respondent in order to determine its profit, so that Commerce assesses the degree to which the respondent actually benefits from the financial contribution.

On remand in *Hyundai CORE*, Commerce still found a benefit (albeit a significantly smaller one). *See Hyundai Steel Co. v. United States,* Court No. 21-00304, Slip Op. 23-142 (CIT September 26, 2023) Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results of Redetermination Pursuant to Court Remand (Jan. 24, 2024) (Case No. 1:21-cv-00304-MMB ECF 57) at 4 (revising 0.01 subsidy rate to "less than 0.005 percent *ad valorem*"). The court upheld Commerce's remand determination, which no party appealed. *See generally* ECF Docket, Case No. 1:21-cv-00304-MMB.

Put simply, the Court's holding in *Hyundai CORE*, consistent with the definition of "benefit" as synonymous to "profit" in the context of a financial contribution involving rental or port income forgone, recognizes that any benefit determination requires Commerce to consider the actual, economic benefit and, consequently, to account for the cost or burden incurred by the recipient in the process, or as a consequence, of receiving the benefit.

This same logic underlay the Court's decision in *Gov't of Sri Lanka*. In the countervailing duty investigation at issue in that case, Commerce concluded that the Guaranteed Price Scheme for Rubber ("GPS") maintained by Plaintiff Government of Sri Lanka ("GSL") was a countervailable subsidy. 308 F. Supp. 3d at 1375. Under the GPS, the "GSL would set an above-market 'guaranteed price' for rubber smallholders, calculate a 'market price' to be paid by purchasers, and assume responsibility for paying the difference between the 'guaranteed price' and

the 'market price.'" *Id.* at 1379. In relevant part, respondent Camso was required to seek reimbursement payments from the GSL, the total amount of which Commerce concluded "were 'a financial contribution in the form of a direct transfer of funds and a benefit. . . .'" *Id.* at 1380. As the Court explained, however, because Camso "would have to wait until the administrative process is concluded to obtain its reimbursement, . . . . Camso was effectively providing interest-free loans to GSL. This was to Camso's <u>detriment</u>, rather than its benefit." *Id.* at 1380, 1382 (emphasis original). The Court's conclusion in *Gov't of Sri Lanka* further underscores that the issue of whether a respondent incurs some cost or detriment is relevant to Commerce's ultimate determination of benefit.

In short, the statute, regulation, and interpretive guidance make clear that "benefit" in the context of a financial contribution involving rental or port income forgone is synonymous with "profit" and that, in refusing to account for QatarEnergy's expenses when determining the benefit conferred on QatarEnergy through the land-use program, Commerce violated the statute. Moreover, despite its citation to a single case in the *Final CVD Determination*, Commerce's reasoning is undermined by other, more relevant precedent from this court. This Court should therefore find that Commerce's staunch refusal to account for QatarEnergy's significant expenses from its benefit determination was contrary to law.

## V.    CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiffs respectfully request that the Court:

1)    Enter judgment in favor of Plaintiffs;

2)    Hold and declare that Commerce abused its discretion by rejecting the QAFCO Electricity & Water Reconciliation; that Commerce's selection of a 16% "subsidy rate" as AFA for purchases of electricity and water was unsupported

by substantial evidence and otherwise not in accordance with law; and that Commerce's refusal to account for QatarEnergy's expenses when determining benefit for the provision of land rights was contrary to law;

3)    Remand this matter to Commerce to reconsider the *Final CVD Determination*, and to issue a revised final determination in conformity with the Court's decision; and

4)    Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

WHITE AND CASE LLP

  /s/ Jay C. Campbell
Jay C. Campbell
Richard G. King
Ron Kendler
C. Alejandro Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Qatar Melamine Company (a Qatari Private Shareholding Company) and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.)

Date: September 3, 2025

CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for Hyundai's Rule 56.2 Brief, as computed by the White & Case word processing system (Microsoft Word 2016) is 13,201.

    /s/ Jay C. Campbell
Jay C. Campbell
