IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| QATAR MELAMINE COMPANY, (A QATARI PRIVATE SHAREHOLDING COMPANY) et al,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>CORNERSTONE CHEMICCAL COMPANY. | NON-CONFIDENTIAL VERSION<br>Court No. 25-00053<br><br>Business Proprietary Information has been deleted from Pages 19, 30, and 31 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

<div style="margin-left:40%">

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

</div>

OF COUNSEL

SHANNI ALON
Attorney
Office of the Chief Counsel for Trade
    Enforcement & Compliance
U.S. Department of Commerce

<div style="margin-left:40%">

KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

*Attorneys for the United States*

</div>

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT PURSUANT TO RULE 56.2 ........................................................................ 1

     I.      The Administrative Determination Under Review ................................................. 1

     II.    Issues Presented for Review ................................................................................ 2

STATEMENT OF FACTS .............................................................................................. 2

     I.      Initiation of Investigation and Questionnaires ...................................................... 2

     II.    Preliminary Determination ................................................................................... 4

     III.   Post-Preliminary Analysis .................................................................................. 4

     IV.   Provision of Electricity for LTAR ....................................................................... 6

     V.    Provision of Water for LTAR .............................................................................. 7

     VI.   Provision of Management, Usage, and Usufruct Rights Over Industrial
             Areas ................................................................................................................. 9

     VII.  Verification ...................................................................................................... 11

     VIII. Final Determination .......................................................................................... 13

SUMMARY OF THE ARGUMENT ................................................................................. 13

ARGUMENT ............................................................................................................... 15

     I.      Standard Of Review ......................................................................................... 15

     II.    Commerce Did Not Abuse Its Discretion When It Rejected Untimely
             Submitted New Factual Information Presented at Verification ............................ 16

     III.   Commerce's Selection of the Subsidy Rate as AFA for the Provisions of
             Electricity and Water for LTAR Is Supported by Substantial Evidence and
             Otherwise in Accordance with Law .................................................................. 25

     IV.   Commerce's Determination of Benefit for the Provision of Land Rights Is
             in Accordance with Law .................................................................................. 31

CONCLUSION ............................................................................................................ 37

TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Alloys, Inc. v. United States*,
    30 F.3d 1469 (Fed. Cir. 1994) ................................................................. 16

*Ass'n of Am. Sch. Paper Suppliers v. United States*,
    32 C.I.T. 1196 ................................................................................... 24

*BGH Edelstahl Siegen GmbH v. United States*,
    600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) ........................................... 32

*Bomont Indus. v. United States*,
    733 F. Supp. 1507 (Ct. Int'l Trade 1990) ...................................... 13, 16

*Citic Trading Co. v. United States*,
    27 C.I.T. 356 (2003) ........................................................................... 24

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ........................................................... 15

*Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
    44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ........................................... 16

*Consol. Edison Co. v. N.L.R.B.*,
    305 U.S. 197 (1938) ........................................................................... 15

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ........................................................................... 15

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ........................................................... 26

*Essar Steel Ltd. v. United States*,
    753 F.3d 1368 (Fed. Cir. 2014) ........................................................... 28

*Essar Steel, Ltd. v. United States*,
    395 F. Supp. 2d 1275 (Ct. Int'l Trade 2005) ....................................... 32

*F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) ........................................................... 26

*Fischer S.A. Comercio, Industria & Agricultura v. United States*,
    700 F. Supp. 2d 1364 (Ct Int'l Trade 2010) .................................... 21, 24

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ........................................................... 15

*Goodluck India Ltd. v. United States,*
   11 F.4th 1335 (Fed Cir. 2021) ........................................................................... passim

*Gov't of Quebec v. United States,*
   567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) ........................................................... 32

*Guizhou Tyre Co. v. United States,*
   523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ...................................................... 18, 25

*Hung Vuong Corp. v. United States,*
   483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ........................................................... 16

*Hyundai Steel Co. v. United States,*
   651 F.Supp.3d 1321 (Ct. Int'l Trade 2023) ............................................................. 35

*Linyi Chengen Imp. & Exp. Co., Ltd. v. United States,*
   433 F. Supp 3d 1278 (Ct. Int'l Trade 2020) ............................................................ 24

*Max Fortune Indus. Co. v. United States,*
   37 C.IT. 549 (2013) .................................................................................................... 22

*Micron Tech., Inc. v. United States,*
   117 F.3d 1386 (Fed. Cir. 1997) ................................................................................ 15

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) ........................................................................... 25, 26

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995) .................................................................................. 21

*PAM, S.p.A. v. United States,*
   582 F.3d 1336 (Fed. Cir. 2009) ................................................................................ 15

*Papierfabrik August Koehler SE v. United States,*
   843 F.3d 1373 (Fed. Cir. 2016) ................................................................................ 21

*Qingdao Sea-Line Trading Co., Ltd. v. United States,*
   766 F.3d 1378 (Fed. Cir. 2014) ................................................................................ 29

*Reiner Brach GmbH & Co. KG v. United States,*
   206 F. Supp. 2d 1323 (C.I.T. 2002) .......................................................................... 21

*Ticaret A.S. v. United States,*
   61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ............................................................. 16

*Timken U.S. Corp. v. United States,*
   434 F.3d 1345 (Fed. Cir. 2006) ................................................................................ 21

*TMK IPSCO v. United States*,
    179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ........................................................ 24

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ........................................................................................ 15

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
    435 U.S. 519 (1978) ........................................................................................ 16

*Yantai Timken Co., Ltd. v. United States*,
    521 F. Supp. 2d  (Ct. Int'l Trade 2007) ........................................................ 22

Statutes

19 U.S.C. 1677(5)(D)(ii) ............................................................................... 31, 34

19 U.S.C. § 1671d(e) ........................................................................................ 17

19 U.S.C. § 1677(5) ........................................................................................ 32

19 U.S.C. § 1677(5)(B) ........................................................................................ 8

19 U.S.C. § 1677(5)(C) ........................................................................................ 34

19 U.S.C. § 1677(5)(D) ........................................................................................ 32

19 U.S.C. § 1677(5)(E) ................................................................................... 32, 33

19 U.S.C. § 1677(6) ....................................................................................... 35, 36

19 U.S.C. § 1677e(a)(1)-(2) ................................................................................ 25

19 U.S.C. § 1677e(b)(1) ..................................................................................... 25

19 U.S.C. § 1677e(b)(1)(B) ................................................................................ 26

19 U.S.C. § 1677e(b)(2) ..................................................................................... 26

19 U.S.C. § 1677m(i)(1) ..................................................................................... 16

19 USC 1677e(d)(2) ........................................................................................... 27

28 U.S.C. § 2637(d) ........................................................................................... 29

Regulations

19 C.F.R. § 351.511 ........................................................................................... 33

19 CFR 351.503(c) ......................................................................................... 35, 36

<u>Other Authorities</u>

*Countervailing Duties: Final Rule*,
   63 Fed. Reg. 65, 348 (Dep't of Commerce Nov. 25, 1998) ..................................................... 33

*Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from
   the People's Republic of China: Final Determination of Sales at Less Than Fair Value*,
   75 Fed. Reg. 59,217 (September 27, 2010) ............................................................................. 17

*Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Affirmative
   Countervailing Duty Determination*,
   78 Fed. Reg. 50391 (Dep't of Commerce Aug. 19, 2013) ...................................................... 28

*Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination,*
   81 Fed. Reg. 3,104 (Dep't of Commerce Jan. 20, 2016) ......................................................... 29

*Laminated Woven Sacks from the Socialist Republic of Vietnam: Final Affirmative
   Countervailing Duty Determination*,
   84 Fed. Reg. 14,647 (Dep't of Commerce April 11, 2019) ..................................................... 29

*Melamine from Germany, India, Qatar, and Trinidad and Tobago: Initiation of Countervailing
   Duty Investigations*,
   89 Fed. Reg. 17,381 (Dep't of Commerce March 11, 2024) ..................................................... 2

*Final Affirmative Countervailing Duty Determination and Final Negative Critical
   Circumstances Determination*,
   89 Fed. Reg. 97,593 (Dep't of Commerce Dec. 9, 2024) .................................................... 1, 11

*Melamine from Qatar: Preliminary Affirmative Countervailing Duty Determination, Preliminary
   Negative Determination of Critical Circumstances, and Alignment of Final Determination
   with Final Antidumping Duty Determination*,
   89 Fed. Reg. 59,045 (Dep't of Co .......................................................................................... 3, 4

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) (QMC) and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) (Muntajat) (collectively QMC/Muntajat or plaintiffs).  Plaintiffs challenge certain aspects of the final determination of the U.S. Department of Commerce's (Commerce) investigation of melamine from Qatar.  Specifically, plaintiffs challenge Commerce's rejection of untimely new factual information provided for the first time on the fourth day of verification.  Therefore, Commerce applied facts available with an adverse inference (AFA).  Plaintiffs challenge Commerce's selection of the AFA rate.  Finally, plaintiffs challenge Commerce's determination of benefit for the provision of land.

