UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| QATAR MELAMINE COMPANY, (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATAR PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.),<br><br>       Plaintiffs,<br>  v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>CORNERSTONE CHEMICAL COMPANY,<br><br>       Defendant-Intervenor. | Court No. 25-00053 |

## RESPONSE BRIEF OF DEFENDANT-INTERVENOR IN OPPOSITION TO PLANTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Stephen J. Orava
Patrick McLain
Kanzanira Thorington

KING & SPALDING, LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4706
(202) 626-2950

*Counsel to Cornerstone Chemical Company*

March 5, 2026

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT PURSUANT TO RULE 56.2 ..................................................... 1

    A.    The Administrative Determination Under Review ................................... 1

    B.    Issues of Law Presented .......................................................................... 1

III.  STATEMENT OF FACTS ................................................................................. 3

IV.   STANDARD OF REVIEW ................................................................................ 3

V.    ARGUMENT ..................................................................................................... 3

    A.    Commerce Acted Within Its Discretion In Rejecting Information
        Regarding Unreported Electricity And Water Purchases That Was
        Presented On The Fourth Day Of Verification ........................................ 3

    B.    The AFA Rate Commerce Selected For The Provision Of Electricity And
        Water For LTAR Is Supported By Substantial Evidence And Otherwise In
        Accordance With Law ............................................................................ 11

    C.    Commerce's Determination Of Benefit For The Provision Of Land Rights
        Is In Accordance With Law ................................................................... 14

VI.   CONCLUSION ................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Alloys, Inc. v. United States,*
   30 F.3d 1469 (Fed. Cir. 1994)......................................................................................4

*Fischer S.A. Comercio v. United States,*
   700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) ...............................................................9

*Fraserview Remanufacturing Inc. v. United States,*
   678 F. Supp. 3d 1371 (Ct. Int'l Trade 2024) .............................................................16

*Goodluck India Ltd. v. United States,*
   11 F.4th 1335 (Fed. Cir. 2021) ...........................................................................4, 5, 8

*Guizhou Tyre Co. v. United States,*
   523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ........................................................4, 7, 9

*Hyundai Steel Co. v. United States,*
   651 F.Supp.3d 1321 (Ct. Int'l Trade 2023) ...............................................................16

*Hyundai Steel Co. v. United States,*
   No. 2024-1100, 2025 WL 1367463 (Fed. Cir. May 12, 2025)...............................16

*Hyundai Steel Co. v. United States,*
   658 F. Supp. 3d 1331 (Ct. Int'l Trade 2023) .............................................................16

*Hyundai Steel Co. v. United States,*
   No. 21-304, ECF No. 60 (Ct. Int'l Trade Feb. 20, 2024) .........................................16

*Micron Tech., Inc. v. United States,*
   117 F.3d 1386 (Fed. Cir. 1997).................................................................................4

*Morex Ribbon Corp. v. United States,*
   253 F.Supp.3d 1378 (Ct. Int'l Trade 2017) ..............................................................11

*Mosaic Co. v. United States,*
   647 F. Supp. 3d 1358 (Ct. Int'l Trade 2023) ......................................................15, 16

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003)................................................................................10

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995)..................................................................................9

*Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .............................................................8

**Statutes**

19 U.S.C. § 1677(6) ...................................................................................................2, 15

19 U.S.C. § 1677e ..........................................................................................................10

19 U.S.C. § 1677e(b)(1) .................................................................................................10

19 U.S.C. § 1677e(d)(1)-(2) ...........................................................................................14

19 U.S.C. § 1677e(d)(1)(A) ............................................................................................12

19 U.S.C. § 1677e(d)(2) ..................................................................................................12

**Regulations**

19 C.F.R. § 351.308(j) ....................................................................................................12

**Rules**

Fed. Cir. R. 32.1(d) ........................................................................................................16

**Administrative Materials**

*Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty
    Determination*,
    81 Fed. Reg. 3,104 (Dep't of Commerce Jan. 20, 2016) ........................................12

*Hyundai Steel Co. v. United States*, Final Results of Redetermination Pursuant to
    Court Remand, No. 21-536, ECF No. 48-1 (Ct. Int'l Trade Apr. 10, 2023) ...........16

