**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.),

    Plaintiffs,

v.

 UNITED STATES,

    Defendant,

and

CORNERSTONE CHEMICAL COMPANY

   Defendant-Intervenor.

Court No. 25-00053

# NON-CONFIDENTIAL

**Business Proprietary Information has been deleted from Pages 5, 11, 13 and 15.**

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

Jay C. Campbell
Richard G. King
C. Alejandro Dilley
Chunfu Yan

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

April 2, 2026

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................................1

II.     ARGUMENT......................................................................................................................2

        A.      Defendant and Petitioner Fail To Show That Commerce Properly
                Exercised Discretion in Rejecting Verified Information Concerning
                Electricity and Water Purchases ...............................................................................2

                1.      Commerce examined QAFCO's complete electricity and water
                        information at verification without identifying any discrepancies ..............3

                2.      QAFCO's explanation for the omission was not contradicted ....................9

                3.      Conclusion ...............................................................................................10

        B.      Defendant and Petitioner Fail To Demonstrate That the AFA Rate
                Selected by Commerce for the Provision of Electricity and Water Is
                Supported by Substantial Evidence and Otherwise in Accordance with
                Law ..........................................................................................................................10

        C.      Defendant and Petitioner Fail To Demonstrate that Commerce's Benefit
                Calculation for the Provision of Land Rights Is in Accordance with Law............14

III.    CONCLUSION AND RELIEF SOUGHT .......................................................................18

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Canadian Solar Inc. v. United States*,
537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ...............................................................8

*Chaparral Steel Co. v. United States*,
901 F.2d 1097 (Fed. Cir. 1990)...................................................................................8

*Delverde, SrL v. United States*,
989 F. Supp. 218 (Ct. Int'l Trade 1997),
*vacated on other grounds*, 202 F.3d 1360 (Fed. Cir. 2000).......................................17

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000).................................................................................13

*Fischer S.A. Comercio v. United States*,
700 F. Supp. 2d 1364 (Ct. Int'l Trade 2010) .............................................................3

*Gallant Ocean (Thailand) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010)................................................................................13

*Goodluck India Ltd. v. United States*,
11 F.4th 1335 (Fed. Cir. 2021).........................................................................3, 7, 8

*Guizhou Tyre Co. v. United States*,
523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) .........................................................7, 8

*Hyundai Steel Co. v. United States*,
651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ......................................................15, 16

*Hyundai Steel Co. v. United States*,
658 F. Supp. 3d 1331 (Ct. Int'l Trade 2023) ............................................................16

*Mosaic Co. v. United States*,
647 F. Supp. 3d 1358 (Ct. Int'l 2023),
*aff'd on other grounds by* 160 F.4th 1340 (Fed. Cir. 2025)................................16, 17

*Neimenggu Fufeng Biotechnologies Co. v. United States*,
741 F. Supp. 3d 1354 (Ct. Int'l Trade 2024) ............................................................12

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995)....................................................................................3

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016)..................................................................................3

*Qingdao Taifa Grp. Co. v. United States*,
    637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ...........................................................12

*Timken U.S. Corp. v. United States*,
    434 F.3d 1345 (Fed. Cir. 2006)..........................................................................................3

*Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ..........................................................7

## STATUTES AND REGULATIONS

19 U.S.C. § 1677(5)(C)..........................................................................................................17

19 U.S.C. § 1677(5)(D)(iv).....................................................................................................12

19 U.S.C. § 1677(5)(E) ...............................................................................................14, 15, 16, 18

19 U.S.C. § 1677(6) ...............................................................................................14, 15, 16

19 U.S.C. § 1677e(d)(1)(A) ...............................................................................................11, 12, 13

19 C.F.R. § 351.503(c)..........................................................................................................14, 17

19 C.F.R. § 351.511(a)(1)......................................................................................................12

## LEGISLATIVE MATERIALS

Uruguay Round Agreements Act,
    H.R. Rep. No. 103-826(I), reprinted in 1994 U.S.C.C.A.N. 4040..........................................17

## ADMINISTRATIVE DETERMINATIONS

*Countervailing Duties*,
    63 Fed. Reg. 65348 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*")..........14

*Melamine from Qatar*,
    89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.),
    and accompanying Issues and Decision Memorandum................................................... passim

## MISCELLANEOUS

Oxford English Dictionary (online edition),
    https://www.oed.com/dictionary/profit_n?tab=meaning_and_use#28099986
    (last accessed Sept. 3, 2025) ...............................................................................................16

**PUBLIC VERSION**

## I.      INTRODUCTION

Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat") (collectively, "QMC-Muntajat," "Respondents," or "Plaintiffs") reply to Defendant United States' ("Defendant" or the "Government") Response Brief (ECF 41, 42) ("Def.'s Resp.") and Defendant-Intervenor Cornerstone Chemical Company's ("Petitioner") Response Brief (ECF 44) ("Petr.'s Resp.").