Plaintiffs' claims are without merit.  Because Commerce's determination is otherwise in accordance with law, Commerce's determination should be sustained in all respects.  Accordingly, we respectfully request that the Court deny plaintiffs motion and enter judgment for the United States.

<div align="center">STATEMENT PURSUANT TO RULE 56.2</div>

I.    The Administrative Determination Under Review

Plaintiffs challenge *Melamine from Qatar: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination* 89 Fed. Reg. 97,593 (Dep't of Commerce Dec. 9, 2024) (P.R. 285), and accompanying Issues and Decision Memorandum (IDM) (P.R. 282).  The period of investigation (POI) is January 1, 2023, through December 31, 2023.

II.    Issues Presented for Review

1.    Whether Commerce's rejection of QMC's parent company's reconciliation of purchases of electricity and water was reasonable when Commerce determined that it was untimely submitted new factual information and not a minor correction presented on the fourth day of verification.

2.    Whether Commerce's selection of a 16 percent AFA subsidy rate for the provisions of electricity and water, combined, was supported by substantial evidence and otherwise in accordance with law.

3.    Whether Commerce's determination of benefit for the provision of land rights is in accordance with law when plaintiff was granted, free of charge, the right to manage and operate certain land and port areas in industrial cities including collecting rental and lease income.

<div align="center">STATEMENT OF FACTS</div>

I.    Initiation of Investigation and Questionnaires

On March 11, 2024, Commerce published the initiation of a countervailing duty (CVD) investigation on melamine from Qatar.  *See Melamine from Germany, India, Qatar, and Trinidad and Tobago: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 17,381 (Dep't of Commerce March 11, 2024) (*Initiation Notice*) (P.R. 56).  In the *Initiation Notice*, Commerce stated that it intended to examine all known producers/exporters of subject merchandise from Qatar; the petition identified two companies as producers/exporters, Qatar Melamine Company (QMC) and Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C (Muntajat).  *Initiation Notice*, 89 Fed. Reg. 17,384; *Melamine from Qatar: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Determination of Critical Circumstances, and Alignment of Final Determination with Final*

<div align="center">2</div>

*Antidumping Duty Determination*, 89 Fed. Reg. 59,045 (Dep't of Commerce July 22, 2024)

(*Preliminary Determination*) (P.R. 205), and accompanying Preliminary Decision Memorandum

(PDM) at 2 (P.R. 211).

      On March 19, 2024, Commerce issued the initial CVD questionnaire to the Government

of Qatar (GOQ) with instructions to forward the questionnaire to QMC and Muntajat. *See*

Commerce's Letter, "Countervailing Duty Questionnaire," dated March 19, 2024 (Initial

Questionnaire) (P.R. 60).  On April 5, 2024, QMC and Muntajat (collectively, QMC/Muntajat)

submitted a single affiliation response to Commerce's questions for both companies. *See*

QMC/Muntajat's Letter, "Affiliated Companies Response," dated April 5, 2024 (Affiliation

Response) (C.R. 44/P.R. 68).  QMC/Muntajat is cross-owned with Industries Qatar, QAFCO,

and QatarEnergy. *See* PDM at 2 (citing QMC/Muntajat's Letter, "Response to the General

Questions and Program-Specific Portions of Section III of the CVD Questionnaire," dated May

10, 2024).  On May 14, 2024, Commerce received the first part of the GOQ's initial

questionnaire response and the remainder of the response on May 16, 2024. *See* GOQ's Letter,

"Government of the State of Qatar General Questions Response," dated May 14, 2024 (GOQ

IQR) (P.R94); GOQ's Letter, "Response to Subsections II.A. and II.C. (Natural Gas) from

Section II of the CVD Questionnaire," dated May 16, 2024 (GOQ IQR part 2) (P.R. 129).  On

June 27, 2024, Commerce received timely responses from QMC/Muntajat and its cross-owned

companies to Commerce's supplemental questionnaire. *See* QMC/Muntajat's Letter, "Response

to Section III Supplemental Questionnaire," dated June 27, 2024 (QMC/Muntajat SQR) (P.R.

167).  On June 17, 2024, the petitioner and QMC/Muntajat filed factual information in response

to Commerce's request for benchmarks. *See* Petitioner's Letter, "Petitioner's Benchmark

Submission," dated June 17, 2024 (P.R. 145); *see also* QMC/Muntajat's Letter, "Benchmark

Submission," dated June 17, 2024 (P.R. 150).  On June 12, 2024, the petitioner submitted a new

subsidy allegation.  *See* Petitioner's Letter, "Petitioner's New Subsidy Allegations," dated June

12, 2024 (Petitioner's NSA) (P.R. 140).

II.     Preliminary Determination

On July 22, 2024, Commerce published the preliminary determination.  *See Melamine*

*from Qatar: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative*

*Determination of Critical Circumstances, and Alignment of Final Determination with Final*

*Antidumping Duty Determination*, 89 Fed. Reg. 59,045 (Dep't of Commerce July 22, 2024)

(*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

Commerce preliminarily determined that countervailable subsidies were being provided to

producers and exporters of melamine from Qatar.  *Id.*

In the *Preliminary Determination*, Commerce initiated on the petitioner's new subsidy

allegation regarding the provision of land for less than adequate remuneration (LTAR).  *Id.*

Commerce stated that it required additional information to determine whether the provision of

electricity for LTAR and provision of water for LTAR programs are countervailable.  PDM at 7;

14.

III.    Post-Preliminary Analysis

On July 22, 2024, and August 23, 2024, Commerce issued post-preliminary supplemental

questionnaires to QMC/Muntajat and the GOQ.  *See* Commerce's Letters, "Post-Preliminary

Supplemental Questionnaire," dated July 22, 2024 (Post-Preliminary Supplemental

Questionnaires) (P.R. 268); and "Second Post-Preliminary Supplemental Questionnaire," dated

August 23, 2024 (P.R. 292).  Commerce received timely responses to these questionnaires.

From August 7, 2024, through September 3, 2024, QMC/Muntajat and the GOQ timely

responded to Commerce's post-preliminary supplemental questionnaires. *See* QMC/Muntajat's

Letter, "Response to the Post-Preliminary Supplemental Questionnaire," dated August 7, 2024

(QMC/Muntajat's Post-Preliminary SQR) (P.R. 235); *see also* GOQ's Letter, "Response to the

Post-Preliminary Supplemental Questionnaire," dated August 7, 2024 (GOQ's Post-Preliminary

SQR) (P.R. 230); QMC/Muntajat's Letter, "Response to Certain Questions in the Second Post-

Preliminary Supplemental Questionnaire," dated August 30, 2024 (QMC/Muntajat Second Post-

Preliminary SQR Part 1) (P.R. 244); and QMC/Muntajat's Letter, "Reconciliations in Response

to the Second Post-Preliminary Supplemental Questionnaire," dated September 3, 2024 (GOQ's

Second Post-Preliminary SQR Part 2) (P.R. 245).  On July 23, 2024, Commerce requested

information regarding benchmarks for the alleged land for LTAR subsidy on which Commerce

initiated.  *See* Memorandum, "Deadline for Submitting Benchmark Data for Provision of Land

for LTAR," dated July 23, 2024 (P.R. 216).  On August 5, 2024, the petitioner and

QMC/Muntajat filed factual information in response to Commerce's request for benchmarks

concerning the alleged subsidy of provision of land for LTAR.  *See* QMC/Muntajat's Letter,

"Land Benchmark," dated August 5, 2024 (QMC/Muntajat's Land Benchmark Submission)

(P.R. 227); *see also* Petitioner's Letter, "Petitioner's Land for LTAR Benchmark Submission,"

(Petitioner's Land Benchmark Submission) (P.R. 228).