*Melamine From Germany, India, Qatar, and Trinidad and Tobago: Initiation of
    Countervailing Duty Investigations*,
    89 Fed. Reg. 17381 (Dep't of Commerce Mar. 11, 2024) ......................................12

*Melamine from Qatar: Final Affirmative Countervailing Duty Determination and
    Final Negative Critical Circumstances Determination*
    89 Fed. Reg. 97,593 (Dep't of Commerce Dec. 9, 2024) ...............................*passim*

*Regulations Improving and Strengthening the Enforcement of Trade Remedies
    Through the Administration of the Antidumping and Countervailing Duty
    Laws*,
    89 Fed. Reg. 20,766 (Dep't of Commerce Mar. 25, 2024) .....................................12

## I.    INTRODUCTION

Defendant-Intervenor Cornerstone Chemical Corporation ("Defendant-Intervenor") hereby submits this brief in opposition to claims raised by Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat") (collectively "QMC/Muntajat" or "Plaintiffs").  Br. of Pls. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (Sept. 3, 2025), ECF No. 32 ("Pls. Br.").

## II.    STATEMENT PURSUANT TO RULE 56.2

### A.    The Administrative Determination Under Review

The administrative determination under review is the final affirmative determination by the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of Melamine from Qatar, issued and published as *Melamine from Qatar: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination* 89 Fed. Reg. 97,593 (Dep't of Commerce Dec. 9, 2024) ("*Final Determination*") (P.R. 285), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 282).

### B.    Issues of Law Presented

#### 1.    Did Commerce reasonably exercise its discretion in rejecting new information that QMC/Muntajat presented on the fourth day of verification regarding previously unreported purchases of electricity and water?

Yes.  Commerce reasonably exercised its discretion when it rejected QMC/Muntajat's belated attempt at verification to provide complete reporting of its purchases under the electricity for less than adequate remuneration ("LTAR") and water for LTAR subsidy programs. QMC/Muntajat's proffered information (i) should have been reported in response to Commerce

questionnaires, as Plaintiffs admit, (ii) was not requested by Commerce at verification, (iii) was not proffered as a minor correction on the first day of verification and is not now expressly claimed by Plaintiffs to constitute a minor correction, and (iv) was only revealed to Commerce on the fourth day of verification. Commerce reasonably declined to accept QMC/Muntajat's improper attempt to fill a gap in the record that they created through their failure to timely provide information that Commerce requested.

> **2.      Is Commerce's selection of subsidy rates in applying adverse facts available ("AFA") for the provisions of electricity and water for LTAR supported by substantial evidence and otherwise in accordance with law?**

Yes. Plaintiffs wrongly accuse Commerce of departing from the statutory regime for selecting AFA rates. In fact, the agency departed from its administrative AFA hierarchy to account for the unique circumstances of this case and, in so doing, determined subsidy rates for the electricity and water programs that were significantly *lower* than the rates that would have resulted from application of the administrative hierarchy.

> **3.      Is Commerce's determination of benefit for the provision of land rights in accordance with law?**

Yes. The Government of Qatar ("GOQ") granted Plaintiffs, free of charge, the right to manage and operate certain land and port areas in industrial cities, including the right to collect rental and lease income. Commerce correctly calculated the benefit from the provision of land usufruct rights as the total amount of revenue collected from rental payments and port fees. Commerce properly declined to offset this revenue with QMC/Muntajat's development and management costs as such items are not included in the list of permissible benefit offsets provided at 19 U.S.C. § 1677(6).

Defendant-Intervenor generally agrees with the response brief of Defendant. *See generally* Def.'s Opp. to Pls.' Rule 56.2 Mot. for J. on the Agency R. (Feb. 2, 2026), ECF No.

41 ("Def. Br.").  For the reasons set forth therein and below, Plaintiffs' arguments lack merit,

and the *Final Determination* should be sustained.

### III.    STATEMENT OF FACTS

Cornerstone adopts and incorporates by reference the statement of facts as set forth in

Defendant's response brief.  Def. Br. at 2-13.

### IV.    STANDARD OF REVIEW

Cornerstone adopts and incorporates by reference the standard of review as set forth in

Defendant's response brief.  Def. Br. at 15.