In their response briefs, Defendant and Petitioner fail to demonstrate:

- That the U.S. Department of Commerce ("Commerce") properly exercised discretion in rejecting a reconciliation containing updated information despite that it had reviewed and verified that information the day before;

- That Commerce's selection of a punitive rate as adverse facts available ("AFA") for information it rejected is supported by substantial evidence and otherwise in accordance with the statutory requirement that a "countervailable subsidy rate" be used as AFA; and

- That Commerce determined "benefit" for the provision of land rights in accordance with law despite disregarding information it is required to consider under the statute and otherwise misinterpreting the statute and regulations.

Moreover, the Government and Petitioner dodge or overlook critical facts; avoid or ignore certain of Plaintiffs' arguments; and reiterate Commerce's misinterpretations of the statute and regulations.

Accordingly, Plaintiffs respectfully request that the Court hold that Commerce's final determination in the countervailing duty ("CVD") investigation of melamine from the State of

Qatar is unsupported by substantial evidence and otherwise not in accordance with law. *Melamine from Qatar*, 89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.) (P.R. 285) ("*Final CVD Determination*"); accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Melamine from Qatar* (C-518-002) (Dec. 2, 2024) (P.R. 282) ("*Final IDM*").

## II.    ARGUMENT

For the reasons discussed below, Plaintiffs respectfully ask the Court to reject Defendant's and Petitioner's arguments and hold that (1) Commerce abused its discretion by rejecting updated electricity and water information that it had verified; (2) Commerce's selection of an AFA rate for the provision of electricity and water is unsupported by substantial evidence and otherwise not in accordance with law; and (3) Commerce's calculation of the "benefit" for the provision of land rights is not in accordance with law.

### A.    Defendant and Petitioner Fail To Show That Commerce Properly Exercised Discretion in Rejecting Verified Information Concerning Electricity and Water Purchases

In attempting to defend Commerce's unreasonable decision to reject additional purchases of electricity and water identified by QMC's parent company, Qatar Fertiliser Company (P.S.C.) ("QAFCO") at verification, the Government and Petitioner (1) avoid confronting the critical fact that Commerce had verified all of QAFCO's purchases of electricity and water – both those reported before and those identified during the verification – on the day before it informed Respondents' counsel of Commerce's decision to reject the information; and (2) wrongly suggest that QAFCO contradicted itself in explaining the reason for the prior omission.

2

**PUBLIC VERSION**

> **1.    Commerce examined QAFCO's complete electricity and water information at verification without identifying any discrepancies**

In their response briefs, the Government and Petitioner fail to confront the key fact underpinning Commerce's abuse of discretion:  Commerce examined the "QAFCO Electricity & Water Reconciliation" in detail at verification without identifying any discrepancies and, thus, rejected information that it had verified.  *See* QMC-Muntajat Case Brief (C-518-002) (Nov. 6, 2024) ("*Original Case Brief*") at Attachment to Appendix (Decl. of J. Campbell) (C.R. 358-368; P.R. 265-272).  The Government's and Petitioner's claim that Commerce had not verified the reconciliation exhibit lacks credibility in the face of contradictory – and undisputed – record evidence: a sworn and contemporaneous declaration from Respondents' counsel.  Moreover, the Government and Petitioner unavailingly rely on court decisions that do not involve situations where Commerce had verified information it later rejected and, thus, are inapposite.

The salient legal principle underlying Plaintiffs' claim is that Commerce abuses its discretion "by refusing to accept updated data ***when there is plenty of time for Commerce to verify or consider it***."  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342-43 (Fed. Cir. 2021) (emphasis added, internal brackets and quotation marks omitted) (quoting *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016); citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207-08 (Fed. Cir. 1995); *Fischer S.A. Comercio v. United States*, 700 F. Supp. 2d 1364, 1370-71 (Ct. Int'l Trade 2010)).