   On September 12, 2024, Commerce issued its Post-Preliminary Analysis Memorandum.

"Post-Preliminary Analysis Memorandum for the Countervailing Duty Investigation of

Melamine from Qatar," dated September 12, 2024 (Post-Prelim) (P.R. 248).  Commerce

preliminarily determined that countervailable subsidies are being provided to producers and

exporters of melamine from Qatar with respect to the provision of electricity for LTAR,

provision of water for LTAR, and provision of management, usage, and usufruct rights over industrial areas.  *Id.*

IV.    Provision of Electricity for LTAR

The provision of electricity is regulated and controlled by the GOQ, through Qatar General Electricity and Water Corporation (Kahramaa), which is an authority of the GOQ.  Post-Prelim at 5.  Kahramaa charges standard rates for electricity for different categories of users, for example, residential, commercial, industrial (bulk or light), and governmental rates applicable to consumers in Qatar (the "current tariff" rates).  Post-Prelim at 5.  The rates to final customers are determined and approved by Kahramaa's President, then they are sent to the Minister of State for Energy Affairs.  *Id.*  They can only be implemented by a decision of the Council of Ministers based on the proposal from the Minister of State for Energy Affairs.  Post-Prelim at 5.  QMC reported that it purchased electricity from its parent company, QAFCO.  Post-Prelim at 5.  QAFCO reported that it purchased electricity exclusively from Kahramaa and paid the electricity rate from Kahramaa's rate schedule for bulk industries.  QatarEnergy reported that it purchased electricity from Kahramaa in four categories:  bulk industrial, light industrial, commercial and residential.  Post-Prelim at 5.  "Bulk industries," according to Law No. 4 of 2018 on the Regulation of Electricity and Water Supply, is defined as those customers whose demand exceeds five megawatts of electricity per day.  Post-Prelim at 5.  The GOQ explained that in Qatar, electricity is produced by independent companies, in which GOQ has ownership interest, and purchased and distributed by Kahramaa.  Post-Prelim at 5.  Kahramaa was established by Amiri Decree No. (46) of 2015 with the objective to "achieve the highest performance rates in the provision and distribution of electricity and potable water, ensuring the permanent and regular supply of the country's needs in these resources."  Post-Prelim at 5.  Additionally,

Kahramaa's goals and objectives are guided by Qatar's National Vision 2030 and Qatar's National Development Strategy (2024-2030). Post-Prelim at 5.

Commerce determined that the GOQ's provision of electricity at the current tariff rate constitutes a financial contribution in the form of a provision of a good. Post-Prelim at 5-6, unchanged in *Final Determination*. Commerce determined that the GOQ's provision of electricity at the bulk and light industries current tariff rates is *de jure* specific because the bulk industries rate is expressly limited to industrial consumers in Qatar whose consumption exceeds five megawatts of electricity per day and the light industries rate is expressly limited to industrial consumers in Qatar whose consumption is less than five megawatts of electricity per day and subject to approval of the Ministry of Commerce and Industry and inspection Kahramaa. Post-Prelim at 5-6, unchanged in *Final Determination*. Commerce determined the GOQ's provision of electricity at the commercial tariff rates is *de facto* specific because QatarEnergy and cross-owned subsidiary QAFCO are predominant users of the commercial tariff rate. Post-Prelim at 5-6, unchanged in *Final Determination*.

V.    Provision of Water for LTAR

The provision of water is regulated and controlled by the GOQ, through Kahramaa. Post-Prelim at 7-8. The GOQ explained that in Qatar, water is produced by companies in which the GOQ has an ownership interest, and it is purchased and distributed by Kahramaa. *Id.* Kahramaa charges standard rates for water for different categories of users, for example, residential, commercial, industrial (bulk or light), and governmental rates applicable to consumers in Qatar (the "current tariff" rates). Post-Prelim at 7-8. The rates to final customers are determined and approved by Kahramaa's President, then they are sent to the Minister of State for Energy Affairs. *Id.* They can only be implemented by a decision of the Council of Ministers based on the

proposal from the Minister of State for Energy Affairs.  Post-Prelim at 7-8.  QMC reported that it purchased water from its parent company, QAFCO.  Post-Prelim at 7-8.  QAFCO reported that it purchased water exclusively from Kahramaa.  Post-Prelim at 7-8.  QAFCO reported that it paid the commercial and the bulk industries rate.  Post-Prelim at 7-8.  QatarEnergy reported that it purchased electricity from Kahramaa in four categories:  bulk industrial, light industrial, commercial, and residential.  "Bulk Industries," according to Law No. 4 of 2018 on the Regulation of Electricity and Water Supply, is defined as customers whose demand exceeds 600 cubic meters of water per day.  Post-Prelim at 7-8.

Commerce determined that Kahramaa is an authority pursuant to 19 U.S.C. § 1677(5)(B). Post-Prelim at 8, unchanged in *Final Determination*.  Commerce determined the GOQ's provision of water at the current tariff rates constitutes a financial contribution in form of a provision of a good.  Additionally, Commerce determined the GOQ's provision of water at the light and bulk industries current tariff rates is *de jure* specific because the bulk industries rate is expressly limited to industrial consumers in Qatar whose consumption exceeds 600 cubic meters per day and the light industries rate is expressly limited to industrial consumers in Qatar whose consumption is less than 600 cubic meters per day and subject to approval of the Ministry of Commerce and Industry and inspection by Kahramaa.  Post-Prelim at 8, unchanged in *Final Determination*.  Commerce determined the GOQ's provision of water at the commercial tariff rates is *de facto* specific because QatarEnergy and cross-owned subsidiary QAFCO are predominant users of the commercial tariff rate.  Post-Prelim at 8, unchanged in *Final Determination*.

VI.    <u>Provision of Management, Usage, and Usufruct Rights Over Industrial Areas</u>

The GOQ granted QatarEnergy usufruct (that is, land use and management rights) over the Mesaieed Industrial City (MIC), Ras Laffan Industrial City (Ras Laffan), and Dukhan Concession Area (DCA) through issuing Decree No. 59 of 1989 (the MIC Decree), Decree No. 35 of 1994 (the Ras Laffan Decree), and Decree No. 55 of 1995 (the DCA Decree), respectively. Post-Prelim at 9.  The Mesaieed port is part of the MIC land granted to QatarEnergy by the GOQ, and the Ras Laffan port is part of the Ras Laffan land granted to QatarEnergy by the GOQ.  The GOQ affirmed QatarEnergy's rights over these port areas with the Council of Ministers' Resolution No. (19) of 2002 (the Ports' Resolution).  Post Prelim at 9.

The Council of Ministers' Decision No. (10) of 1989 (the MIC Ministers' Decision) describes the usufruct terms of the MIC Decree.  Post-Prelim at 9.  The MIC Ministers' Decision grants QatarEnergy the right to "use, utilize, and manage" land within the MIC and gives Qatar Energy all rights over the land, "except having absolute discretion."  Post-Prelim at 9. Furthermore, QatarEnergy maintains these rights over the MIC until the company is canceled by law.  Post-Prelim at 9-10.  The MIC Ministers' Decision states that the MIC lands are the private property of the State of Qatar and QatarEnergy has no right to transfer ownership of the lands. Article 4 of the MIC Ministers' Decision lists the obligations of QatarEnergy as the "usufructuary" of the MIC lands. QatarEnergy is "committed to the use, utilization, and management of lands" in the MIC.  Post-Prelim at 10.

Similarly, the Council of Ministers' Decision No. (9) of 1994 (the Ras Laffan Ministers' Decision) describes the usufruct terms of the Ras Laffan Decree.  Post-Prelim at 10.  The Ras Laffan Ministers' Decision grants QatarEnergy the right to use and to utilize the Ras Laffan "lands, berths and facilities" granted by the GOQ.  Post-Prelim at 10.  QatarEnergy maintains

land rights over Ras Laffan for the terms of its existence as a company, and Qatar Energy may not permanently relinquish these land rights to others.  Article 3 of the Ras Laffan Ministers' Decision states that the utilization of the Ras Laffan lands and facilities is "an instrument" for QatarEnergy.  Post-Prelim at 10.