### V.    ARGUMENT

#### A.    Commerce Acted Within Its Discretion In Rejecting Information Regarding Unreported Electricity And Water Purchases That Was Presented On The Fourth Day Of Verification

In the *Final Determination*, Commerce countervailed the GOQ's provision of electricity

for LTAR and its provision of water for LTAR, and the agency applied AFA in determining the

benefit for each program.  IDM at 13-14.  Commerce applied AFA because QMC/Muntajat

failed to timely report consumption of electricity and water under certain categories by Qatar

Fertiliser Company (P.S.C.) ("QAFCO"), despite having multiple "opportunities to submit

accurate consumption data, or even to correct its data if necessary in response to Commerce's

supplemental questionnaire . . ."  IDM at 5.  At verification, Commerce did not request new

consumption data, and QMC/Muntajat did not attempt to present the previously unreported

consumption of water and electricity as a minor correction on the first day of verification.  IDM

at 6.  Nevertheless, on the *fourth day of verification*, QAFCO presented Commerce officials with

the unreported consumption data.  IDM at 5.  Commerce rejected it as untimely new factual

information.  IDM at 6.

Plaintiffs claim that Commerce abused its discretion in rejecting the information regarding unreported purchases of electricity and water.  Pls. Br. at 11-21.  Plaintiffs concede that "Commerce retains discretion to determine how it will conduct verification," but they contend that the agency may not reject new information presented at verification where such information is necessary to correct, clarify, or corroborate record information and Commerce has sufficient time to review and verify the information.  Pls. Br. at 11.  As explained in further detail below, these arguments are without merit, and the Court should reject them.

"Verification represents a point of no return. The purpose of verification is 'to test information provided by a party for accuracy and completeness.'"  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)); *see also Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1350 (Ct. Int'l Trade 2021) ("The purpose of verification is to 'verify the accuracy and completeness of submitted factual information.'") (quoting 19 C.F.R. § 351.307(d)). Accordingly, "verification is not a forum for respondents to provide or for Commerce to accept or collect new factual information."  *Guizhou Tyre*, 523 F. Supp. 3d at 1350; *see also Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997).  Indeed, at the verification stage, "Commerce enjoys 'broad discretion' to promulgate and enforce its procedural rules."  *Goodluck India*, 11 F.4th at 1344 (quoting *Stupp Corp. v. United States*, 5 F.4th 1341, 1350-51 (Fed. Cir. 2021)); *see also Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("the statute gives Commerce wide latitude in its verification procedures"); *Micron*, 117 F.3d at 1396 ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures *ad hoc*").

Consistent with the broad discretion accorded to the agency, the Federal Circuit has endorsed Commerce's practice of accepting only "minor corrections" at verification – *i.e.*, corrective information that "rectifies 'minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, or minor classification errors.'" *Goodluck India*, 11 F.4th at 1339. As the Federal Circuit has held, "{t}his practice, as applied at verification, strikes an appropriate balance between finality and accuracy." *Id* at 1343. Here, QMC/Muntajat did not present the unreported consumption data as a purported minor correction on the first day of verification. IDM at 6. Rather, they attempted to add that data to the record during the fourth day of verification, as further discussed below. In contrast to the plaintiffs in many of the cases cited in the parties' briefs and discussed below, Plaintiffs do not expressly claim that the information presented to Commerce constitutes a minor correction that the agency inappropriately rejected for not being minor. Instead, Plaintiffs contend that the information at issue supposedly "corroborated record information and rectified an error in judgment," Pls. Br. at 14, while also attempting to minimize the significance of the unreported purchase volumes. *See, e.g.,* Pls. Br. at 17. These arguments fail.

In its verification agenda, Commerce did not request any new consumption data regarding electricity and water, and it did not ask for reconciliation documentation covering the entirety of the period of investigation. IDM at 6, 29. Rather, Commerce stated that it would examine documentation for electricity and water payments made in two months, March 2023 and September 2023, and then reconcile the payments to the accounting system. Commerce Letter, "Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C Questionnaire Responses," dated September 12, 2024, ("Verification Agenda") at 9 (P.R. 247) (stating, with respect to electricity, that the