Here, Commerce not only had time to verify the QAFCO Electricity & Water Reconciliation, it ***verified*** the information.  "Commerce conducted verification of the information submitted by QAFCO in the CVD investigation at QAFCO's head office in Doha, Qatar, from Tuesday, September 24, 2024, through Thursday, September 26, 2024."  *Original*

3

**PUBLIC VERSION**

*Case Brief* at Appendix (Decl. of J. Campbell at ¶2).  On the second day, Wednesday, September 25, 2024, the Commerce verifiers reviewed QAFCO's purchases of electricity and water from the state-owned Qatar General Electricity & Water Corporation ("Kahramaa"), which QAFCO presented in the QAFCO Electricity & Water Reconciliation.  *See id.* at ¶¶3-8.  As depicted below, the very first page of the reconciliation package included a worksheet clearly showing: (1) QAFCO's electricity purchases previously reported in Exhibit ELECTR_QAFCO-1 to its CVD questionnaire response; (2) QAFCO's newly identified "Residential & Club" purchases of electricity; (3) QAFCO's water purchases previously reported in Exhibit WATER_QAFCO-1 to its CVD questionnaire response; and (4) QAFCO's newly identified "Ammonia Plant (potable water)" and "Residential & Club" purchases of water:

**PUBLIC VERSION**

| 2023 Purchase Schedules | | | 2023 General Ledger |
|---|---|---|---|
| Electricity | Value (QAR) | Exhibit or Note | Value (QAR) |
| Bulk Industrial | | Exhibit ELECTR-QAFCO-1 | |
| Residential & Club | | Electricity for residential housing units and recreational facility. | |
| Total | | | |

| 2023 Purchase Schedules | | | 2023 General Ledger |
|---|---|---|---|
| Water | Value (QAR) | Exhibit or Note | Value (QAR) |
| Bulk Industrial & Commercial | | Exhibit WATER_QAFCO-1 | |
| Ammonia Plant (potable water) | | Water for personal hygiene, etc. (not production line). | |
| Residential & Club | | Water for residential housing units and recreational facility. | |
| Total | | | |

Total Electricity & Water
QR 5 rent removed per
Exhibit Water_QAFCO_1

*See Original Case Brief* at Attachment to Appendix; *see also* QMC-Muntajat CVD Questionnaire Response (C-518-002) (May 10, 2024) (C.R. 45-103; P.R. 82-93) ("*Section III Response*") at Exhibits ELECTR_QAFCO-1 & WATER_QAFCO-1.

The QAFCO Electricity & Water Reconciliation also included complete schedules of the company's purchases of electricity and water for each category presented in the worksheet above (*i.e.*, Exhibit ELECTR-QAFCO-1; "Residential & Club" electricity; Exhibit WATER_QAFCO-1; "Ammonia Plant (potable water)"; "Residential & Club" water), and tied those purchases to its accounting system, supported by accounting entries and the provider's (Kahramaa) invoices.

**PUBLIC VERSION**

*See Original Case Brief* at Attachment to Appendix.  As declared by Respondents' counsel, "On Wednesday, September 25, 2024, the Commerce verifiers reviewed the QAFCO Electricity & Water Reconciliation over an approximately two-hour period – without identifying any significant discrepancies to {QAFCO or its counsel}." *Id.* at Appendix (Decl. of J. Campbell at ¶8).

Neither the Government nor Petitioner disputes the factual assertions presented in the J. Campbell Declaration.  The Government simply claims that "Commerce did not verify the information but rather reviewed the document to determine whether the information was a minor correction or untimely submitted new factual information."  Def.'s Resp. at 22 (citing *Final IDM* at 5); *see also* Petr.'s Resp. at 7 (citing Commerce Memorandum, RE: Verification of the Questionnaire Responses of Qatar Melamine Company and Muntajat (C-518-002) (Oct. 30, 2024) at 15-19 (C.R. 355; P.R. 260) ("*QMC-Muntajat Verification Report*")).  This is implausible.  As shown above, QAFCO's additional purchases were disclosed on the very first sheet of the reconciliation package.  Consequently, it would have taken no more than a few seconds to confirm that the QAFCO Electricity & Water Reconciliation included new factual information.  Nor did Commerce review the information merely to determine whether it was a minor correction.  As Defendant asserts in its response brief, Commerce only considers minor corrections reported at the beginning of verification.  *See* Def.'s Resp. at 20 ("QMC/Muntajat did not attempt to present this previously unreported consumption data as a minor correction on the first day of verification, when Commerce ***would have*** determined whether the newly presented data constituted a correction to information already on the record, or new factual information.") (emphasis added).