As with the MIC and Ras Laffan areas, the DCA Decree grants QatarEnergy the right to "use, exploit, and manage the lands and facilities" in the DCA.  Post-Prelim at 10. QatarEnergy's term of land rights over the DCA is determined by its duration as a company, and QatarEnergy may not "dispose" of the land in any way.  Post-Prelim at 10.  Furthermore, the DCA Decree states that the DCA is "{s}tate-owned private property."  Post-Prelim at 10.

Under the Ports' Resolution, the GOQ assigned the management and supervision of the Mesaieed port and the Ras Laffan port to QatarEnergy.  Post-Prelim at 10.  The Mesaieed port is part of the land granted in the MIC to Qatar Energy.  Post-Prelim at 10.  The Ras Laffan port is part of the land granted in Ras Laffan to Qatar Energy.  Post-Prelim at 10.  The Ports' Resolution gives QatarEnergy the ability to carry out port services including pilotage, towing, mooring work, organizing movement of ships, loading goods, unloading goods, and storing goods.  Post-Prelim at 10.  The resolution allows QatarEnergy to determine and to collect fees for the services it provides at these ports.  Post-Prelim at 10.

Commerce determined this program provides a financial contribution in the form of revenue forgone, pursuant to 19 U.S.C. § 1677(5)(D)(ii), because the GOQ's granting of usufruct rights to QatarEnergy includes the right to collect land lease and port income from these areas, which would otherwise have been collected by the GOQ absent the delegation of these rights to QatarEnergy by decree.  Post-Prelim at 11, unchanged in *Final Determination*. Additionally, Commerce determined the program to be *de jure* specific because these usufruct

rights were granted by law solely to QatarEnergy. Post-Prelim at 11, unchanged in *Final Determination*.

VII.    <u>Verification</u>

Between September 15 and September 26, 2024, Commerce conducted verification of the GOQ and QMC/Muntajat and their cross-owned affiliates to verify the information relied upon in making its final determination. *Melamine from Qatar: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination* 89 Fed. Reg. 97,593 (Dep't of Commerce Dec. 9, 2024) (P.R. 285), and accompanying Issues and Decision Memorandum (IDM) at 2 (P.R. 282). On the fourth day of verification, QAFCO stated that although in its questionnaire responses it had reported that it consumed water in only the commercial and bulk industrial tariff categories, it had also consumed water in the residential and a specific industrial tariff category that is more preferential than other rates. IDM at 5. Additionally, QAFCO stated that it had additional unreported consumption in the commercial tariff category. IDM at 5. For electricity, QAFCO had reported in its questionnaire responses that it consumed electricity only in the commercial tariff category. IDM at 5. However, at verification, QAFCO stated that it had also consumed electricity in the residential and commercial tariff categories. IDM at 5. QAFCO prepared an exhibit showing its reported data and unreported data, which Commerce declined to accept because it contained untimely submitted new factual information. IDM at 5.

At verification, QAFCO officials stated that they misreported its consumption data because they had confused the CVD reporting methodology with the antidumping methodology and had reported only water and consumption data from its production facilities and not its total consumption. IDM at 7. That is inconsistent with other statements made by QAFCO officials

during verification.  IDM at 7.  Specifically, QAFCO officials stated that QAFCO did not report consumption from one water meter located in a production plant, which is subject to the most preferential subsidized industrial rate.  IDM at 7.  Although QAFCO officials tried to distinguish this meter as not used for production in its production plant, officials then contradicted themselves by stating that this was the only water meter in the production plant; therefore, Commerce reasonably concluded that it must have been used in the production process.  IDM at 7.  Moreover, Commerce's initial questionnaire provides reporting instructions to company officials, and company officials did not contact Commerce with questions about QAFCO's reporting.  IDM at 7.

The verification agenda sent to QMC/Muntajat prior to verification clearly stated, "{p}lease note that verification is not intended to be an opportunity for the submission of new factual information."  *See* Commerce's Letter, "Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C Questionnaire Responses," dated September 12, 2024 (Verification Agenda) (P.R. 247) at 2.  The agenda further states that, "{i}nformation will be accepted at verification only when the information makes minor corrections to information already on the record or when information is requested by the verifiers, in accordance with the agenda below, to corroborate, support, and clarify factual information already on the record."  *Id.*  Further, section A of the agenda, titled "Corrections to Response," clarifies that "{i}f you identified errors in the responses while preparing for verification, please provide the following at the outset of verification:  (1) A list of the errors; (2) Original documentation to show the corrections; and (3) A chart that shows the magnitude of changes to quantitative data."  *Id.* at 6.  The agenda further states that "{t}he verifiers will examine the errors to determine if they are minor" and "depending on the nature of

the errors that you identify (*e.g.*, discovery of unreported loans), you should contact the officials in charge prior to the start of verification." *Id.* QMC/Muntajat did not attempt to present this previously unreported consumption data as a minor correction on the first day of verification, when Commerce would determine if newly presented data constituted a correction to information already on the record, or new factual information. IDM at 5. Additionally, Commerce did not request any new consumption data in its verification agenda. *See* Verification Agenda.

VIII.   <u>Final Determination</u>

On September 5, 2024 and November 13, 2024, the petitioner and QMC/Muntajat submitted case and rebuttal briefs. *See* Petitioner's Letter, "Petitioner's Case Brief," dated November 6, 2024 (Petitioner's Case Brief) (P.R. 264); QMC/Muntajat's Letter, "Case Brief Resubmission," dated November 12, 2024 (QMC/Muntajat's Case Brief) (P.R. 277); Petitioner's Letter, "Petitioner's Rebuttal Brief," dated November 13, 2024 (Petitioner's Rebuttal Brief) (P.R. 278); QMC/Muntajat's Letter, "Rebuttal Brief," dated November 13, 2024 (QMC/Muntajat's Rebuttal Brief (P.R. 279).

On December 9, 2024, Commerce published its final determination. *Final Determination*.   Commerce determined that countervailable subsidies were being provided to producers and exporters of melamine from Qatar. *Id*. Commerce applied facts available with an adverse inference and determined the water and electricity for LTAR programs are countervailable subsidies. IDM at Comment 4. Commerce determined the provision of management, usage, and usufruct rights over industrial areas is a countervailable subsidy. IDM at Comment 3.

<u>SUMMARY OF THE ARGUMENT</u>

Commerce's determination should be sustained in full. Verification tests information provided by a party for accuracy and completeness not an opportunity to provide new

information.  *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1509 (Ct. Int'l Trade 1990).

Commerce accepts minor corrections presented at the outset of verification that corroborate,

support, and clarify factual information already on the record.  *Goodluck India Ltd. v. United*

*States*, 11 F.4th 1335, 1342-43 (Fed Cir. 2021).  On the fourth day of verification, QAFCO

officials presented information regarding previously unreported purchases of electricity and

water.  Because the new consumption data presented constituted untimely submitted new factual

information and not a minor correction, Commerce reasonably did not accept the information.

This created a gap on the record.  Commerce applied facts available because the total accurate

consumption quantity and value of electricity and water that QAFCO consumed during the POI

is not on the record, which is necessary to calculate the benefit received.  Commerce determined

QMC/Muntajat withheld information that had been requested, significantly impeded the

investigation, and provided information that could not be verified.  Commerce determined

QAFCO did not act to the best of its ability to comply with Commerce's requests for

information; therefore, Commerce applied an adverse inference.

      In selecting the appropriate AFA rate to be applied, Commerce determined not to rely on

the AFA hierarchy in this investigation for selecting an AFA rate for the water and electricity for

LTAR programs.  Commerce deviated from the hierarchy because this is the first CVD

investigation of a product from Qatar and there are no similar programs, accordingly Commerce

determined to apply as an adverse inference that QMC/Muntajat benefitted at the highest tariff

category rate that QMC/Muntajat had reported using in Qatar General Electricity and Water

Corporation's (Kahramaa's) 2023 Annual Tariff Review Report.

      Commerce also determined that the provision of land rights provides a financial

contribution in the form of revenue forgone because the GOQ's granting of usufruct rights to

14

QatarEnergy included the right to collect the land lease and port income from these areas, which would otherwise have been collected by the GOQ absent the delegation of these rights to QatarEnergy by decree.  Commerce further determined that expenses incurred by QatarEnergy should not be subtracted from the gross benefit that QatarEnergy received in the form of rental income and port fees collected.