Commerce verifiers will "{e}xamine documentation for electricity payments made for two months of the POI, from invoice to payment receipt and then tie the payments to the accounting system: March and September 2023"). These verification agenda items were included to verify both the accuracy and completeness of "the information provided" – *i.e.*, the information that QMC/Muntajat had already reported to Commerce. *Id*. at 4. On the fourth day of verification, QAFCO presented Commerce with an exhibit that "was an attempt to reconcile its previously unreported consumption data to its reported consumption data for the entire POI, which is not what Commerce requested." IDM at 29. In doing so, QAFCO revealed for the first time that it had consumption of electricity and water that was not reported in its questionnaire response. Memorandum, "Verification of the Questionnaire Responses of Qatar Melamine Company and Muntajat," dated October 30, 2024 ("Verification Report") at 15-19 (C.R. 355 / P.R. 260). Accordingly, Commerce rejected this information as untimely new factual information that was neither presented as a minor correction nor requested by the agency for purposes of verification. *Id*.; IDM at 29-30.

In its brief, QMC/Muntajat concedes that it failed to report the full universe of purchases of electricity and water prior to verification, as required. *See* Pls. Br. at 2, 13, 14-15, and 21. Notwithstanding its failure to provide Commerce with the requested information, Plaintiffs argue that Commerce should have accepted the new consumption data presented at verification because it constituted information "requested by the verifiers . . . to corroborate, support, and clarify factual information already on the record," as it supported and clarified the information already on the record regarding QAFCO's electricity and water purchases. Pls. Br. at 15. In the very same paragraph of their brief, however, Plaintiffs contend that respondents' failure to provide Commerce with information on the electricity and water purchases was a result of "QAFCO's misunderstanding of its reporting requirements," and that QAFCO "did not intend to omit record

information." Pls. Br. at 15. Therefore, Plaintiffs effectively concede that the information presented at verification neither corroborated nor supported the completeness of QAFCO's electricity and water usage. Rather, it was an attempt "to fill gaps in the record caused by {their} own failure to respond fully to Commerce's questionnaires." *Guizhou Tyre*, 523 F. Supp. 3d at 1348.

Plaintiffs also erroneously state that Commerce "examined *and* verified" the unreported purchases of electricity and water. Pls. Br. at 16. Commerce's verification report establishes that, once QMC/Muntajat revealed that it had previously unreported electricity and water purchases, Commerce declined to take this untimely new information and did not conduct further verification of these programs. Verification Report at 15-19. Unlike the fulsome descriptions of the various specific verification procedures undertaken and results thereof for QatarEnergy's electricity and water purchases, the verification report does not detail similar procedures or results for QAFCO's reported or unreported purchases of electricity and water. *Id.* Rather, the report documents QAFCO's attempt to provide the untimely new information and merely notes that "*{a}ccording to the company,*" the unreported electricity and water accounted for certain percentages of QAFCO's total electricity and water consumption during the period of investigation. *Id.* at 16 and 18-19 (emphasis added). Nothing in the verification report indicates that Commerce verified any elements of QAFCO's proffered reconciliation or the percentages mentioned above. *See id.* Accordingly, Commerce appropriately treated the information on the electricity and water subsidy programs as unverified.

Plaintiffs further argue that Commerce should have accepted the new purchases of electricity and water presented at verification because it had time to review and verify the information. Pls. Br. at 15-18. However, this argument ignores that QMC/Muntajat did not

identify its erroneous underreporting of electricity and water until the fourth day of its

verification, despite Commerce's clear instructions in its verification agenda to both identify and

quantify any errors in its responses "at the outset of verification."  Verification Agenda (P.R.

247) at 6; Verification Report at 3.

As Defendant notes in its brief, the case law that Plaintiffs rely on to support their

argument that Commerce should have accepted and verified the new purchases at verification are

inapposite.  *See* Def. Br. at 23-25.  In fact, the courts have consistently upheld Commerce's

decisions to reject attempts to provide new information at verification that does not constitute a

minor correction.

For example, in *Goodluck*, the Federal Circuit considered a claim involving a purported

minor correction presented on the first day of verification, and it held that "Commerce's initial

determination—rejecting Goodluck India's supplemental submission on grounds that it

constituted new factual information and not a minor or clerical correction of the record, and that

the submission was unverifiable as it was submitted on the eve of verification—is supported by

substantial evidence and not otherwise contrary to law."  *Goodluck*, 11 F.4th at 1337.

Similarly, in *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F.