PUBLIC VERSION

No, the Commerce verifiers did not simply review the reconciliation package to determine whether the omission was minor or constituted new factual information: They spent approximately two hours reviewing the entire QAFCO Electricity & Water Reconciliation (which included supporting documents) in detail – without identifying any significant discrepancies. It was not until the following day, Thursday, September 26, 2024, that the verifiers informed Respondents' counsel that "Commerce management in Washington, DC, instructed them not to accept the QAFCO Electricity & Water Reconciliation for the record of the CVD investigation." *Original Case Brief* at Appendix (Decl. of J. Campbell at ¶9).

The Government and Petitioner rely on several court decisions to support Commerce's rejection of QAFCO's additional information, but none is controlling here. They cite *Goodluck India* and *Içdaş* for the proposition that Commerce may reasonably reject corrections presented at verification that are not minor. *See* Def.'s Resp. at 17 (citing *Goodluck India*, 11 F.4th 1342-43); Petr.'s Resp. at 8-9 (citing *Goodluck India*, 11 F.4th at 1337; *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1360 (Ct. Int'l Trade 2021)). Similarly, the Government cites *Guizhou Tyre* for the proposition that "respondents cannot, at verification, attempt to 'fill gaps in the record caused by {their} own failure to respond fully to Commerce's questionnaires.'" Def.'s Resp. at 17-18 (quoting *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1348 (Ct. Int'l Trade 2021)).

Unlike here, however, in those cases Commerce did not verify the new information presented. *See Goodluck India*, 11 F.4th at 1337 (holding, in part, that respondent's "submission was unverifiable as it was submitted on the eve of verification" and crediting Commerce's finding that "any attempts to correct {respondent's} errors would involve both extensive SAS programming and complex calculations to Goodluck's cost database"); *Içdaş*, 498 F. Supp. 3d

7

**PUBLIC VERSION**

at 1362 (noting that Commerce did not have an opportunity to review and verify corrections presented after Commerce discovered an error during the verification); *Guizhou Tyre*, 523 F. Supp. 3d at 1350 (accepting Commerce's explanation that respondent's lateness in reporting the information deprived the agency of the opportunity to verify it). None of the Government's or Petitioner's cited cases holds that Commerce may reject new information – whether minor or not – that the agency verified. To the contrary, the Federal Circuit has recognized that Commerce abuses its discretion "by refusing to accept updated data ***when there is plenty of time for Commerce to verify or consider it***." *Goodluck India*, 11 F.4th at 1342-43 (emphasis added, internal brackets and quotation marks omitted).

The Government cites *Goodluck* for the proposition that "{v}erification represents a point of no return." Def.'s Resp. at 22 (quoting *Goodluck India*, 11 F.4th at 1343-44). In this case, however, the point of no return was when Commerce reviewed and verified the QAFCO Electricity & Water Reconciliation. Once Commerce confirms the correct information, it cannot unknow what it knows without violating the statutory mandate to calculate countervailable subsidy rates as accurately as possible. *See Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1394-95 (Ct. Int'l Trade 2021) (citing *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103 (Fed. Cir. 1990); *Içdaş Celik*, 498 F. Supp. 3d at 1353)). Upon verifying the information, Commerce no longer had discretion to reject QAFCO's electricity and water purchases.[1]

---

[1] For this same reason, it is beside the point for the Government and Petitioner to argue that the QAFCO Electricity & Water Reconciliation "did not 'corroborate, support, {or} clarify factual information already on the record{,}'" Def.'s Resp. at 18 (citing Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. Questionnaire Responses (C-518-002) (Sept. 12, 2024) at 2 (P.R. 247) ("*Verification Agenda*")), or that "Commerce did not request any new consumption data in its verification agenda{,}" Def.'s Resp. at 20-21 (citing *Verification Agenda* at 9); Petr.'s Resp. at 5. While

**2.    QAFCO's explanation for the omission was not contradicted**

While not determinative, given Commerce's verification of the QAFCO Electricity & Water Reconciliation, it bears noting that QAFCO's explanation for its prior omission of certain electricity and water purchases is consistent with the record evidence.  As QAFCO's senior accountant explained during the verification, the company did not previously report certain purchases of electricity and water – for residential consumption, recreational usage, and personal hygiene – because it thought the requirement was "to report only purchases of electricity and water ***for production operations*** (consistent with its reporting of QMC's electricity and water costs in the parallel antidumping duty investigation of melamine from Qatar . . . .)." *Original Case Brief* at Appendix 1 (Decl. of Jay Campbell at ¶7) & Attachment (page entitled "Reconciliation of Electricity and Water").   Commerce's decision to reject QAFCO's explanation is unsupported by substantial evidence.