<div align="center">ARGUMENT</div>

I.    <u>Standard Of Review</u>

The Court sustains any determination, finding, or conclusion made by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law.  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)).  "Substantial evidence" means "more than a mere scintilla" of evidence and evidence that "a reasonable mind might accept as adequate to support a conclusion."  *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197 (1938)).

Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record."  *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

<div align="center">15</div>

II.    Commerce Did Not Abuse Its Discretion When It Rejected Untimely Submitted New
Factual Information Presented at Verification

Commerce's finding that the reconciliation exhibit that QAFCO provided on the fourth

day of verification was not a minor correction but rather untimely submitted new factual

information was not an abuse of discretion.

The statute requires that Commerce verify all information in reaching a final

determination.  19 U.S.C. § 1677m(i)(1).  Commerce has "broad discretion to fashion its own

rules of administrative procedure, including the authority to establish and enforce time limits

concerning the submission of written information and data."  *Coalition for the Preservation of*

*Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 237 (Ct. Int'l

Trade 1999) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense*

*Council, Inc.*, 435 U.S. 519, 544-45 (1978)); *see also Am. Alloys, Inc. v. United States*, 30 F.3d

1469, 1475 (Fed. Cir. 1994).  As Commerce explained in its verification agenda, verification is

not a forum for respondents to provide or for Commerce to accept or to collect new factual

information.  *See Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 61 F. Supp.

3d 1306, 1349 (Ct. Int'l Trade 2015); Verification Agenda at 2.  This practice comports with the

purpose of verification, which is to "test information provided by a party for accuracy and

completeness."  *Bomont Indus*, 733 F. Supp. at 1509; *see also Hung Vuong Corp. v. United*

*States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) ("{V}erification is not an opportunity

for a do-over; instead, the purpose of verification is to confirm information previously submitted

by a respondent in response to Commerce's requests for information.").

Minor corrections presented at the outset of verification are accepted to corroborate, to support, and to clarify factual information already on the record.  Verification Agenda at 2[1]; *see Goodluck India Ltd.*, 11 F.4th at 1342-43 (*Goodluck India*). The corrections accepted at verification typically include corrections of minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, and minor classification errors. *See, e.g., Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 59,217 (September 27, 2010), and accompanying IDM at Comment 10.  At verification, verifiers will examine the errors to determine whether they are minor.  Verification Agenda at 6.

Commerce has discretion to accept or to reject corrective information on a case-by-case basis.  *Goodluck India*, 11 F.4th at 1342 (holding that Commerce acted within its discretion in rejecting Goodluck's revised submissions on the day of verification because substantial evidence supports Commerce's determination that Goodluck's revisions were not minor).  Commerce's discretion in establishing and enforcing its procedures, in particular the correction of clerical errors, is grounded in the trade statute, 19 U.S.C. § 1671d(e) ("The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued.").  The Court has held that respondents cannot, at verification, attempt to "fill gaps in the record caused by {respondent's} own failure to

---

[1] Section A of the agenda, "Corrections to Response," clarifies that "{i}f you identified errors in the responses while preparing for verification, please provide the following *at the outset* of verification:  (1) A list of the errors; (2) Original documentation to show the corrections; and (3) A chart that shows the magnitude of changes to quantitative data."  Verification Agenda at 6 (emphasis added).

respond fully to Commerce's questionnaires." *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021).

At verification, QAFCO attempted to fill gaps in the record. On the fourth day of verification, QAFCO officials presented documentation prepared to reconcile QAFCO's electricity usage reported in its questionnaire response to QAFCO's electricity usage in its accounting system and bills. Verification Report at 16. Additionally, QAFCO officials presented documentation prepared to reconcile QAFCO's water usage reported in its questionnaire response to QAFCO's water usage according to its accounting system and bills. Verification Report at 19. In its questionnaire responses, QAFCO did not report usage of commercial or residential tariff categories for electricity nor did QAFCO report usage of commercial or residential tariff categories for water. Verification Report at 17, 19. Commerce did not accept the new consumption data presented to verifiers at verification because Commerce determined that it "constituted untimely filed new factual information" and not a minor correction. IDM at 6 (citing Verification Report at 15-19). Given Commerce's discretion to establish and to enforce administrative deadlines, and the well-known fact that verification is not a fact-gathering exercise, Commerce's determination not to accept the proffered reconciliation exhibit is reasonable and not an abuse of discretion.

The information provided by QAFCO at verification did not "corroborate, support, {or} clarify factual information already on the record." Verification Agenda at 2. Instead, it presented new evidence, which Plaintiffs repeatedly admit is new and not previously on the record, that contradicted information already reported. Verification Report at 15-19; Pl. Br. at 14-15 (explaining that the information presented "included information regarding QAFCO's previously *unreported* purchases of electricity and water" (emphasis added) and claiming the

"omission" was an error in judgment). Prior to verification, the record contained information regarding energy consumption in only the bulk industrial category. Verification Report at 15. However, at verification, QAFCO officials, for the first time, reported that it had consumed electricity in the residential and commercial tariff categories. Verification Report at 15. Additionally, prior to verification, the record included information regarding QAFCO's water consumption in only the bulk industrial and commercial tariff categories. Verification Report at 18. At verification, QAFCO officials stated, for the first time, that QAFCO had also consumed water in the residential and [          ] industrial tariff categories and had unreported consumption in the commercial tariff category. Verification Report at 18. The information presented did not "corroborate, support, {or} clarify factual information already on the record" but rather was untimely submitted new factual information—specifically, new consumption categories and new consumption data. IDM at 5.

Plaintiffs try to excuse the presentation of new factual information at verification by explaining that they confused the CVD reporting methodology with the antidumping methodology and reported water and consumption data from only its production facilities and not its total consumption. *See* Pl. Br. at 14-15. However, that explanation is inconsistent with other statements made by QAFCO officials during verification. IDM at 7. Specifically, QAFCO officials stated that QAFCO did not report consumption from one water meter located in a production plant, which is subject to the most preferential subsidized industrial rate. IDM at 7. Although QAFCO officials tried to distinguish this meter as not used for production in its production plant, officials then contradicted themselves by stating that this was the only water meter in the production plant. IDM at 7. Moreover, Commerce's initial questionnaire provides reporting instructions to company officials, and company officials did not contact Commerce

with questions about QAFCO's reporting. *See* Commerce's Initial Questionnaire. Commerce requested electricity and water consumption data from QMC/Muntajat and their cross-owned companies on multiple occasions prior to verification. IDM at 5. QAFCO had the opportunity to submit accurate consumption data, or even to correct its data if necessary in response to Commerce's supplemental questionnaire, which it failed to do, unlike QatarEnergy who, in response to Commerce's supplemental questionnaire, revised its reporting for its water and electricity programs to include a new consumption category and revised consumption data. IDM at 5. Because the information is untimely submitted new factual information and not a minor correction, as conceded by plaintiffs, Commerce properly declined to accept the prepared exhibit at verification.

Moreover, QMC/Muntajat did not attempt to present this previously unreported consumption data as a minor correction on the first day of verification, when Commerce would have determined whether the newly presented data constituted a correction to information already on the record, or new factual information. Verification Agenda at 2; Verification Report 15-20. Commerce was not presented with the information until the fourth day of verification, when the appropriate time to present minor corrections is at the outset. As Commerce explained in Section A of the agenda, "Corrections to Response," "{i}f you identified errors in the responses while preparing for verification, please provide the following at the *outset of verification*: (1) A list of the errors; (2) Original documentation to show the corrections; and (3) A chart that shows the magnitude of changes to quantitative data." QMC/Muntajat Verification Agenda at 6 (emphasis added).

Plaintiffs also argue that Commerce requested the new information and thus it should be accepted. Pl. Br. at 15. However, Commerce did not request any new consumption data in its

verification agenda.  QMC/Muntajat's Verification Agenda at 9.  Commerce asked three questions each with respect to the provision of water and electricity LTAR programs:  "(1) Discuss the company's electricity/water usage and how payments are reflected in the accounting system; (2) Examine documentation for electricity/water payments made for two months of the POI, from invoice to payment receipt and then tie the payments to the accounting system: March and September 2023; and (3) Tie the company's reported electricity rates paid to the tariff rate schedule of the electricity supplier."  Verification Report at 9.  The exhibit that QAFCO presented at verification was an attempt to reconcile its previously unreported consumption data to its reported consumption data for the entire POI, which is not what Commerce requested. IDM at 29.  Thus, Commerce's determination to reject the information provided by QAFCO is an appropriate exercise of Commerce's discretion.