Supp. 3d 1345, 1360 (Ct. Int'l Trade 2021) ("*Içdaş*"), this Court rejected the respondent's

contention that Commerce abused its discretion by refusing to consider its corrective

submissions at verification.  The Court explained that:

> Commerce is generally prohibited from considering untimely new
> factual information under 19 C.F.R. § 351.302(d).  Although it is
> Commerce's practice to accept "minor corrections to the
> information already on the record" at verification, this practice
> does not extend to major, substantive alterations. . . . "{T}he court
> finds that Commerce's interpretation of the error as substantive,

and its consequential rejection of the corrective submissions, was
not an abuse of discretion.

*Içdaş*, 498 F. Supp. 3d at 1360 (internal citations omitted).  The Court also found that

Commerce's decision was supported by the timing and circumstances under which the error was

revealed.  *Id.* at 1358 ("the company did not acknowledge its mistake until Commerce attempted

to replicate Içdaş's reported sales at verification and expressly identified the error."); *id.* at 1362

("Where plaintiffs in *NTN Bearing* or *Fischer* submitted corrections prior to verification, Içdaş

sought to correct its mistake substantially later in the proceedings, after Commerce discovered

the error at verification.") (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir.

1995); *Fischer S.A. Comercio v. United States*, 700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010)).

These precedents confirm that Commerce reasonably exercised its discretion not to

accept new information on electricity and water consumption that (i) by Plaintiffs' own

admission, should have been reported in response to Commerce questionnaires but was not, (ii)

was not requested by Commerce at verification, (iii) was not proffered as a minor correction on

the first day of verification and is not now expressly claimed by Plaintiffs to constitute a minor

correction,  and (iv) was only revealed to Commerce on the fourth day of verification.  In other

words, Commerce appropriately rejected QMC/Muntajat's attempt "to fill gaps in the record

caused by" their "own failure to respond fully to Commerce's questionnaires."  *Guizhou Tyre*,

523 F. Supp. 3d  at 1348 ("Guizhou's information about the loans submitted at verification did

not 'corroborate, support and clarify factual information on the record;' rather, it was an attempt

by Guizhou to fill gaps in the record caused by Guizhou's own failure to respond fully to

Commerce's questionnaires."); *see also* Def. Br. at 24-25.

Plaintiffs cannot escape this conclusion by asserting that their failure to timely provide

requested information originated from a good faith confusion of CVD reporting requirements

with antidumping ("AD") requirements and that they proffered the new consumption information to rectify this "error in judgment." Pls. Br. at 13-15. This asserted "misunderstanding" of Commerce's reporting requirements is an insufficient basis to establish that they acted to the best of their abilities, as required by the Tariff Act of 1930 ("the Act"). 19 U.S.C. § 1677e(b)(1). Plaintiffs do not claim that Commerce inappropriately required the reporting of *all* electricity and water purchases in a timely manner, but only that QMC/Muntajat mistakenly failed to do so because this requirement differed from the reporting requirements in the companion AD investigation. However, this argument fails for several reasons.

First, it is uncontroverted that "QMC/Muntajat had numerous opportunities to provide complete and accurate reporting of its electricity and water purchase consumption throughout this proceeding, and it did not do so." IDM at 29.

Second, AD and CVD cases are conducted pursuant to differing sections of the Act and Commerce's regulations and consequently have distinctive reporting requirements. Plaintiffs' asserted ignorance of these distinctions does not excuse their obligation to respond to Commerce's information requests to the best of their abilities. As the Federal Circuit has held, "{c}ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). This standard "does not condone inattentiveness, carelessness, or inadequate record keeping," and importantly for this case, "{i}t assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken . . . ." *Id.*

Third, under 19 U.S.C. § 1677e, the provision authorizing adverse inferences in determinations made on the basis of facts otherwise available, Commerce is not required to show

10

that a respondent intentionally failed to provide the requested information. *Morex Ribbon Corp.*

*v. United States*, 253 F.Supp.3d 1378, 1383 (Ct. Int'l Trade 2017) ("section 1677e(b) does not by

its terms set a 'willfulness' or 'reasonable respondent' standard, nor does it require findings of

motivation or intent. Simply put, there is no *mens rea* component to the section 1677e(b)

inquiry.") (citations omitted).