In particular, QAFCO did not report water consumption for the only meter at its ammonia plant because this related to potable water for personal hygiene, not production.  *See id.*; *see also QMC-Muntajat Verification Report* at 18.   Commerce, however, unreasonably discredited QAFCO's explanation, wrongly assuming that QAFCO's single water meter at the production plant must have been for production.  *See Final IDM* at 7 ("Although QAFCO officials tried to distinguish this meter as not used for production in its production plant, officials then contradicted themselves by stating that this was the only water meter in the production plant; therefore, we find that it must have been used in the production process."); *see also* Def.'s Resp.

---

Respondents disagree, *see* QMC-Muntajat's Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record (ECF 32, 33) at 6-7, 14-15 ("Pls.' Br."), the Government's and Petitioner's points are moot because Commerce verified QAFCO's newly identified electricity and water purchases.

**PUBLIC VERSION**

at 19, 27.  QAFCO officials did not contradict themselves.  Commerce overlooked the record evidence that QAFCO *self-produces* desalinated water and only purchases potable water from Kahramaa.  *See* QMC-Muntajat Response to Section III Supplemental Questionnaire (C-518-002) (June 27, 2024) at 52, 55-56 & Exhibit WATER-QATAREN-12 (Services Agreement between QAFCO and QMC at Attachment 4), Exhibit WATER-QATAREN-13 (screenshots from QAFCO's accounting system showing the calculation of its costs to produce desalinated water for February and August 2023) (C.R. 175-242; P.R. 167-191).  Consequently, contrary to Commerce's mistaken assumption, QAFCO's explanation was consistent with the record evidence.

### 3.    Conclusion

For the reasons discussed above, the Government and Petitioner fail to demonstrate that Commerce properly exercised its discretion in rejecting information that was verified.

**B.    Defendant and Petitioner Fail To Demonstrate That the AFA Rate Selected by Commerce for the Provision of Electricity and Water Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

The Government and Petitioner fail to demonstrate that Commerce's derivation and application of a 16% rate as adverse facts available ("AFA") for the provision of electricity and water (combined) should be sustained.  Neither has an answer to Plaintiffs' earlier demonstration that the 16% rate (*i.e.*, 8% for the provision of electricity plus 8% for the provision of water) is not a subsidy rate, let alone a "countervailable subsidy rate," as required by the statute without exception.  Moreover, the Government incorrectly claims that there are no identical or similar programs on the record that could have been used as the AFA rate, overlooking that Commerce preliminarily had calculated subsidy rates for QatarEnergy's use of the identical program.

The statute authorizes Commerce to select one of two different "countervailable subsidy rates" as adverse facts available ("AFA") in a countervailing duty proceeding:

> (i) "a ***countervailable subsidy rate*** applied for the same or similar program in a countervailing duty proceeding involving the same country"; or
>
> (ii) "if there is no same or similar program, . . . a ***countervailable subsidy rate*** for a subsidy program from a proceeding that the administering authority considers reasonable to use . . . ."

19 U.S.C. § 1677e(d)(1)(A) (emphasis added).  Here, as AFA for the provision of electricity and water, Commerce represented that it "applied an adverse inference that QMC/Muntajat consumed these utilities at the highest [          ] provided under a tariff category which QMC/Muntajat reported using (*i.e.*, the commercial rate) listed in Kahramaa's 2023 Annual Tariff Review Report." *Final Determination Calculations for Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat)* (C-518-002) (Dec. 2, 2024) at 3-4 (C.R. 372; P.R. 283) ("*Final Calculation Memo*"); *see also* Def.'s Resp. at 30.  The purported [          ] used by Commerce (8% for both electricity and water), however, is not a "countervailable subsidy rate," as required by the statute, or even a subsidy rate at all, as demonstrated in Plaintiffs' initial brief. *See* Pls.' Br. at 24-28.