Plaintiffs argue that Commerce had time to verify the new information and actually did so and as such the information should have been accepted.  Pl. Br. 14-17.  Plaintiffs, relying on *Goodluck India*, correctly observe that Commerce can abuse its discretion by refusing to accept updated data when there is plenty of time for Commerce to verify or consider it; however, the Federal Circuit in *Goodluck India* stated this is true when the corrective information is presented at a preliminary stage when there are no finality concerns.  *Goodluck India*, 11 F.4th at 1343-44 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995); *Fischer S.A. Comercio, Industria & Agricultura v. United States*, 700 F. Supp. 2d 1364, 1370-71 (Ct Int'l Trade 2010); *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006); *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016)); *see also Reiner Brach GmbH & Co. KG v. United States*, 206 F. Supp. 2d 1323, 1334 (C.I.T. 2002) ("Commerce clearly cannot complete its own work unless it is able at some point to freeze the

record and make calculations and findings based on that fixed and certain body of information"
(internal quotation marks and citation omitted)).  The Court has repeatedly sustained
Commerce's determination when Commerce rejects new factual information submitted after the
applicable deadline recognizing that "{f}or Commerce to fulfill its mandate to administer the . . .
law . . . it must be permitted to enforce the time frame provided in its regulations."  *See e.g.,*
*Yantai Timken Co., Ltd. v. United States*, 521 F. Supp. 2d 1371 (Ct. Int'l Trade 2007).  The
Federal Circuit also states that "verification represents a point of no return." *Goodluck India*, 11
F.4th at 1343-44.

     In this case, Commerce had already issued its preliminary determination and post-
preliminary analysis prior to verification.  In its verification agenda, Commerce stated that it
would only accept minor corrections during verification that corroborate, support, and clarify
factual information already on the record to comport with the purpose of verification, which is to
test information provided by a party for accuracy and completeness.  It is undisputed that new
factual information was presented at verification after the preliminary stages of the investigation.
Because Commerce determined that the information was not a minor correction, Commerce
reasonably declined to accept the new information.  Despite plaintiffs' allegation that Commerce
verified the reconciliation because Commerce reviewed the exhibit presented, Commerce did not
verify the information but rather reviewed the document to determine whether the information
was a minor correction or untimely submitted new factual information.  IDM at 5.  Plaintiffs'
attempt to distinguish the facts in this case with the facts of *Max Fotune Indus. Co.*, when the
Court sustained Commerce's rejection at verification of new information that was offered on the
last hour of the last day of verification because Commerce did not have time to review and verify
the data.  *Max Fortune Indus. Co. v. United States*, 37 C.IT. 549, 551 (2013).  However, in this

investigation, unlike in *Max Fortune*, Commerce did review the information presented and based on that review Commerce properly determined that the information was untimely submitted new factual information. Additionally, the new information presented at verification concerned the consumption quantity and value of electricity and water that QAFCO consumed during the POI, IDM at 6, not a simple clerical error or straightforward mathematical adjustment. As found by the Federal Circuit, the untimely submission of corrective information at verification results in a tension between finality and correct result such that Commerce accepts corrective information at verification only for minor corrections to information already on the record when a minor correction would rectify errors in addition, subtraction, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like. *Goodluck India*, 11 F.4th at 1343-44. This practice "strikes an appropriate balance between finality and accuracy." *Goodluck India*, 11 F.4th at 1343-44. Because Commerce had already issued its preliminary determination and the exhibit presented for the first time on the fourth day of verification contained new factual information rather than information to corroborate, support, or clarify the record, Commerce properly declined to accept the exhibit.

Commerce's decision to accept or to reject corrective information is a fact-based inquiry. *Goodluck India*, 11 F.4th at 1343-44. Plaintiffs cite a litany of cases in an attempt to demonstrate that Commerce should have accepted the untimely submitted new factual information presented for the first time at verification that contradicted the information on the record. However, the cases that plaintiffs cite are inapposite because they determine whether Commerce abused its discretion when it did not accept new information to clarify, corroborate, or clarify information that had already been properly submitted on the record. The plaintiffs cite *Citic Trading*, when the Court remanded to Commerce for not accepting the new information

(list of companies that had shut down due to environmentally-objectionable equipment) that would corroborate, support or clarify the record (which demonstrated massive shutdowns had been ordered).  *See Citic Trading Co. v. United States*, 27 C.I.T. 356, 373 (2003).  Similarly, in *Association of American School Paper Suppliers* the Court found that Commerce correctly accepted Kejriwal's G&A analysis submission provided at verification because it is within Commerce's discretion to accept such information "when Commerce reasonably believes the information clarifies and corroborates previously submitted information."  *Ass'n of Am. Sch. Paper Suppliers v. United States*, 32 C.I.T. 1196, 1215-1217 (2008).  In *TMK IPSCO*, Commerce accepted factual information at verification that the sales respondent reported reflected not only its own sales but also the sales of all of its subsidiaries when Commerce ordinarily divides the subsidies received by a company only by the sales of that company unless the company that receives a subsidy is a holding or parent company.  *TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1354 (Ct. Int'l Trade 2016).  The Court held that plaintiff did not offer authority to support its position that Commerce should have not accepted the information.  *Id.* at 1355.  In *Linyi Chengen*, the Court remanded to Commerce for accepting only 2 pages of a 12-page document when the Court found that "the 12-page complete document should be construed instead as information corroborating, supporting, or clarifying information already on the record."  *Linyi Chengen Imp. & Exp. Co., Ltd. v. United States*, 433 F. Supp 3d 1278, 1284 (Ct. Int'l Trade 2020).  In contrast, in *Fischer*, the Court found that Commerce abused its discretion when it refused to allow respondent to correct a mistake in the conversion factor and also distinguished those facts from situations when a respondent attempts to "fill the gap."  *Fischer S.A. Comercio, Industria & Agricultura*, 700 F. Supp. 2d at 1377.  Contrary to plaintiffs' argument, the Court has held that respondents cannot, at verification, attempt to "fill gaps in the

record caused by {respondent's} own failure to respond fully to Commerce's questionnaires."
*Guizhou Tyre Co.*, 523 F. Supp. 3d at 1348.

Unlike the cases that plaintiffs rely on, the information presented at verification in this case contradicted the record. IDM at 5. It did not support, clarify, or corroborate the record. IDM at 5. Rather, on the fourth day of verification, plaintiffs attempted to fill a gap in the record. IDM at 5. The Court has been clear: Commerce does not abuse its discretion when it does not accept new factual information at verification that does not support, clarify, or corroborate the record. Accordingly, Commerce did not abuse its discretion in declining to accept the untimely proffered information at verification.

III.     Commerce's Selection of the Subsidy Rate as AFA for the Provisions of Electricity and Water for LTAR Is Supported by Substantial Evidence and Otherwise in Accordance with Law.

Commerce's application of facts available with an adverse inference for the provisions of electricity and water for LTAR is supported by substantial evidence and otherwise in accordance with law. Commerce shall use facts otherwise available to reach its final determination when "necessary information is not available on the record," a party "withholds information that has been requested," fails to provide the information timely or in the manner requested, "significantly impedes a proceeding," or provides information Commerce is unable to verify. 19 U.S.C. § 1677e(a)(1)-(2).

If Commerce finds that a respondent "failed to cooperate by not acting to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available. 19 U.S.C. § 1677e(b)(1). "While the {best of its ability} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp. v.*

*United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  An interested party fails to cooperate to "the best of its ability" when "it fails to put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp.*, 337 F.3d at 1382.  The "best of its ability" standard requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.  *Id.*

When applying AFA, Commerce may use any information on the record, including information in the petition, a final determination or a previous administrative review. 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)-(2). Commerce is "not required to determine, or make any adjustments to, a countervailable subsidy rate ... based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information."  19 U.S.C. § 1677e(b)(1)(B).  In applying AFA, Commerce seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose and to induce cooperation, which ensures that "the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1270-80 (Fed. Cir. 2012) (citing *F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (finding that "{t}he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation, not to impose punitive damages").