In sum, Commerce acted within its discretion not to accept the untimely new

consumption information presented for the first time on the fourth day of verification and,

accordingly, not to verify QMC/Muntajat's previously submitted incomplete information. The

Court should therefore sustain Commerce's application of AFA to QMC/Muntajat's purchases of

electricity and water for LTAR.

> **B.      The AFA Rate Commerce Selected For The Provision Of Electricity And
> Water For LTAR Is Supported By Substantial Evidence And Otherwise In
> Accordance With Law**

In the *Final Determination*, Commerce selected an AFA rate of 8 percent for the

provision of electricity for LTAR and an 8 percent rate for the provision of water for LTAR

based on record information from the 2023 Annual Tariff Review Report of the GOQ's supplier

of electricity and water. IDM at 11. *See also* Memorandum, "Final Determination Calculations

for Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution

Company (Muntajat) Q.P.J.S.C.," dated December 2, 2024 ("Final Calculation Memorandum")

(C.R. 372 / P.R. 283). Plaintiffs claim that Commerce erred in selecting the AFA rates, Pls. Br.

at 22-32, but their arguments fail for the reasons stated in Defendant's brief. Def. Br. at 25-31.

Defendant-Intervenor wishes to underscore two points that further undermine Plaintiffs' claim.

Plaintiffs' criticisms of Commerce's departure from its AFA hierarchy are misplaced. *See* Pls. Br. at 32. The Act provides that, in selecting an AFA rate in a countervailing duty proceeding, Commerce may:

> (i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or
>
> (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use.

19 U.S.C. § 1677e(d)(1)(A). The Act also provides that, in carrying out section 1677e(d)(1), Commerce "may apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available." 19 U.S.C. § 1677e(d)(2).

Consistent with its authority under section 1677e(d)(1)(A), Commerce has developed a hierarchy methodology for selecting AFA rates in CVD proceedings. IDM at 8-10.[1] However, Commerce has found that it is inappropriate to apply its AFA hierarchy in some situations. IDM at 9 n.50 (citing *Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,104 (Dep't of Commerce January 20, 2016), and accompanying

---

[1] Shortly after the underlying investigation was initiated, Commerce codified its methodology as 19 C.F.R. § 351.308(j). *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,767 (Dep't of Commerce Mar. 25, 2024) (Commerce "developed its practice of applying its current hierarchy in selecting AFA rates in CVD proceedings over many years, preceding its codification into the Act, to effectuate the statutory purpose of section 776(b) of the Act to induce respondents to provide Commerce with complete and accurate information in CVD proceedings in a timely manner."). Commerce initiated the underlying investigation on March 5, 2024. *Melamine From Germany, India, Qatar, and Trinidad and Tobago: Initiation of Countervailing Duty Investigations*, 89 Fed. Reg. 17381 (Dep't of Commerce Mar. 11, 2024).

Issues and Decision Memorandum at 7-8); *id.* at 11; *see also* Def. Br. at 29. Moreover, as

Commerce explained in reference to sections 1677e(d)(1) and 1677e(d)(2) of the Act:

> The Act anticipates a two-step process for determining an appropriate AFA rate in CVD cases: (1) Commerce may apply its hierarchy methodology; and (2) Commerce may apply the highest rate derived from this hierarchy to a respondent, should it choose to apply that hierarchy in the first place, unless, after an evaluation of the situation that resulted in the use of AFA, Commerce determines that the situation warrants a rate different than the rate derived from the hierarchy be applied.

IDM at 8; *see also* Def. Br. at 28.

Here, Commerce correctly found that this is the first CVD proceeding involving Qatar

and that there are no identical or similar/comparable programs that are useable under steps one

through three of its CVD AFA hierarchy. IDM at 11 n.54. Accordingly, Commerce found that

application of that hierarchy would, at step four, "result in applying the 24.04 percent rate

calculated for QMC/Muntajat for the corporate income tax exemptions program, for both the

electricity and water for LTAR programs." *Id.* However, Commerce determined that it is not

appropriate to use the 24.04 percent rate for each of the electricity and water programs, given

"the uniqueness of the facts of this case and information on the record of this proceeding." IDM

at 11. Commerce therefore determined it appropriate to deviate from the CVD AFA hierarchy,

as it had in certain limited circumstances. *Id.*

Importantly, Commerce *did not* state that it was deviating from the requirements of the

Act, contrary to Plaintiffs' attempt to put words in the agency's mouth. *See* Pls. Br. at 32 ("Here,

however, Commerce 'determine{d} that the rate derived from the AFA hierarchy {under the

statute} is not an appropriate rate to use in the instant investigation, based on the uniqueness of

the facts of this case and information on the record of this proceeding.' Final IDM at 11.