Rather, the 8% rate selected by Commerce as the AFA rate for both electricity and water is the ratio of (1) the subsidy paid by the State of Qatar's Ministry of Finance to Kahramaa, the state-owned utilities supplier, for electricity/water consumption in the Commercial sector to (2) the total subsidy amount paid by the Ministry of Finance to Kahramaa for electricity/water consumption across all sectors. *See* Pls.' Br. at 28.  The 8% rate has nothing to do with any amount of subsidization received by QAFCO or any other consumer of electricity and water in the State of Qatar, and is completely unrelated to the "countervailable subsidy rate" that Commerce is required to calculate for the government's provision of a good under the statute

**PUBLIC VERSION**

and regulation, 19 U.S.C. § 1677(5)(D)(iv); 19 C.F.R. § 351.511(a)(1).  Because Commerce did

not use a "countervailable subsidy rate" as AFA, as required by 19 U.S.C. § 1677e(d)(1)(A), its

selection of AFA rates for the provision of electricity and water is not in accordance with law.

Notably, neither the Government nor Petitioner attempts to challenge Plaintiffs' demonstration

that the 8% rate selected by Commerce does not reflect a subsidy rate to a company, let alone a

countervailable subsidy, as required by the statute.  *See* Def.'s Resp. at 25-31; Petr.'s Resp. at

11-14.[2]

Repeating Commerce's position below, the Government claims "that there are no

identical or similar/comparable programs that are useable under . . . the CVD AFA hierarchy."

Def.'s Resp. at 29 (citing *Final IDM* at 11).  This is wrong and, thus, unsupported by substantial

evidence.  As a responding cross-owned company, QatarEnergy also reported purchases of

electricity and water from Kahramaa during the POI, and Commerce calculated the

countervailable subsidy conferred on QatarEnergy in its post-preliminary determination.  *See*

Commerce Memorandum, RE: Post-Preliminary Analysis Calculations for Qatar Melamine

Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat)

Q.P.J.S.C. (C-518-002) (Sept. 12, 2024) at Attachment II (Detailed Benefit Calculations

---

[2] Defendant contends that Plaintiffs did not exhaust their argument before Commerce that the 8% subsidy rate selected as AFA bears no relation to the subsidy rate for the provision of electricity and water for less than adequate remuneration.  *See* Def.'s Resp. at 28.  Because Commerce did not apply AFA to the provision of electricity or water in the preliminary determination, however, Respondents lacked a meaningful opportunity to raise the issue before Commerce.  Under these circumstances, the court has excused the exhaustion requirement.  *See Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354, 1372 (Ct. Int'l Trade 2024) ("'A party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level.'") (*quoting Qingdao Taifa Grp. Co. v. United States*, 637 F. Supp. 2d 1231, 1236 (Ct. Int'l Trade 2009)).

**PUBLIC VERSION**

Spreadsheet at Tab "Benefit") (C.R. 304-305). Consequently, Commerce could have selected "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country{,}" which is the preferred AFA rate under the statute. 19 U.S.C. § 1677e(d)(1)(A).

For this same reason, Commerce wrongly concluded that following the CVD AFA hierarchy would have "result{ed} in applying the 24.04 percent rate calculated for QMC/Muntajat for the corporate income tax exemptions program, for both the electricity and water for LTAR programs." *Final IDM* at 11 n.54. Moreover, even setting aside the availability of a countervailable subsidy rate for the identical program, selection of the 24.04% rate as AFA would have been punitive in light of the facts that (1) QAFCO's previously unreported purchases of electricity and water accounted for only [    ]% of its total electricity and water purchases during the POI (and an even smaller percentage considering QAFCO's and QatarEnergy's combined purchases of electricity and water) and (2) Commerce had calculated preliminary countervailable subsidy rates of 0.48% and 0.10% for QAFCO's and QatarEnergy's combined purchases of electricity and water, respectively. *See* Post-Preliminary Analysis Memorandum for the Countervailing Duty Investigation of Melamine from Qatar (C-518-002) (Sept. 12, 2024) at 7, 9 (P.R. 248) ("*Post-Preliminary Decision Memo*"). Even taking deterrence into account, Commerce's choice of AFA must ***not result in "punitive, aberrational, or uncorroborated margins***." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (emphasis added); *see also Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) ("This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter . . . future non-compliance").

For these reasons, Commerce's selection of a 16% rate (8% for electricity plus 8% for water) as AFA for the provision of electricity and water is unsupported by substantial evidence and not in accordance with law.