Commerce applied facts available with an adverse inference to determine the subsidy rate for QMC/Muntajat's consumption of water and electricity.  IDM at 3-7.  The total accurate consumption quantity and value of electricity and water that QAFCO consumed during the POI

is not on the record. IDM at 6. That information is necessary to calculate the benefit QAFCO received. QMC/Muntajat withheld information that Commerce requested, significantly impeded the investigation, and provided information that could not be verified. IDM at 7. Moreover, Commerce found that QAFCO did not act to the best of its ability to comply with requests for information thus making it necessary to apply an adverse inference. IDM at 7. QAFCO had multiple opportunities prior to verification to provide complete and accurate consumption data for electricity and water during the POI, yet it failed to do so. IDM at 7. QAFCO officials stated that they misreported its consumption data due to confusion between CVD and AD reporting methodologies but this is inconsistent with other statements indicating QAFCO did not report consumption from one water meter located in a production plant, which is subject to the most preferential subsidized industrial rate stating this meter was not used for production in its production plant and also stating this was the only water meter in the production plant. IDM at 7. Therefore, Commerce determined that QAFCO did not act to the best of its ability to comply with Commerce's requests for electricity and water consumption data and as such applied adverse inferences.

When selecting AFA rates, the statute provides that Commerce may use a countervailable subsidy rate determined for the same or a similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that Commerce considers reasonable to use, including the highest of such rates. 19 U.S.C. § 1677e(d)(2). When there are cooperating respondents, as in this investigation, Commerce will first determine if there is an identical program in the current investigation and use the highest calculated above zero rate (including *de minimis*) for the identical program. *See Certain Frozen Warmwater Shrimp from the People's Republic of China:*

*Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50391 (Dep't of Commerce Aug. 19, 2013) (*Shrimp from China*), and accompanying IDM at 13; *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014) (upholding "hierarchical methodology for selecting an AFA rate").

If no such rate exists, Commerce then determines whether there is a similar/comparable program (based on the treatment of the benefit) in any CVD proceeding involving the same country and apply the highest calculated above *de minimis* rate for the similar/comparable program. *Shrimp from China* IDM at 13-14. Finally, when no such rate is available, Commerce applies the highest calculated above *de minimis* rate from any non-company specific program in a CVD case involving the same country that the company's industry could conceivably use. *Id.*

In selecting the highest rate available in each step of Commerce's investigation AFA hierarchy, Commerce strikes a balance between inducement, industry relevancy, and program relevancy. *Id.* The statute anticipates a two-step process for determining an appropriate AFA rate in CVD cases: (1) Commerce may apply its hierarchy methodology; and (2) Commerce may apply the highest rate derived from this hierarchy to a respondent, should it choose to apply that hierarchy in the first place, unless, after an evaluation of the situation that resulted in the use of AFA, Commerce determines that the situation warrants a rate different than the rate derived from the hierarchy. IDM at 8.

Commerce's selection of an eight percent AFA program rate is supported by substantial evidence and in accordance with law. Although plaintiffs contend the rate selected bears no relation to the subsidy rate for the provision of electricity and water for LTAR, plaintiffs have waived and failed to exhaust this argument by failing to assert it before the agency. Consequently, any such argument is not properly before the Court and should not be considered.

*See* 28 U.S.C. § 2637(d); *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014) (refusing to consider arguments not presented in the party's case briefs to Commerce).  Even if the Court were to find that plaintiffs need not have exhausted these arguments, Commerce's determination is in accordance with law.

   Based on the information on the record of this proceeding and the uniqueness of the facts of this case, Commerce determined that it was not appropriate to use the CVD AFA hierarchy for the water and electricity for LTAR programs for QMC/Muntajat.  IDM at 11; *see Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination,* 81 Fed. Reg. 3,104 (Dep't of Commerce Jan. 20, 2016*)*, and accompanying IDM at 7-8 (when Commerce determined applying the AFA rate of the CVD hierarchy was not appropriate, and instead applied the highest combined standard income tax rate for corporations in Indonesia); *see also Laminated Woven Sacks from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 14,647 (Dep't of Commerce April 11, 2019), and accompanying IDM.  This investigation is the first CVD proceeding involving Qatar.  IDM at 11.  Unlike in an administrative review, in investigations, Commerce is beginning to develop an understanding of how the industry under investigation uses subsidies.  IDM at 10 note 51.  Additionally, in this case, Commerce has no prior understanding of the industry and no final calculated and verified rates for the industry.  *Id.*  Moreover, the electricity and water for LTAR programs at issue are the only programs for which Commerce calculated this type of benefit such that there are no identical or similar/comparable programs that are useable under steps one through three of the CVD AFA hierarchy.  IDM at 11; 19 C.F.R. § 351.308(j).  Following the hierarchy would result in applying the rate calculated for the corporate income tax exemptions programs under step four, 24.04 percent, for both electricity and water for LTAR programs.

IDM at 11; 19 C.F.R. § 351.308(j)(1)(iv).  Therefore, to determine the appropriate rate to apply as AFA, Commerce used a simple average of the projected utility rates for electricity and water to yield a combined utility rate.  IDM at 11.

With respect to the provision of electricity and water LTAR programs, which pertain to provision of a good at LTAR, Commerce applied an adverse inference that QMC/Muntajat consumed these utilities at the highest [          ] provided under a tariff category that QMC/Muntajat reported using,  the commercial rate, listed in Kahramaa's 2023 Annual Tariff Review Report, which Commerce considered to be the most accurate measure of the extent of subsidization on the record.  Memorandum, "Final Determination Calculations for Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.," dated December 2, 2024 ) (C.R. 372 / P.R. 283) (Final Calc Memo) at 3-4.  The total accurate consumption quantity and value of electricity and water that QAFCO consumed is not on the record, which is necessary information to calculate the benefit received.  IDM at 6. The deficiencies found with respect to QAFCO's usage of the provision of electricity and water programs undermine its submitted consumption data, which Commerce relies on for the analysis of the program and calculation of the benefit to the company and render this data unusable in this proceeding. IDM at 6.

Because this information is unusable, the only relevant information on the record is Kahramaa's 2023 Annual Tariff Review Report, which contains data on GOQ tariffs for water and electricity through Kahramaa.  IDM at 11.  The GOQ explained that the Qatar General Electricity and Water Corporation (Kahramaa) has a [              ] with the Qatari Ministry of Finance (MOF) under which the [                              ]                                        ].  Final Calc

Memo at 3.  The GOQ explained that the current tariff rate is the tariff rate Kahramaa actually

charges its customers and which Kahramaa publishes on its website.  Final Calc Memo at 3.  The

GOQ explained that the [███████████████████████████████████████████]

[████████████████████████████████████████████████]

[████████████████████████████████████]. Final Calc Memo at 3.  The GOQ

submitted its Annual Tariff Review Report for 2023, which includes [█████████] showing the

electricity and water [███████████] for each tariff category [██████████████████]

[█████████] tariff rate.  Final Calc Memo at 3.  Commerce considered these [█████████] the most

accurate measure of the extent of subsidization on the record to apply as AFA.  Final Calc Memo

at 3.  Therefore, Commerce applied an adverse inference that QMC/Muntajat consumed these

utilities at the highest [███████████] provided under a tariff category that QMC/Muntajat

reported using, the commercial rate, listed in Kahramaa's 2023 Annual Tariff Review Report.

Final Calc Memo at 3.  To prevent the release of business proprietary information, Commerce

used a simple average of the projected utility rates of electricity and water to yield a combined

utility rate, which is supported by substantial evidence and otherwise in accordance with law.

IDM at 11.

IV.    Commerce's Determination of Benefit for the Provision of Land Rights Is in Accordance
        with Law

        Commerce determined that the provision of land rights provides a financial contribution

in the form of revenue forgone because the GOQ's granting of usufruct rights to QatarEnergy

included the right to collect the land lease and port income from these areas, which would

otherwise have been collected by the GOQ absent the delegation of these rights to QatarEnergy

by decree.  19 U.S.C. 1677(5)(D)(ii); IDM at 22.  Commerce also determined that expenses

incurred by QatarEnergy should not be subtracted from the gross benefit that QatarEnergy

received in the form of rental income and port fees collected.  IDM 24-26.  These determinations are both in accordance with law.