Contrary to Commerce's explanation, the statute does not provide for any exceptions to the

13

'AFA hierarchy' for CVD proceedings.") (incorrect text in braces added to IDM quotation by Plaintiffs). Rather, Commerce was departing from its own administrative hierarchy, which it developed under the discretion afforded by the Act, based on the unique circumstances of this case, which is the first CVD investigation of imports from Qatar. This is plain from Commerce's application of the four-step hierarchy, discussed above; the Act itself does not lay out a four-step hierarchy for selecting AFA rates. *Compare* IDM at 11 n.54, *with* 19 U.S.C. § 1677e(d)(1)-(2).

In addition, given Plaintiffs' complaints about the supposedly punitive nature of the AFA rates used by Commerce, *see* Pls. Br. at 29-31, it bears emphasizing that, if Commerce had applied its administrative AFA hierarchy, the rates for each of the electricity for LTAR and water for LTAR programs would have been significantly higher: 24.04 percent instead of 8 percent. *See* IDM at 11 n.54. In other words, rather than unduly penalize QMC/Muntajat, Commerce exhibited discernment and restraint when it departed from its AFA hierarchy.

These reasons confirm that Commerce should reject Plaintiffs' challenges to Commerce's selection of the AFA rates for the electricity for LTAR and water for LTAR programs.

### C. Commerce's Determination Of Benefit For The Provision Of Land Rights Is In Accordance With Law

The GOQ provided QatarEnergy, QMC/Muntajat's cross-owned affiliate, with management, usage, and usufruct (land use) rights, including the right to collect the land lease and port income from these areas that the GOQ would have otherwise collected. IDM at 22-23. In doing so, the GOQ provided a recurring revenue stream to QatarEnergy at no cost. IDM at 24-25. Accordingly, Commerce lawfully found that this program provided a financial contribution in the form of revenue foregone, notwithstanding QMC/Muntajat's erroneous attempts to characterize this program as akin to a grant of land. IDM at 23-24. The agency also lawfully determined that this program conferred a benefit in the amount of revenue that

QatarEnergy collected from rental payments and port fees.  IDM at 25; *see also* Def. Br. at 34-36.

Plaintiffs wrongly claim that Commerce should have performed a profit calculation in determining the benefit, whereby the revenue collected by QatarEnergy would be offset by the costs it incurred in developing, maintaining, and administering the industrial cities and port associated with the usufruct rights.  Pls. Br. at 38-43.  As Defendant argues in its brief and as confirmed in the statute, the Plaintiffs' asserted costs are not a factor that Commerce can allowably offset in determining the benefit conferred.  Def. Br. at 31-36; *see also* 19 U.S.C. § 1677(6) (defining the three types of allowable offsets from the gross countervailable subsidy as application fees/deposits, loss in value of the subsidy from mandated deferred receipt, and export taxes/duties levied on export of subject merchandise to the United States to offset countervailable subsidies).

This conclusion is supported by this Court's decision in *Mosaic Co. v. United States*, 647 F. Supp. 3d 1358 (Ct. Int'l Trade 2023) ("*Mosaic*"), *aff'd on other grounds by* 160 F.4th 1340 (Fed. Cir. 2025).  There, the Court sustained Commerce's reliance on section 1677(6) of the Act in refusing to offset the subsidy amount by expenses that the respondent occurred:

> Commerce's exclusion of the expenses related to unused mining licenses was supported by substantial evidence. Commerce did not ignore the expenses as PhosAgro asserts because Commerce directly explained why it would not grant the adjustment PhosAgro sought. *And Commerce correctly concluded that it lacked the statutory authority to provide an offset based on these expenses. Section 1677(6) is an exclusive list, and the fees paid for unused mining licenses does not fit the statutory framework as an application fee, deposit, or similar payment.* Thus, Commerce's exclusion of these costs from calculating the benefit was supported by substantial evidence.