### C.    Defendant and Petitioner Fail To Demonstrate that Commerce's Benefit Calculation for the Provision of Land Rights Is in Accordance with Law

The Government and Petitioner fail to offer any compelling reason why Commerce's benefit calculation for the provision of land rights should be sustained. Most notably, they ignore Respondents' legal argument that "benefit" under 19 U.S.C. § 1677(5)(E) means "profit" in the context of rental or port income forgone. The Government and Petitioner also repeat Commerce's flawed conclusion that calculating the benefit as the profit QatarEnergy derived from its land rights would contravene the subsidy offset provision, 19 U.S.C. § 1677(6). Lastly, the Government reiterates Commerce's misconception that 19 C.F.R. § 351.503(c) precludes it from recognizing the expenses QatarEnergy had to incur to charge rent and port fees in the first place.

In their initial brief, Plaintiffs demonstrated that, in the context of a financial contribution involving rental or port services revenue forgone, "benefit" under 19 U.S.C. § 1677(5)(E) means profit. *See* Pls.' Br. at 34-38. To support this interpretation, Plaintiffs relied on the plain and ordinary meaning of "benefit," as defined in various dictionaries; the statutory and regulatory scheme (neither of which defines "benefit" for purposes of income forgone); and the *CVD Preamble*, which explains that benefit should be measured in an "economic or accounting sense{.}" *Countervailing Duties*, 63 Fed. Reg. 65348, 65360 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*"). Neither Defendant nor Petitioner addresses Plaintiffs' argument, *see* Def.'s Resp. at 31-36; Petr.'s Resp. at 14-17, thereby waiving any future opportunity to

14

challenge Respondents' interpretation that "benefit" in the context of rental or portal income forgone means "profit."

The Government argues that "Commerce lawfully determined that {the land rights} program conferred a benefit in the amount of revenue that QatarEnergy collected from rental payments and port fees." Def.'s Resp. at 35 (citing *Hyundai Steel Co. v. United States*, 651 F. Supp. 3d 1321 (Ct. Int'l Trade 2023)). During the POI, however, QatarEnergy incurred expenses totaling QAR [   ] billion to develop, maintain, and administer the industrial sites and ports from which it derived rental and port income. *See Original Case Brief* at 22 (citations omitted). Because "benefit" means profit in the context of rental and port income forgone, Commerce should have deducted these costs from the revenue QatarEnergy earned from rent and port fees during the POI to calculate the benefit.

To justify Commerce's decision, Defendant and Petitioner mistakenly rely on the subsidy offset provision, 19 U.S.C. § 1677(6), *see* Def.'s Resp. at 35-36; Petr.'s Resp. at 15, which does not apply to benefit in the context of rental or port income forgone. Section 1677(6) authorizes Commerce to subtract the values of certain items from the "gross countervailable subsidy" to derive a "net countervailable subsidy." The Government and Petitioner argue that, because expenses incurred in order to operate a business and earn revenue "are not among the exhaustive list of offsets provided for under section 1677(6){,}" Commerce was not required to take QatarEnergy's industrial land and port expenses into account. Def.'s Resp. at 35 (citing *Final IDM* at 25-26); *see also* Petr.'s Resp. at 15. Respondents, however, do not seek an offset to a gross subsidy. Respondents seek a benefit calculation for the provision of land rights to QatarEnergy that is consistent with the "benefit" provision, 19 U.S.C. § 1677(5)(E). That calculation requires Commerce to deduct (1) the expenses QatarEnergy incurred to develop,

15

maintain, and administer the industrial sites and ports from (2) the rental and port fees income it received during the POI. The offset provision, 19 U.S.C. § 1677(6), does not apply to this situation at all.

This court reached the same conclusion based on a similar fact pattern in *Hyundai Steel Co. v. United States*, 658 F. Supp. 3d 1331, 1336 (Ct. Int'l Trade 2023) ("*Hyundai CORE*"). Specifically, in *Hyundai CORE*, the court held that, in calculating the benefit for port services income forgone, Commerce contravened the statute by refusing to consider the costs incurred by the respondent to construct the port facilities. *See id.* at 1335-36.

> The plain and obvious import of the statute is that a countervailable "benefit" "normally" requires, well, "a *benefit* to the recipient." 19 U.S.C. § 1677(5)(E) (emphasis added). A benefit is an "advantage, profit, good." Oxford English Dictionary (online edition). If there's no advantage, profit, or good to the recipient from the government program at issue, then there's no countervailable benefit for purposes of the statute, unless an applicable exception applies (and the government makes no such contention here) . . . .
>
> In {refusing to consider Hyundai's costs to determine whether the company received a benefit}, ***the Department erred as a matter of law***. If, as Hyundai contends, the value of its port-usage rights did not exceed its construction costs, then the company received no "advantage, profit, or good," and thus no countervailable benefit. The court accordingly remands for the Department to make that determination.