A countervailable subsidy exists when a foreign governmental authority has provided a financial contribution to a recipient, a benefit is thereby conferred, and the subsidy is specific. 19 U.S.C. § 1677(5); *see also* Statement of Administrative Action accompanying Uruguay Round Trade Agreements Act, H.R. Doc. 103-316 (1994) (SAA).  In determining whether a subsidy is countervailable, Commerce looks to three specific elements:  financial contribution, specificity, and whether a benefit was conferred.  SAA at 925; 19 U.S.C. § 1677(5).

A financial contribution is defined as "(i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees, (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income, (iii) providing goods or service, other than general infrastructure, or (iv) purchasing goods."  19 U.S.C. § 1677(5)(D).  These categories are purposefully broad and non-exhaustive.  SAA at 927.

A government makes a financial contribution when it forgoes revenue that is otherwise due.  *See BGH Edelstahl Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1262 (Ct. Int'l Trade 2022) (citing 19 U.S.C. § 1677(5)(D)(ii)); *see also Gov't of Quebec v. United States*, 567 F. Supp. 3d 1273, 1278 (Ct. Int'l Trade 2022) (explaining that the statute defines financial contribution "not only as 'the direct transfer of funds' but also as 'foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income'"); *Essar Steel, Ltd. v. United States*, 395 F. Supp. 2d 1275, 1277 (Ct. Int'l Trade 2005).

The statute,  19 U.S.C. § 1677(5)(E), provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy:  "A benefit shall normally

be treated as conferred where there is a benefit to the recipient including - . . . (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate renumeration, and in the case where goods are purchased . . . for more than adequate remuneration." 19 U.S.C. § 1677(5)(E).  When goods or services are provided for "less than adequate remuneration," the adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country that is subject to the investigation or review.  *Id.* at § 1677(5)(E).  Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." *Id.*

Commerce's regulations explain how it evaluates adequacy of remuneration in particular circumstances.  *See* 19 C.F.R. § 351.511.  Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question."  *Id.* at § 351.511(a)(2)(i) (explaining tier 1 benchmark).  If market-prices are not available, Commerce "compar{es} the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  *Id.* at § 351.511(a)(2)(ii) (explaining tier 2 benchmark).  When a tier 2 benchmark is also unavailable, Commerce "measure{s} the adequacy of remuneration by assessing whether the government price is consistent with market principles."  *Id.* at § 351.511(a)(2)(iii) (explaining tier 3 benchmark).  In the preamble to its regulation, Commerce explains that a tier 3 benchmark analysis will examine "such factors as the government's price setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination."  *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65, 348 (Dep't of Commerce

Nov. 25, 1998) (*CVD Preamble*).  Commerce does not consider these tier 3 factors "in any hierarchy" and "may rely on one or more of these factors in any particular case."  *Id.* Additionally, Commerce examines whether a benefit has been conferred regardless of whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise, and does not need to consider the effect of the subsidy in determining whether it exists.  19 U.S.C. § 1677(5)(C).

QatarEnergy received management and usufruct rights over the industrial areas at no cost—QatarEnergy made no payment to the GOQ to maintain usufruct rights over the industrial cities and has the right to collect rental and lease income in its management of the industrial lands.  IDM at 23-24.  QatarEnergy's usufruct rights over the industrial cities do not extend to the right to sell or dispose of the land.  IDM at 23.  QatarEnergy's inability to sell, dispose of, and transfer control of these lands demonstrates that the GOQ ultimately owns and controls the land.  IDM at 23.  Although the GOQ has granted QatarEnergy management, usage, and usufruct rights over the industrial cities and ports for the company's benefit, the GOQ has not granted ownership of the industrial cities and ports to QatarEnergy.  IDM at 23.  QatarEnergy's rights over the land can be cancelled by law and the lands will be returned back to the State.  IDM at 23-24.  In fact, the GOQ reclaimed usufruct rights over the Ras Au Aboud port from QatarEnergy in 2016 when the GOQ required QatarEnergy to vacate the area.  IDM at 23-24.  If the GOQ were to dissolve QatarEnergy by decree, control of industrial cities would lie with the GOQ; therefore, it is not appropriate to categorize QatarEnergy's usufruct rights over the industrial cities akin to an outright grant of land.  IDM at 23-24.  The GOQ is providing at asset at no cost from which QatarEnergy derives income, revenue that the GOQ could have otherwise

collected; the GOQ therefore provided a financial contribution in the form of revenue forgone, one of the criteria to be considered under 19 U.S.C. § 1677(5)(D)(ii).

Additionally, Commerce lawfully determined that this program conferred a benefit in the amount of revenue that QatarEnergy collected from rental payments and port fees. *See Hyundai Steel Co. v. United States*, 651 F.Supp.3d 1321 (Ct. Int'l Trade 2023) ("The Court also concludes that Commerce reasonably determined that the Government of Korea's provision of rights under the Port of Incheon program, specifically the right to collect revenues from third parties using the port, conferred a benefit to Hyundai Steel."). In *Hyundai Steel*, Commerce declined to offset the benefit by any costs incurred in constructing the port, observing that the statute provides limited circumstances when Commerce is to offset a subsidy rate, which was not met. In this case, QatarEnergy's expenses in operating or maintaining the land and port areas at issue are not among the exhaustive list of offsets provided for under section 1677(6). Specifically, the statute states:

> NET COUNTERVAILABLE SUBSIDY. For the purposes of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of –
>
> (A) Any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
>
> (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
>
> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

19 U.S.C. § 1677(6).

Expenses analogous to QMC/Muntajat's costs are not included in this list of factors that Commerce is directed to consider in calculating the net countervailable subsidy. Moreover, pursuant to 19 C.F.R. § 351.503(c), in determining whether a benefit is conferred, Commerce is not required to consider the effect of the government action on the firm's performance, including its prices or output, or how the firm's behavior is otherwise altered. 19 C.F.R. § 351.503(c). "If there is a financial contribution and a firm pays less for an input than it otherwise would pay in the absence of the financial contribution (or received revenues beyond the amount it otherwise would earn), that is the end of the inquiry insofar as the benefit element is concerned." *CVD Preamble*, 63 Fed. Reg. at 65361. Moreover, the SAA states, "the {} definition of subsidy does not require that Commerce consider or analyze the effect (including whether there is any effect at all) of government action on the price or output of the class or kind of merchandise under investigation or review." Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act (URAA), H.R. Doc. 103-316, Vol. 1 (1994) (SAA) at 926. Despite plaintiffs argument that the benefit is equal to the profit, under the statute and the CVD regulations, the fact that plaintiffs may have incurred a cost is not a factor that Commerce must consider in determining the benefit conferred. *See* 19 U.S.C. § 1677(6); 19 C.F.R. § 351.503(c). As Commerce explains, QatarEnergy was granted, free of charge, the right to manage and to operate certain land and port areas in industrial cities, which included collecting rental and lease income, plainly for the company's own benefit. IDM at 26. Any costs it incurs as a result of its operations is distinct from the subsidy being provided by the GOQ and therefore immaterial to Commerce's analysis. IDM at 26. Commerce's decision not to subtract the costs that QatarEnergy incurred to develop the industrial areas in calculating the benefit for this program is, therefore, in accordance with law.

36

CONCLUSION

For the reasons above, we respectfully request this Court to deny plaintiff's motion for

judgment on the agency record and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL                              s/ Kristin E. Olson
                                        KRISTIN E. OLSON
SHANNI ALON                             Trial Attorney
Attorney                                U.S. Department of Justice
Office of the Chief Counsel for Trade   Civil Division
    Enforcement & Compliance            Commercial Litigation Branch
U.S. Department of Commerce             P.O. Box 480
                                        Ben Franklin Station
                                        Washington, D.C. 20044
                                        Tel: (202) 307-6299
                                        kristin.olson@usdoj.gov

February 2, 2026                        *Attorneys for the United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 14,000 word limitation authorized by the Court's Standard Chambers Procedures because the brief contains 10,734 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>s/ Kristin E. Olson</u>

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| QATAR MELAMINE COMPANY, (A QATARI PRIVATE SHAREHOLDING COMPANY) et al, | |
| Plaintiff, | |
| v. | CONFIDENTIAL VERSION<br>Court No. 25-00053 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| CORNERSTONE CHEMICCAL COMPANY. | |

<u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the agency record, defendant's response thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is denied, and it is further

ORDERED that judgment is entered in favor of the United States.

_____
Hon. Jane A. Restani, Judge

Dated: _____
New York, NY