647 F. Supp. 3d at 1372 (emphasis added; citations omitted).

Similarly, this Court upheld a Commerce remand redetermination that refused to offset the costs of constructing a port from the gross subsidy benefit. *Hyundai Steel Co. v. United States*, 651 F.Supp.3d 1321, 1326 (Ct. Int'l Trade 2023) ("*Hyundai HR*")*, aff'd Hyundai Steel Co. v. United States*, No. 2024-1100, 2025 WL 1367463 (Fed. Cir. May 12, 2025), *cited in* Def. Br. at 35; *see also Hyundai Steel Co. v. United States*, No. 21-536, ECF No. 48-1 (Ct. Int'l Trade Apr. 10, 2023) at 20 (stating, in Commerce's final results of redetermination pursuant to remand, that "the costs incurred by Hyundai Steel in construction of the port are not considered, *i.e.*, as an offset, in determining the benefit provided by the GOK under the Act or Commerce's regulations.").

The *Mosaic* and *Hyundai HR* precedents are more persuasive authority than the *Hyundai CORE* decision cited by Plaintiffs. Pls. Br. at 40-41 (citing *Hyundai Steel Co. v. United States*, 658 F. Supp. 3d 1331(Ct. Int'l Trade 2023) ("*Hyundai CORE*")). *Mosaic* and *Hyundai HR* accord with each other, and they both were affirmed by the Federal Circuit. The Federal Circuit affirmed *Hyundai HR* in a nonprecedential judgment, *Hyundai Steel Co.*, 2025 WL 1367463, which, while not having the effect of binding precedent, can be considered for guidance. Fed. Cir. R. 32.1(d); *Fraserview Remanufacturing Inc. v. United States*, 678 F. Supp. 3d 1371, 1386 n. 16 (Ct. Int'l Trade 2024). The Federal Circuit also affirmed *Mosaic*, albeit on other grounds. 160 F.4th 1340. In contrast, the *Hyundai CORE* decision is an outlier and was not appealed after Commerce, under respectful protest, took into account the respondent's costs in analyzing the benefit from the provision of port-usage rights. *See Hyundai Steel Co. v. United States*, No. 21-304, ECF No. 60 (Ct. Int'l Trade Feb. 20, 2024) (judgment sustaining Commerce's remand redetermination); *Hyundai Steel Co. v. United States*, No. 21-304, ECF No. 57 (Ct. Int'l Trade Jan. 24, 2024) (Commerce's final results of redetermination pursuant to remand).

16

Thus, Commerce's decision not to subtract the costs that QatarEnergy incurred to develop the industrial areas in calculating the benefit for this program is in accordance with law.

## VI.    CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for judgment on the agency record and instead sustain Commerce's *Final Determination*.

Respectfully submitted,

*/s/ Patrick J. McLain*
Stephen J. Orava
Patrick J. McLain
Kanzanira Thorington

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706
(202) 737-0500
sorava@kslaw.com

*Counsel for Cornerstone Chemical Corporation*

Dated: March 5, 2026

17

**CERTIFICATE OF COMPLIANCE
WITH WORD COUNT LIMITATIONS**

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard Chambers Procedures* and the Court's scheduling order of June 4, 2025, the undersigned certifies that this brief complies with the word count limitation of 7,000 words set forth in the Court's scheduling order.  Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief contains 4,940 words.  In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

/s/ *Patrick J. McLain*
Patrick J. McLain

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006-4706
(202) 737-0500
sorava@kslaw.com

*Counsel for Cornerstone Chemical Corporation*

Dated: March 5, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

|  |  |
|---|---|
| QATAR MELAMINE COMPANY, (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATAR PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.),<br><br>    Plaintiffs,<br>  v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>  and<br><br>CORNERSTONE CHEMICAL COMPANY,<br><br>    Defendant-Intervenor. | **Court No. 25-00053** |

<u>ORDER</u>

Upon consideration of Plaintiffs' motion for judgment upon the agency record, Defendant's and Defendant-Intervenor's responses thereto, the administrative record, and all other pertinent papers, it is hereby

ORDERED that Plaintiffs' motion is denied, and it is further

ORDERED that judgment is entered in favor of the United States.

_____
Hon. Jane A. Restani, Judge

Dated: _____
    New York, NY