*Id.* at 1335-36 (internal brackets omitted, italics original, bold italics added).

Petitioner urges the court to rely instead on two other opinions in which the court affirmed Commerce's position that the statutory offset provision, 19 U.S.C. § 1677(6), precludes it from deducting expenses incurred in furtherance of operating a business and earning revenue. *See* Petr.'s Resp. at 16-17 (citing *Hyundai Steel Co. v. United States*, 651 F. Supp. 3d 1321, 1326 (Ct. Int'l Trade 2023) ("*Hyundai HR*"), *aff'd* 2025 U.S. App. LEXIS 11367 (Fed. Cir. May 12, 2025); *Mosaic Co. v. United States*, 647 F. Supp. 3d 1358, 1372 (Ct. Int'l 2023) ("*Mosaic*"), *aff'd on other grounds by* 160 F.4th 1340 (Fed. Cir. 2025). As Petitioner concedes, however,

**PUBLIC VERSION**

neither of these opinions binds the court.  *See* Petr.'s Resp. at 16.  The Federal Circuit affirmed *Hyundai HR* in a **nonprecedential** judgment, and the Court of International Trade's decision in *Mosaic* was affirmed on grounds other than the "subsidy offset" issue.  *See id.*

Lastly, the Government cites 19 U.S.C. § 1677(5)(C) and 19 C.F.R. § 351.503(c) for the proposition that Commerce "does not need to consider the effect of the subsidy in determining whether it exists."  Def.'s Resp. at 34; *see also Final IDM* at 26.  The Statement of Administrative Action, however, clarifies that § 1677(5)(C) permits Commerce to disregard the effect of a subsidy on the respondent's production or sale of *the subject merchandise*:

> {T}he Administration wants to make clear its view that the new definition of subsidy does *not* require that Commerce consider or analyze the effect (including whether there is any effect at all) of a government action on the price or output of *the class or kind of merchandise under investigation or review*.

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I) at 926, reprinted in 1994 U.S.C.C.A.N. 4040, 4198 ("SAA") (emphasis added); *see also Delverde, SrL v. United States*, 989 F. Supp. 218, 231 (Ct. Int'l Trade 1997) ("The specific function of {§ 1677(5)(C)} is limited to preventing Commerce from having to engage in an analysis as to the impact of a 'government action on the price or output of *the class or kind of merchandise under investigation or review*.'") (emphasis added), *vacated on other grounds*, 202 F.3d 1360 (Fed. Cir. 2000).  QatarEnergy's administration of industrial lands and ports has nothing to do with the subject merchandise in this case, melamine.  Consequently, § 1677(5)(C) does not permit Commerce to disregard the costs QatarEnergy incurred to develop, maintain, and administer the industrial lands and ports for which it charges rent and port fees.

The Government claims that "{a}ny costs {QatarEnergy} incurs as a result of its operations is distinct from the subsidy being provided by the {Government of Qatar} and therefore immaterial to Commerce's analysis."  Def.'s Resp. at 36 (citing *Final IDM* at 26).  This

17

**PUBLIC VERSION**

is wrong. QatarEnergy cannot earn revenue from rent or port fees (the claimed "financial contribution") without bearing the costs of developing, maintaining, and administering the industrial lands and port facilities. Far from being "distinct," QatarEnergy could not receive the "subsidy" at all without bearing costs.

In summary, by disregarding the significant expenses QatarEnergy incurred to be able to earn rental and port income from the industrial lands and ports, Commerce failed to calculate the "benefit" in a manner that is consistent with the statute, 19 U.S.C. § 1677(5)(E).

## III. CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above and in their initial brief, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs.

Respectfully submitted,

WHITE AND CASE LLP


 /s/ Jay C. Campbell
Jay C. Campbell
Richard G. King
C. Alejandro Dilley
Chunfu Yan

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Qatar Melamine Company (a Qatari Private Shareholding Company) and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.)

Date: April 2, 2026

18

CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for Plaintiffs' Reply Brief, as computed by the White & Case word processing system (Microsoft Word 2016) is 4,607.

/s/ Jay C. Campbell
Jay C. Campbell