**Slip Op. 26-81**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) and QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.),<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>    and<br><br>CORNERSTONE CHEMICAL COMPANY,<br><br>        Defendant-Intervenor. | Before: Jane A. Restani, Judge<br><br>Court No. 25-00053<br><br>**Public Version** |

## OPINION AND ORDER

Dated: July 27, 2026

[Sustaining in part and remanding in part Commerce's final determination for the countervailing duty investigation on melamine from the State of Qatar.]

Jay Charles Campbell, White & Case, LLP, of Washington, DC, argued for the plaintiffs. Also on the brief were Chunfu Yan, Colin Alejandro Dilley, and Richard Gordon King.

Kristin Elaine Olson, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for the defendant. Of counsel on the brief were Samuel Edward Childerson and Shanni Alon, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Patrick James McLain, King & Spalding, LLP, of Washington, DC, argued for the defendant-intervenor. Also on the brief were Stephen James Orava and Kanzanira Ayanda Nandi Thorington.

Restani, Judge: Before the court is Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company's (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat") (collectively, "QMC-Muntajat" or "Plaintiffs") motion for judgment on the agency record pursuant to USCIT Rule 56.2, challenging the final determination of the United States Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of melamine from the State of Qatar ("Qatar").  Confidential Mot. for J. on Agency R. 56.2, ECF No. 32 (Sep. 4, 2025) ("Pls. Mot."); see Melamine From Qatar: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 89 Fed. Reg. 97,593 (Dep't Commerce Dec. 9, 2024) ("Final Determination"); see also Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Melamine from Qatar, P.R. 282 (Dec. 2, 2024) ("IDM").

Plaintiffs request that the court determine that (1) Commerce abused its discretion by rejecting a reconciliation of QMC's parent company's, Qatar Fertiliser Company (P.S.C.) ("QAFCO"), purchases of electricity and water during the period of investigation at verification; (2) Commerce unreasonably selected a 16% subsidy rate as facts otherwise available with an adverse inference for the provision of electricity and water; and (3) Commerce unreasonably determined the benefit for the provision of land rights. See Pls. Mot. at 2.  They ask the court to remand to Commerce. Id.  The United States and defendant-intervenor Cornerstone Chemical Company ("Cornerstone") oppose and ask the court to sustain the Final Determination.  See Confidential Resp. to Mot., ECF No. 41 (Feb. 2, 2026) ("Gov. Resp."); Resp. of Def.-Intervenor to Mot. for J. upon the Agency R., ECF No. 44 (Mar. 5, 2026) ("Cornerstone Resp.").

For the following reasons, the court sustains Commerce's rejection of QAFCO's reconciliation and remands to Commerce to reconsider its selection of the 16% subsidy rate as an adverse rate for the provision of electricity and water and to also reconsider the benefit determination for the provision of land rights consistent with this opinion.

## BACKGROUND

On February 14, 2024, Cornerstone filed a petition for antidumping duty ("AD") and CVD measures on imports of melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago. See Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Melamine from Germany, India, Japan, the Netherlands, Qatar, and Trinidad and Tobago, C.R. 1–42, P.R. 1–41 (Feb. 14, 2024). On March 5, 2024, Commerce initiated its CVD investigation on melamine from Qatar for the period of investigation of January 1, 2023, through December 31, 2023 (the "POI"). Melamine from Germany, Qatar, and Trinidad and Tobago: Initiation of Countervailing Duty Investigations, 89 Fed. Reg. 17,381 (Dep't Commerce Mar. 11, 2024). Commerce selected QMC-Muntajat as respondents.[1] Countervailing Duty Investigation of Melamine from the State of Qatar: Countervailing Duty Questionnaire at 1, P.R. 60 (Mar. 19, 2024) ("Initial Questionnaire"). On June 12, 2024, Cornerstone filed a new subsidy allegation, alleging that the Government of Qatar ("GOQ") provided free land use and usufruct rights to QatarEnergy, the ultimate parent company of QMC, for less than adequate remuneration ("LTAR"). Decision Memorandum for the Preliminary Affirmative Determination in the

---

[1] In its CVD questionnaire to QMC-Muntajat, Commerce requested that QMC-Muntajat submit responses for certain cross-owned affiliated companies. Countervailing Duty Investigation of Melamine from the State of Qatar: Countervailing Duty Questionnaire at III-1–7, P.R. 60 (Mar. 19, 2024). QMC-Muntajat identified QAFCO, Industries Qatar Q.P.S.C., and QatarEnergy as the relevant cross-owned affiliates for purposes of responding to Commerce's initial questionnaire. Melamine from Qatar: Affiliated Companies Response at 1, C.R. 44, P.R. 68 (Apr. 5, 2024) ("Affiliated Cos. Resp.").

Countervailing Duty Investigation of Melamine from Qatar at 5, P.R. 205 (July 15, 2024) ("PDM").

On July 22, 2024, Commerce published its preliminary determination. See Melamine from Qatar: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Determination of Critical Circumstances, and Alignment of Final Determination with Final Antidumping Duty Determination, 89 Fed. Reg. 59,045 (Dep't Commerce July 22, 2024) ("Preliminary Determination"); PDM. Commerce preliminarily determined that the GOQ was providing countervailable subsidies to producers and exporters of melamine. See Preliminary Determination. Commerce initiated its CVD investigation into whether the GOQ provided land for LTAR. PDM at 6, 14. Commerce stated that it required additional information to determine whether the GOQ was providing land rights, water, and electricity for LTAR, and stated that it would address these programs in a post-preliminary analysis. Id.

On September 12, 2024, Commerce issued its post-preliminary analysis memorandum. Post-Preliminary Analysis Memorandum for the Countervailing Duty Investigation of Melamine from Qatar, P.R. 248 (Sep. 12, 2024) ("Post-Prelim. Memo"). Commerce preliminarily determined that the GOQ was providing countervailable subsidies to producers and exporters of melamine from Qatar with respect to the provision of electricity for LTAR, provision of water for LTAR, and provision of management, usage, and usufruct rights over certain industrial areas. Id. at 5–12. Commerce preliminarily calculated a net countervailable subsidy rate of 0.48% ad valorem for the provision of electricity, id. at 7, 0.10% ad valorem for the provision of water, id. at 9, and 1.71% ad valorem for the provision of land. Id. at 12.

Between September 15, 2024, and September 26, 2024, Commerce conducted its verification of the GOQ's and QMC-Muntajat's (and their cross-owned affiliates') responses.

IDM at 2.  On the fourth day of verification, QAFCO disclosed that it had hitherto unreported water and electricity usage and attempted to submit a reconciliation of its unreported water and electricity usage to the company's accounting system.  Id. at 5.  Commerce rejected QAFCO's reconciliation data as untimely new factual information.  Id.

On December 9, 2024, Commerce published its final determination.  Final Determination. Commerce determined that the GOQ was providing countervailable subsidies to producers and exporters of melamine from Qatar.  See id.  Commerce applied facts otherwise available with an adverse inference for the provision of electricity and water.  IDM at 28–29.  Commerce further determined that the expenses incurred by QatarEnergy should not be subtracted from the gross benefit QatarEnergy received.  Id. at 25.  Commerce calculated a countervailable subsidy rate of 8% ad valorem for the provision of electricity, 8% ad valorem for the provision of water, and 1.71% ad valorem for the provision of certain land rights.  Id. at 13–14.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and Section 516A of the Tariff Act of 1930 (the "Act"), codified as amended, 19 U.S.C. § 1516a.  The court sustains Commerce's results in a countervailing duty investigation unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

## DISCUSSION

### I.      Commerce Reasonably Rejected QAFCO's Reconciliation Data at Verification

Plaintiffs first argue that Commerce abused its discretion by rejecting QAFCO's reconciliation data as untimely.  Pls. Mot. at 11.  They argue that Commerce may not reject new information at verification where that information is "necessary to correct, clarify, or corroborate

Court No. 25-00053                                                              Page 6

record information" and where "Commerce has sufficient time to review and verify" that information. Id. According to QMC-Muntajat, the reconciliation data here corroborated record information and was submitted in response to Commerce's request that QAFCO reconcile its purchases of electricity and water in March 2023 and September 2023 to the company's accounting system. Id. at 14. QMC-Muntajat further maintains that Commerce "reviewed the [reconciliation data] over an approximately two-hour period" without identifying serious discrepancies (verified it, in QMC-Muntajat's view) but nonetheless rejected the data the very next day. Id. at 16. In support of their position, Plaintiffs cite to several decisions, which they characterize as analogous, from this court and the Federal Circuit. Id. at 18–21.

The government and Cornerstone respond that Commerce properly rejected the reconciliation data. Gov. Resp. at 16; Cornerstone Resp. at 4. The government argues that QAFCO's submission of the reconciliation data was not a corroboration of existing record evidence but rather new evidence because QAFCO provided additional consumption data regarding its previously unreported electricity and water usage. Gov. Resp. at 19. Moreover, according to the government and Cornerstone, the reconciliation data went beyond Commerce's request for reconciliation because it contained previously unreported consumption values for electricity and water. Id. at 20–21; Cornerstone Resp. at 6–7. The government and Cornerstone further argue that verification in this case marked a point at which QMC-Muntajat could not submit new information. Gov. Resp. at 22; Cornerstone Resp. at 4. The government emphasizes that Commerce had already issued its preliminary determination and post-preliminary analysis before verification, and that it had provided Plaintiffs with sufficient notice that it would not accept

untimely new information at verification.[2]   Gov. Resp. at 22.   Both the government and Cornerstone argue that Plaintiffs' cited authority is inapposite.  Id. at 23–25; Cornerstone Resp. at 8–9.

Verification refers to the "process by which Commerce 'verif[ies] the accuracy and completeness' of factual information submitted by interested parties, before Commerce makes a final countervailing duty determination."  Gov't of Quebec v. United States, 105 F.4th 1359, 1364 (Fed. Cir. 2024) (quoting 19 C.F.R § 351.307(d)); see also 19 U.S.C. § 1677m(i)(1) (requiring Commerce to verify all information that it relies upon in making a final determination).  The court reviews "verification procedures employed by Commerce in an investigation for abuse of discretion."  Micron Tech., Inc. v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997).  Commerce abuses its discretion "by rejecting corrective information, which includes submissions to correct information already provided to Commerce, or to clarify information already in the record, but not submissions proffered to fill gaps caused by the respondent's failure to provide a questionnaire response or evidence requested during verification."  Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States, 498 F. Supp. 3d 1345, 1361 (CIT 2021) (citation modified) (citation omitted).

As mentioned, QMC-Muntajat identified QAFCO, Industries Qatar Q.P.S.C. ("Industries Qatar"), and QatarEnergy as the relevant cross-owned affiliates for purposes of responding to Commerce's Initial Questionnaire.  Melamine from Qatar: Affiliated Companies Response at 1, C.R. 44, P.R. 68 (Apr. 5, 2024) ("Affiliated Cos. Resp.").  QMC-Muntajat indicated that QAFCO is QMC's direct parent company and that QatarEnergy is the ultimate parent company (with direct

---

[2] Both the government and Cornerstone emphasize that Plaintiffs waited until the fourth day of verification to submit the reconciliation data, in spite of Commerce's instructions to identify and quantify errors at the outset.  Gov. Resp. at 20; Cornerstone Resp. at 7–8.

Court No. 25-00053                                                                      Page 8

and indirect majority interests in Industries Qatar, QAFCO, and QMC).  Id. at 4.  Only QAFCO

and QatarEnergy purchased electricity and water during the POI.  Pls. Mot. at 5.

On May 10, 2024, QMC-Muntajat submitted complete questionnaire responses for

QAFCO, Industries Qatar, and QatarEnergy.  See Response of QMC-Muntajat, Melamine from

Qatar: Response to the General Questions and Program-Specific Portions of Section III of the CVD

Questionnaire, C.R. 45–103, P.R. 82–93 (May 10, 2024) ("Pls. Sec. III Resp.").  QAFCO reported

that it purchased electricity and water from the state-owned Qatar General Electricity & Water

Corporation ("Kahramaa"),[3] specifically electricity at the Bulk Industrial rate and water at the Bulk

Industrial and Commercial rates.  See id., Exs. ELECTR_QAFCO-1, WATER_QAFCO-1.  Based

upon this reported consumption data, Commerce calculated a preliminary subsidy rate of 0.48%

for QAFCO's and QatarEnergy's purchases of electricity combined, and a preliminary subsidy

rate of 0.10% for QAFCO's and QatarEnergy's purchases of water combined.[4]  See Post Prelim.

Memo at 7, 9.

During the POI, QAFCO also purchased electricity at the Residential and Commercial rates

and water at the Residential and Preferential Industrial rates (as well as additional water at the

Commercial rate), but did not report these consumptions until verification.  See Verification of the

Questionnaire Responses of QMC-Muntajat at 15, 17, C.R. 355, P.R. 260 (Oct. 30, 2024) ("Pls.

---

[3] Kahramaa is the sole owner and operator of the transmission and distribution networks of electricity and water in Qatar and is responsible for setting electricity and water rates to various types of customers.  Response of GOQ, Melamine from Qatar: Response to Section II of the CVD ("GOQ Sec. II Resp."), Ex. SOQ-KAHRA-6 at 4, C.R. 104–137, P.R. 94–119 (May 14, 2024). Kahramaa sells electricity and water at various standard rates depending on the customer type, including "Heavy Industrial (Bulk)," Preferential Industrial, "Commercial," and "Residential." Id., Ex. SOQ-KAHRA-4 at 6.

[4] As part of its post-preliminary determination, Commerce found that Kahramaa's provision of electricity and water at the Bulk Industrial and Commercial rates was specific under 19 U.S.C. § 1677(5A)(D)(i) and 1677(A)(D)(iii)(II), respectively, but did not find that Kahramaa's provision of electricity and water at the Residential rate was specific.  See Post-Prelim. Memo at 5–8.

Verification Rep."). To verify QMC-Muntajat's responses, Commerce requested a reconciliation of QAFCO's purchases of electricity and water in March 2023 and September 2023 to the company's accounting system.[5] Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing & Distribution Company (Muntajat) Q.P.J.S.C Questionnaire Responses at 9, P.R. 247 (Sep. 12, 2024) ("Verification Agenda"). In response, QAFCO prepared a reconciliation that tied its purchases of electricity and water—including its previously unreported purchases—to its accounting records for the POI. See Letter from QMC/Muntajat, Case Brief at App'x, Reconciliation of Electricity and Water, C.R. 358–68, P.R. 265–72 (Nov. 6, 2024) (the "Reconciliation"). Commerce reviewed the Reconciliation on September 25, 2024, and did not identify any discrepancies to Plaintiffs. See Letter from QMC/Muntajat, Case Brief at App'x, Decl. of J. Campbell ¶ 8, C.R. 358–68, P.R. 265–72 (Nov. 6, 2024). On September 26, 2024, however, Commerce informed Plaintiffs that it would not accept the reconciliation data. Id. ¶ 9. In its verification report, Commerce noted that the unreported electricity consumption accounted for [[  ]]   of QAFCO's total energy purchases, and that the unreported water consumption accounted for [[   ]]   of QAFCO's total water purchases during the POI. Pls. Verification Rep. at 16, 19. Following briefing, Commerce rejected the Reconciliation as untimely new factual information and instead applied an adverse rate under 19 U.S.C. § 1677e(b). See IDM at 6–11, 27–30.

---

[5] As part of its verification agenda, Commerce instructed that "if you identified errors in the responses while preparing for verification, please provide the following at the outset of verification: (1) A list of the errors; (2) Original documentation to show the corrections; and (3) A chart that shows the magnitude of changes to quantitative data." IDM at 6; Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C Questionnaire Responses at 2, P.R. 247 (Sep. 12, 2024) ("Verification Agenda").

Commerce reasonably rejected QAFCO's reconciliation data.[6] Despite QMC-Muntajat's characterizations, see Pls. Mot. at 14–15, the reconciliation data did not merely corroborate existing record information. On the contrary, QMC-Muntajat attempted to present previously unreported water and electricity consumed during the POI. Pls. Verification Rep. at 16, 19. Commerce had previously requested this consumption data. See IDM at 5; Initial Questionnaire at III-9–10. The court does not consider substantial unreported consumption data to be verifiable, especially when Commerce specifically had requested such data from the outset of its investigation.[7] Guizhou Tyre Co. v. United States, 523 F. Supp. 3d 1312, 1348 (CIT 2021) (holding that new factual information was properly rejected at verification where it did not "corroborate, support and clarify factual information on the record" but rather constituted "an attempt . . . to fill gaps in the record caused by [the respondent's] own failure to respond fully to Commerce's questionnaires"). Nor was the reconciliation a "straightforward mathematical adjustment," see Pls. Mot. at 17, because the unreported water and electricity consumption data would have required Commerce to recalculate the CVD margin for electricity and water consumption. Goodluck India Ltd. v. United States, 11 F.4th 1335, 1343 (Fed. Cir. 2021) (finding no abuse of discretion where Commerce declined to consider evidence at verification that

---

[6] While Plaintiffs argue that Commerce actually verified the reconciliation data, Pls. Mot. at 13, Plaintiffs' argument rests on the fact that Commerce officials looked at the reconciliation data for a two-hour period during verification without identifying discrepancies. Id. at 16. Looking at evidence and verifying that evidence, however, are two different things. Indeed, Plaintiffs' counsel conceded at oral argument that, at no point during verification, did Commerce officials represent that they had in fact verified the information. Oral Argument at 08:06–16. Plaintiffs' argument thus fails.

[7] Plaintiffs argue that, because Commerce requested a reconciliation of QMC-Muntajat's (and its cross-owned companies') electricity and water consumption against the companies' accounting systems, the reconciliation data "constituted information requested by the verifiers . . . to corroborate, support, and clarify factual information already on the record" and thus should have been accepted. See Pls. Mot. at 14–15 (citation omitted). But Commerce did not request new consumption data. See Verification Agenda at 9.

"render[ed] the entire [antidumping duty] calculation inaccurate"); Içdaş Celik, 498 F. Supp. 3d at

1362 (holding that Commerce properly rejected a corrective submission at verification where the

"proposed correction would affect a significant portion of the data").  QMC-Muntajat's broadside

of inapposite caselaw does not compel a different result.[8]  Thus, Commerce reasonably rejected

QMC-Muntajat's reconciliation data.

---

[8] Plaintiffs rely heavily on Goodluck India, see Pls. Mot. at 13–17, zeroing in on the following observation: "Commerce can [] abuse its discretion by 'refusing to accept updated data when there is plenty of time for Commerce to verify or consider it.'" Goodluck India, 11 F.4th at 1342 (quoting Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016); NTN Bearing Corp. v. United States, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995); Fischer S.A. Comercio, Industria & Agricultura v. United States, 34 CIT 334, 339–42, 700 F. Supp. 2d. 1364, 1370–71 (2010); Timken U.S. Corp. v. United States, 434 F.3d 1345, 1351 (Fed. Cir. 2006) (citation modified)).  According to Plaintiffs, Commerce violated this standard because it looked at the reconciliation data during verification.  Pls. Mot. at 16.  This is a gross overreading of Goodluck India.  Three paragraphs after making the observation upon which Plaintiffs rely, the court distinguished the cases it cited in support—NTN Bearing, Fischer, and Timken—noting that these cases "all stand for the proposition that Commerce cannot reject corrective information at a preliminary determination stage (where there are no finality concerns) . . .  Here, in contrast, Goodluck submitted its revised databases at verification.  Verification represents a point of no return."  Goodluck India, 11 F.4th at 1343 (emphasis in original).  The court went on to hold that "Commerce acted within its discretion in rejecting Goodluck's revised submissions on the day of verification because substantial evidence supports Commerce's determination that Goodluck's revisions were not minor."  Id.
Plaintiffs' other cases are also not helpful.  Linyi Chengen Import & Export Co. v. United States, is factually distinguishable and, in any event, was reversed by the Federal Circuit on the issue of whether Commerce should have accepted the information presented at verification.  433 F. Supp. 3d 1278 (CIT 2020), rev'd in part 174 F.4th 1351 (Fed. Cir. 2026).  CITIC Trading Co. v. United States concerned Commerce's rejection of a list of closed producers where the list did not exist at the time of the questionnaire and supplemental responses and where the producers were completely independent from the respondent.  27 CIT 356, 358, 369, 372–73 (2003).  TMK IPSCO v. United States concerned an explanation at verification regarding sales that the respondent had already reported.  179 F. Supp. 3d 1328 (CIT 2016).  And in Ass'n of American School Paper Suppliers v. United States, Commerce asked the respondent for further information regarding its accounting systems and financial statements and reconciled "the analyses provided. . . with the information already submitted" to ensure "that cost data already submitted was categorized correctly."  32 CIT 1196, 1217 (2008) (emphasis added).  In none of these cases did the court hold that Commerce unreasonably rejected new data that was previously requested through initial and supplemental questionnaires.

## II.    Commerce Unreasonably Applied a 16% Subsidy Rate for the Provision of Electricity and Water

QMC-Muntajat contends that Commerce unreasonably selected a 16% subsidy rate (8% for electricity and 8% for water) as an adverse rate for the provision of electricity and water. Pls. Mot. at 22–32. First, QMC-Muntajat argues that the rate Commerce selected was "wholly unrelated" to the subsidy rate for the provision of electricity and water because the 16% subsidy rate reflects the subsidy paid by Qatar's Ministry of Finance ("MOF") to Kahramaa for electricity and water consumption in the Commercial sector as a percentage of the total subsidy amount paid across all sectors. Id. at 27, 28. It adds that Commerce's selection of the 16% subsidy rate here is unsupported by substantial evidence because it does not relate to specific information missing from the record (i.e., the reconciliation data). Id. at 29. Second, QMC-Muntajat avers that Commerce's selection of a 16% adverse subsidy rate was punitive. Id. at 29–32. It points out that Commerce preliminarily determined that QMC-Muntajat's subsidy rates for electricity and water were 0.48% and 0.10%, respectively (without the reconciliation data factored in), meaning that the 8% rate selected was 17 times higher than the preliminary electricity rate and 80 times higher than the preliminary water rate for the respective programs.[9] Id. at 29–30.

---

[9] QMC-Muntajat also argues that Commerce impermissibly disregarded the statutory hierarchy governing the selection of adverse rates because there is no exception to the hierarchy for CVD proceedings. Pls. Mot. at 32 (citing 19 U.S.C. § 1677e(d)(1)(A)). While it is not clear how exactly the statute benefits Plaintiffs, both the government and Cornerstone respond that it was reasonable for Commerce to deviate from Commerce's administrative adverse rate hierarchy. Gov. Resp. at 27–29; Cornerstone Resp. at 13. The government adds that following its normal hierarchy would necessitate applying the 24.04% rate calculated for the corporate income tax exemptions under step four of its hierarchy for both the electricity and water for LTAR programs. Gov. Resp. at 29. Contrary to QMC-Muntajat's position, Section 1677e(d)(1)(a) is a permissive statute. 19 U.S.C. § 1677e(d)(1)(A) ("[I]n selecting among the facts otherwise available, [Commerce] may . . . in the case of a countervailing duty proceeding . . . use . . . .") (emphasis added); ArcelorMittal USA LLC v. United States, 337 F. Supp. 3d 1285, 1301 (CIT 2018) ("[Section 1677e's] provision on

The government and Cornerstone respond that Commerce's application of an adverse rate to select a 16% subsidy rate was reasonable.[10]  Gov. Resp. at 25–31; Cornerstone Resp. at 11–14. The government points out that the total and accurate quantity and value of electricity and water that QAFCO consumed during the POI were not on the record, which are necessary to calculate the benefit that QAFCO received.  Gov. Resp. at 26–27, 30.

Commerce shall apply facts otherwise available if a respondent fails to provide "necessary information."  19 U.S.C. § 1677e(a).  If Commerce determines that a respondent has "failed to cooperate . . . to the best of its ability" in providing Commerce with requested information, it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  Id. § 1677e(b)(1)(A).  In a countervailing duty proceeding, Commerce may

> (i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use.

Id. § 1677e(d)(1)(A).  Commerce's regulations set forth an expanded hierarchy in accordance with Section 1677e(d)(1)(A).[11]  See 19 C.F.R. § 351.308(j)(1)(i)–(iv).

---

adverse inferences consistently uses permissive language to describe how Commerce may go about applying AFA.").

[10] The government argues that Plaintiffs waived any challenge to Commerce's selection of the rate by failing to raise it in their case brief before Commerce.  See Gov. Resp. at 28–29.  There was no indication in the post-preliminary decision memorandum that Commerce would apply the adverse rate, see Post-Prelim. Memo, and the government ignores the fact that the case briefs were prepared on November 6, 2024, See Letter from QMC/Muntajat, Case Brief, C.R. 358–68, P.R. 265–72 (Nov. 6, 2024), before Commerce published the IDM on December 2, 2024, and thus before Plaintiffs were apprised of Commerce's decision to apply an adverse rate.  Accordingly, Plaintiffs did not waive the argument.

[11] In applying an adverse rate in a countervailing duty investigation, Commerce will conduct an inquiry under each of the following four steps if no rate exists under the previous step; the four steps are: (i) "determine if a cooperating respondent used an identical program in the investigation and apply the highest calculated above-de minimis rate for the identical program;" (ii) "determine if an identical program was used in another countervailing duty proceeding involving the same

Using an adverse facts available rate, "in CVD cases, is only appropriate so long as a gap in the record exists because the point of AFA is to allow Commerce to make a decision where a record is otherwise incomplete." Risen Energy, Co. v. United States, 724 F. Supp. 3d 1356, 1364 (CIT 2024) (citations omitted). The adverse inference that Commerce selects "must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." Oman Fasteners, LLC v. United States, 125 F.4th 1068, 1086 (Fed. Cir. 2025) (citation modified) (citation omitted); see also Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316 at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198 ("SAA") (Commerce must make its adverse rate determination "based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration").[12] Indeed, "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). Thus, "Commerce should consider the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party in an AFA analysis." BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1301 (Fed. Cir. 2019).

---

country and apply the highest calculated above-de minimis rate for the identical program;" (iii) "determine if there is a similar or comparable program in any countervailing duty proceeding involving the same country and apply the highest calculated above-de minimis rate for the similar or comparable program;" and (iv) "apply the highest calculated above-de minimis rate from any non-company-specific program in a countervailing duty proceeding involving the same country that the Secretary considers the company's industry could possibly use." 19 C.F.R. § 351.308(j)(1)(i)–(iv).

[12] The SAA is the authoritative interpretation of the statute. 19 U.S.C. § 3512(d).

As mentioned, the GOQ regulates and controls the provision of electricity and water through its authority, Kahramaa, which charges standard rates for electricity and water for different categories of users, or sectors (e.g., Residential, Commercial, and Bulk or Light Industrial).  See Post-Prelim. Memo at 5, 7.  Kahramaa calculates a certain rate for electricity and water, which reflects Kahramaa's various expenses, among other things.  Response of GOQ, Melamine from Qatar: Response to the Post-Preliminary Supplemental Questionnaire at 3, C.R. 269–86, P.R. 230–34 (Aug. 7, 2024) ("GOQ Post-Prelim. Questionnaire Resp.").  In general, this rate is higher than the actual tariff rates that Kahramaa charges to its customers.  Id.; Response of GOQ, Melamine from Qatar: Response to Section II of the CVD, Ex. SOQ-KAHRA-06 at 19, C.R. 104–137, P.R. 94–119 (May 14, 2024) (the "Annual Tariff Report").  A governmental authority subsidizes the difference.[13]

In its initial response, QMC reported that it purchased electricity from QAFCO, its parent company, and that QAFCO in turn purchased electricity at the Bulk Industrial rate and water at the Bulk Industrial and Commercial rates from Kahramaa.  Post-Prelim. Memo at 5, 7.  QatarEnergy reported that it purchased electricity and water at the Bulk Industrial, Light Industrial, Commercial, and Residential rates.  Id.  Based on this information, Commerce calculated a preliminary subsidy rate of 0.48% ad valorem for electricity and 0.10% ad valorem for water for

---

[13] Pursuant to a [[

                    ]].    See GOQ Sec. II Resp., Ex. SOQ-KAHRA-04 at 8, 10; GOQ Prelim. Questionnaire Resp. at 3.  Thus, the subsidy amount is the [[
                                                ]].   See GOQ Sec. II Resp., Ex. SOQ-KAHRA-04 at 10 ("[[

                                                                                ]]");
Annual Tariff Report at 7 (detailing a [[                              ]]  for electricity and water).

QMC-Muntajat.[14]  Id. at 7, 9.  As mentioned, however, QAFCO had unreported electricity and

water consumption data, which Commerce did not consider in its post-preliminary calculations,

and which it reasonably rejected as untimely at verification.

In the Final Determination, Commerce revised its preliminary calculations.  Commerce

applied facts otherwise available with an adverse inference[15] because the total accurate amounts

---

[14] Commerce calculated the preliminary subsidy rate for electricity by first subtracting the applicable per-kilowatt hour (kWh) tariff rate that QAFCO or QatarEnergy paid for electricity from the per-kWh benchmark electricity rate to determine a per-kWh benefit rate.  Post-Prelim. Memo at 7.  Commerce then multiplied this rate by the electricity volume consumed by each company to determine the company's POI benefit, which it then divided by the company's total sales value to calculate a company-specific subsidy rate.  Id.  Commerce then summed the ad valorem rate for QatarEnergy and QAFCO to determine a countervailable subsidy rate of 0.48% ad valorem.  See Commerce Memorandum, RE: Post-Preliminary Analysis Calculations for QMC-Muntajat at 3, CR 304–05, P.R. 249 (Sep. 12, 2024) ("Post-Prelim. Cal. Memo").  Likewise, Commerce calculated the preliminary subsidy rate for water by first subtracting the applicable per-cubic-meter ("CBM") tariff rate that QAFCO or QatarEnergy paid from the per-CBM benchmark water rate to determine a per-CBM benefit rate.  Post-Prelim. Memo at 9.  Commerce then multiplied the per-CBM rate by the total water volume consumed by each company to determine each company's POI benefit, which it then divided by the company's applicable total sales value to calculate a company-specific subsidy rate.  Id.  Commerce then summed the ad valorem rate for QatarEnergy and QAFCO to determine a countervailable subsidy rate of 0.10% ad valorem.  See Post-Prelim. Cal. Memo at 4.

[15] Commerce found that QAFCO had not acted to the best of its ability to comply with Commerce's requests for information, such that the selection of an adverse rate was appropriate.  IDM at 7.  QMC-Muntajat does not explicitly contest that it acted to the best of its ability in responding to Commerce's information requests.  The parties, however, debate the reason why QAFCO failed to report certain of its consumption data prior to verification.  QMC-Muntajat maintains that it misreported its consumption data due to confusion between CVD and AD reporting methodologies.  See Pls. Mot. at 15.  Commerce found this purported reason to be inconsistent with statements made during verification, specifically that QAFCO did not report consumption data for one water meter, which QAFCO claimed was not used for production.  IDM at 7.  Even crediting QAFCO's reason for failing to submit this data, the court finds that Commerce reasonably applied an adverse inference in this case.  Purported confusion between CVD and AD reporting methodologies is no excuse for failing to submit [[                ]] of water and [[        ]]  of electricity consumed during the POI.  QAFCO could have asked for clarity at any time during the investigation process.  Because it did not do so, it did not act to the best of its ability in responding to Commerce.  See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (noting that "[c]ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and

of electricity and water that QAFCO had purchased from Kahramaa were not on the record, and thus Commerce could not calculate an accurate subsidy rate. See IDM at 6. Commerce applied an adverse inference that Plaintiffs benefitted at the highest rate that QMC-Muntajat had reported consuming from Kahramaa, i.e., the Commercial rate. Id. at 11; Commerce Memorandum, RE: Final Determination Calculations for QMC-Muntajat at 3, C.R. 372, P.R. 283 (Dec. 2, 2024) ("Final Cal. Memo"). Commerce located what it considered to be the subsidy rate for electricity and water supplied to the Commercial sector in Appendix F of Kahramaa's 2023 Annual Tariff Review Report. See IDM at 11; Annual Tariff Report.

In the Annual Tariff Report,[16] Kahramaa proposed to "[[

]]

---

complete answers to all inquiries in an investigation" and that "[the standard] assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken").

[16] Because the source document from which Commerce selected its adverse rate is business proprietary information ("BPI"), much of the following description is redacted in the public version of this opinion. As relevant, Commerce selected a percentage figure in a table that was listed under a column headed "subsidy (%)." As Plaintiffs explained, however, that percentage figure was not an actual subsidy rate, and bore no relation to the subsidy rate that Commerce should have calculated under its applicable regulations. See Pls. Mot. at 27–28.

[[

]]. Because the specific rates that Commerce decided to use constituted business

proprietary information ("BPI"), Commerce took a simple average of the two rates, i.e., 8% for electricity and 8% for water, or a combined 16% subsidy rate for the provision of electricity and water for LTAR programs. Id. at 4.

Commerce's selection of the 16% subsidy rate for the provision of electricity and water was unsupported by substantial evidence and contrary to law. First, while Commerce has wide latitude to select an adverse rate, it must still select a rate that is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." See Oman Fasteners, 125 F.4th at 1086 (citation omitted). Commerce has not shown that the 16% subsidy rate is probative of the actual subsidy rate QMC-Muntajat received, let alone a reasonably accurate estimate. To the contrary, Plaintiffs have explained—and neither the government nor Cornerstone has provided any meaningful challenge to the contrary—that the percentages Commerce used from Appendix F merely reflect the subsidy amounts in QAR for each sector as a percentage of the total subsidy amount across sectors. Pls. Mot. at 27–28; see also Def.'s Post-Arg. Submission at 3–4, ECF No. 63 (June 23, 2026) (failing to explain how the percentage figures in Appendix F are relevant to the chosen subsidy rate); Confidential Post-Arg. Br. of Def.-Intervenor Cornerstone Chem. Co. at 3, ECF No. 58 (June 23, 2026) ("Cornerstone Post-Arg. Br.") (same). In fact, they are simply not any kind of CVD subsidy rates.

Using the percentages from Appendix F is thus arbitrary because they bear no relation to any subsidy calculation Commerce could find was appropriate here. Pursuant to 19 C.F.R. § 351.525(a), Commerce calculates a subsidy rate by dividing the amount of the benefit during the period of investigation by the total sales in the same period. Commerce normally determines whether a good was provided for LTAR "by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in

question." 19 C.F.R. § 351.511(a)(2)(i).  Rather than choosing an input for this subsidy calculation or evidencing the per-unit benefit that Plaintiffs could have received, the Appendix F figures are based on the comparative consumption amounts of each sector and bear no relation to any subsidy QMC-Muntajat could have received for electricity and water.

Second, Commerce failed to explain why the 16% subsidy rate selected as an adverse rate incentivized compliance without being punitive.  See Gallant Ocean (Thai.) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) ("[A]lthough a higher AFA rate creates a stronger deterrent, Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin.").  In its post-preliminary decision memorandum, Commerce calculated a preliminary subsidy rate for electricity of 0.48% ad valorem.  Post-Prelim. Memo at 7.  According to the Plaintiffs, a very small amount of QAFCO's electricity usage was unreported.   See Pls. Verification Rep. at 16.  Commerce has not explained how this unreported amount of electricity usage could possibly have raised the subsidy rate almost 17-fold.[17]  Compare Post-Prelim. Memo at 7 (0.48%), with IDM at 13 (8%).  While the unreported percentage of water was higher, Commerce has not explained how the missing data was enough to raise the subsidy rate 80-fold. Compare Post-Prelim. Memo at 9 (0.10%), with IDM at 14 (8%).  Nor did Commerce find that QMC-Muntajat's conduct in failing to report its total electricity and water consumption during the

---

[17] The court also notes that the entire electricity and water consumption for QatarEnergy was on the record, and that Commerce calculated preliminary subsidy rates for QatarEnergy's water and electricity usage in the amounts of [[                    ]],   respectively.  See Post-Preliminary Calculation Memo, Attach. 2 at 16, C.R. 304–05, P.R. 249 (Sep. 12, 2024).  While the court agrees with Cornerstone that using the preliminary rates for QatarEnergy as facts available might undermine the purpose of the statute by allowing affiliate data to mask adverse unreported data, Cornerstone Post-Arg. Br. at 3, Commerce should have been aware that its selection of a 16% subsidy rate was well out of accord with preliminary calculations, and thus likely aberrational.  Cf. Gallant Ocean, 602 F.3d at 1324 ("Cooperating respondents' actual dumping margins during the administrative review period—ranging from 2.58% to 10.75%—further call into question the credibility of the adjusted petition rate [of 57.64%].").

POI warranted a high rate.  See BMW of N. Am., 926 F.3d at 1301 ("Commerce should consider the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party in an AFA analysis.").

The court accordingly remands to Commerce to redetermine the subsidy rate for the provision of electricity and water.  Commerce must explain why its selected rate (1) is reflective in some way of the actual subsidy rate Plaintiffs received for water and electricity and (2) incentivizes compliance without leading to punitive or aberrational results.[18]  While Commerce determined that "the total accurate consumption quantity and value of electricity and water that QAFCO consumed during the POI is not on the record," IDM at 6, other data may shed light.[19]  On remand, Commerce should consider whether it may use any record information in selecting a reasonable adverse rate.  The court also notes that, as only a small amount of QAFCO's electricity usage is not on the record, Commerce may find that amount within the range of acceptable minor error and may exercise its discretion to reopen the record to accept it.  Laclede Steel Co. v. United States, 19 CIT 1076, 1078 (1995) ("Any decision to expand the administrative record upon remand is well within [Commerce's] discretion, absent express language from the court barring such

---

[18] As mentioned above, Commerce indicated that, had it not deviated from its hierarchy, it would have applied, under step four of its CVD adverse rate hierarchy, the 24.04% rate calculated for QMC/Muntajat for the corporate income tax exemptions program for both the electricity and water for LTAR programs.  IDM at 11 n.54.  Should Commerce determine to use the 24.04% rate in any manner, it must still explain why it considers this rate reasonable to use, see 19 U.S.C. § 1677e(d)(1)(A)(ii), and why the rate incentivizes cooperation without being punitive. Commerce has already determined that using the rate for each program is not appropriate.  IDM at 11 n.54.

[19] The court notes that the record contains information, such as the [[                    ]] for electricity and water,  see Annual Tariff Report at 5, the [[
                    ]],   id. at 16, the [[
        ]],    id., and the complete reported volume of electricity and water QAFCO and QatarEnergy purchased at the Bulk Industrial rate during the POI, see Post-Prelim. Memo at 5, 7, that may be probative in selecting a reasonable rate.

action."); see also Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1382 (Fed. Cir. 2003) ("Whether on remand the Commission reopens the evidentiary record, while clearly within its authority, is of course solely for the Commission itself to determine.").

### III.   Commerce Unreasonably Determined the Benefit for the Provision of Land Rights

QMC-Muntajat next argues that Commerce unreasonably determined the benefit for the provision of certain land rights because it considered the financial contribution (revenue forgone by the GOQ in granting the right to collect certain port fees and lease income to QatarEnergy) to equal the benefit without accounting for the costs borne by QatarEnergy during the POI to develop and manage the land in question. Pls. Mot. at 32–43. QMC-Muntajat maintains that under 19 U.S.C. § 1677(5)(B), the benefit is distinct from the financial contribution in all instances except where the financial contribution takes the form of a grant. See id. at 33–34 (citing 19 C.F.R. § 351.504(a) ("In the case of a grant, a benefit exists in the amount of the grant.")). Thus, according to QMC-Muntajat, Commerce here must calculate the benefit separately from the financial contribution. Id. at 34–38. Because neither the statute nor Commerce's regulations explain how Commerce must calculate the benefit in the context of a financial contribution involving rental or port services revenue forgone, QMC-Muntajat maintains that the term "benefit" must be given its "plain and ordinary meaning," i.e., "profit."[20] Id. at 36. QMC-Muntajat principally relies on Hyundai Steel Co. v. United States, 658 F. Supp. 3d 1331 (CIT 2023) ("Hyundai CORE"), in which the court remanded to Commerce to assess whether the value of the respondent's port-usage rights exceeded its construction costs for purposes of determining whether the respondent received a countervailable benefit. Id. at 40–43 (citing Hyundai CORE at 1336).

---

[20] According to QMC-Muntajat, the actual benefit (i.e., profit) would equal QAR [[         ]] during the POI. See Pls. Mot. at 39.

The government and Cornerstone counter that Commerce reasonably calculated the benefit to be the "amount of revenue that QatarEnergy collected from rental payments and port fees" during the POI.  Gov. Resp. at 35; see Cornerstone Resp. at 14–17.  They rely on Hyundai Steel Co. v. United States, 651 F. Supp. 3d 1321 (CIT 2023) ("Hyundai Steel"), in which the court sustained Commerce's determination that the provision of the right to collect port revenue constituted a benefit and where Commerce declined to offset any costs the respondent incurred to develop the port facilities.  Gov. Resp. at 35 (citing Hyundai Steel at 1326); Cornerstone Resp. at 16 (same).  Cornerstone further cites Mosaic Co. v. United States, 647 F. Supp. 3d 1358 (CIT 2023) ("Mosaic"), where the court sustained Commerce's reliance on 19 U.S.C. § 1677(6) (listing permissible offsets) in refusing to offset the subsidy amount by expenses that the respondent incurred.  Cornerstone Resp. at 15–16.  According to the government and Cornerstone, because QatarEnergy's expenses in operating or maintaining the land and port areas at issue are not provided for in Section 1677(6), Commerce reasonably declined to offset them.  See Gov. Resp. at 35–36; Cornerstone Resp. at 14–17.

A subsidy is countervailable if, relevant here, an authority provides a financial contribution[21] to a recipient and thereby confers a benefit.  19 U.S.C. § 1677(5)(B).  The term "benefit" is not defined in the statute, but Section 1677(5)(E) contains a list of examples illustrating

---

[21] A financial contribution may take the form of "forgoing or not collecting revenue that is otherwise due."  19 U.S.C. § 1677(5)(D)(ii).  The term "otherwise due" means "'but for the subsidy program,' the subsidy recipient would owe the government an 'enforceable obligation or debt.'" POSCO v. United States, 794 F. Supp. 3d 1402, 1412 (CIT 2025) (quoting Hyundai Steel Co. v. United States, 659 F. Supp. 3d 1327, 1334 (CIT 2023)).  Revenue forgone, therefore, is measured by the value of the financial contribution that would be "otherwise due."  See Hyundai Steel Co., 659 F. Supp. 3d at 1337.

how to determine the benefit in the context of certain financial contributions.[22]  Id. § 1677(5)(E).

"Commerce must make distinct findings as to the elements of financial contribution and benefit."

Wilmar Trading Pte Ltd. v. United States, 466 F. Supp. 3d 1334, 1355–56 (CIT 2020) (citations

omitted).   Commerce's regulations outline how Commerce calculates the benefit for certain

programs.  See 19 C.F.R. § 351.503.  Neither the statute nor Commerce's regulations, however,

specify how to calculate the benefit in the context of a financial contribution involving rental or

port services revenue forgone.  Section 1677(6) lists certain offsets that Commerce may deduct

from the gross countervailable subsidy in determining the net countervailable subsidy.[23]  19 U.S.C.

§ 1677(6).

The GOQ granted certain land rights to QatarEnergy over various industrial cities for the

duration of QatarEnergy's existence, as well as rights over certain ports.  See Pls. Sec. III Resp.,

Exs. LAND-01–LAND-03; Post-Prelim. Memo at 9.  Specifically, the GOQ granted QatarEnergy

---

[22] For example, in the case of an equity infusion, a benefit is conferred "if the investment decision is inconsistent with the usual investment practice of private investors;" in the case of a loan, "if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market;" in the case of a loan guarantee, "if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee;" and in the case where goods or services are provided, "if such goods or services are provided for less than adequate remuneration . . . [as] determined in relation to prevailing market conditions for the good or service."  19 U.S.C. § 1677(5)(E)(i)–(iv).

[23] Section 1677(6) provides that:

> For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—
> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
> (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

19 U.S.C. § 1677(6).

the right to use, utilize, and manage Mesaieed Industrial City ("MIC"), Ras Laffan Industrial City, and Dukhan Concession Area by issuing Decree No. 59 of 1989 (the "MIC Decree"), Decree No. 35 of 1994 (the "Ras Laffan Decree"), and Decree No. 55 of 1995, respectively. See Post-Prelim. Memo at 9. The GOQ assigned the management and supervision of the Mesaieed port (part of the land over which QatarEnergy was given rights in the MIC Decree) and the Ras Laffan port (part of the land over which QatarEnergy was given rights in the Ras Laffan Decree) to QatarEnergy. Id. at 10. QatarEnergy may thus carry out port services and collect fees for the services it provides. Id. QMC-Muntajat provided evidence showing that it incurred expenses during the POI, [[                                        ]],    to develop, maintain, and administer these industrial cities and ports. See Letter from QMC/Muntajat, Case Brief at 6, C.R. 358–68, P.R. 265–72 (Nov. 6, 2024).

In its post-preliminary decision memorandum, Commerce determined that the provision of these land rights provides a financial contribution in the form of revenue forgone, pursuant to 19 U.S.C. § 1677(E)(5)(D)(ii), because "the GOQ's granting of usufruct rights to QatarEnergy included the right to collect land lease and port income from these areas, which would otherwise have been collected by the GOQ absent the delegation of these rights to QatarEnergy."[24] Post-Prelim. Memo at 11. Commerce determined that a benefit was conferred under this program "in the amount of revenue QatarEnergy collected from rental payments and port fees." Id. Commerce, however, did not consider any expenses incurred by QatarEnergy during the POI to develop the

---

[24] Commerce found that the provision of land rights was "recurring," pursuant to 19 C.F.R. § 351.524(c)(2), because "QatarEnergy manages these land and port areas and collects rental and lease income on a regular, year-to-year basis, without the express authorization or approval of the GOQ." IDM at 22, 26. The benefit of the program, therefore, was to be "allocated to the year in which the benefit was received, i.e., the amount of rental income QatarEnergy received during the POI." Id. at 26.

Court No. 25-00053                                                      Page 26

industrial and port areas, and calculated a preliminary net countervailable subsidy rate of 1.71%

ad valorem.  See id. at 9–12.

In its Final Determination, Commerce continued to decline to consider the expenses

incurred by QatarEnergy in calculating the net subsidy rate.  See IDM at 25.  Relying on 19 C.F.R.

§ 351.503(c) and Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348 (Dep't Commerce Nov.

25, 1998) (the "CVD Preamble"), Commerce found that the amount of the benefit was the revenue

QatarEnergy received from the rental income and port fees "beyond the amount [QatarEnergy]

would otherwise earn," in other words that the benefit was equal to the financial contribution.  IDM

at 26 (citing CVD Preamble at 65,361).  Commerce reasoned that "[a]ny costs [QatarEnergy]

incurs as a result of its operations [are] distinct from the subsidy being provided by the GOQ and

therefore immaterial to [Commerce's benefit] analysis."  Id.  Relying on Hot-Rolled Steel from

Korea, Commerce reinforced its determination that it may only deduct the offsets listed in Section

1677(6) from its net subsidy rate calculation.  Because QatarEnergy's expenses are not among the

permissible offsets listed in Section 1677(6), Commerce declined to deduct them.  See id. at 25–

26 (citing Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of

Countervailing Duty Administrative Review; 2018, 86 Fed. Reg. 47,621 (Dep't Commerce Aug.

26, 2021) (declining to offset the benefit that the respondent received in collecting certain port fees

by any of the costs incurred in constructing the port)).

Commerce's determination that it did not need to consider QatarEnergy's expenses in

calculating the benefit was unreasonable.  Commerce determined that the port fees and rental

income forgone constituted a financial contribution, and that the revenue forgone was equal to the

amount QatarEnergy realized during the POI.  See Post-Prelim. Memo at 11; Post-Prelim. Cal.

Memo at 6.  The problem with this determination is that QatarEnergy was able to realize the

revenue that it did during the POI only because it invested in the development and administration of the land in question. Commerce's determination therefore attributes revenue that the GOQ would not have earned absent the same expenditures that QatarEnergy incurred. To compensate for this attribution, Commerce must take into account the expenditures that the GOQ would have incurred in its benefit analysis. Otherwise, Commerce impermissibly unmoors the benefit analysis from the financial contribution determination and attributes revenue to the GOQ that the GOQ did not actually forgo.

The structure and plain language of Section 1677(5)(E) reinforce this matter of common sense. First, the statute is clear that the benefit is derived from and "measured according to the type of financial contribution made." Wilmar Trading, 466 F. Supp. 3d at 1356 (citing 19 U.S.C. § 1677(5)(E)); see also 19 U.S.C. § 1677(5)(B)(i) (a subsidy requires a financial contribution to a person where a "benefit is thereby conferred" (emphasis added)). Thus, any assumption that Commerce carries into its financial contribution determination must carry through to its benefit analysis. Second, while the term benefit is not described in the statute, Section 1677(5)(E) provides examples of how to calculate the benefit in certain contexts, all of which underscore that the benefit must be determined by reference to normal market conditions. 19 U.S.C. § 1677(5)(E); Gov't of Sri Lanka v. United States, 308 F. Supp. 3d 1373, 1383 (CIT 2018) ("The touchstone of Section 1677(E) . . . is that what the company received somehow exceeded what the company paid or should have paid. Often, this is tested by reference to what would otherwise be available under normal market conditions."). In Hyundai CORE, the only case where a court has directly addressed how to determine the benefit in the context of port fees and lease income revenue forgone, the court observed that "[i]n normal market conditions, private companies don't gratuitously build government-owned infrastructure; they demand something in return" and

remanded to Commerce to consider the plaintiff's costs in constructing port facilities.[25] Hyundai

CORE at 1336. The court finds Hyundai CORE to be convincing in the light of the examples

listed in Section 1677(5)(E); Commerce's decision to ignore the POI expenses is not reflective of

normal market conditions. Finally, the plain meaning of the term "benefit"—which Plaintiffs

correctly note is "advantage, profit, good," see Pls. Mot at 35–36 (collecting sources)—combined

with the statutory command to make "distinct" findings as to the benefit and financial contribution,

see Wilmar Trading, 466 F. Supp. 3d at 1355–56, suggests that the benefit may not be equal to the

financial contribution where the recipient has given up something of value to receive the

contribution.

Commerce's cited authority does not persuade the court. Its reliance on the offset provision

contained in Section 1677(6) is misplaced because offsets are not determined until after the gross

countervailable subsidy (and necessarily the benefit) has been determined. See 19 U.S.C.

§ 1677(6) ("For the purpose of determining the net countervailable subsidy, the administering

authority may subtract from the gross countervailable subsidy . . . ." (emphasis added)); see also

S. Rep. No. 96-249, at 85 ("The gross subsidy is the value of the subsidy provided, or made

---

[25] As compared to Hyundai Steel and Mosaic, the court considers Hyundai CORE the more instructive and relevant, though non-binding, precedent because it is the only case that addresses how to determine a benefit in the context of land-related revenue forgone. See Hyundai CORE at 1336. The court in Hyundai Steel sustained Commerce's benefit determination but its opinion did not contain a detailed analysis, so it is of limited instructive value here. See Hyundai Steel at 1326 ("Commerce reasonably determined that the Government of Korea's provision of rights under the Port of Incheon Program, specifically the right to collect revenues from third parties using the port, conferred a benefit to Hyundai Steel. The Court observes that Commerce cited substantial evidence . . . to support its determination that the Government of Korea conferred the right to Hyundai Steel to collect revenue from third-party users of the port."). Mosaic, on the other hand, concerned whether Commerce should have deducted the costs of unused mining licenses that did not confer a benefit to the plaintiff in calculating the net subsidy rate for the provision of mining rights for LTAR related to the mining licenses it did use. See Mosaic, 647 F. Supp. 3d at 1372. The court in Mosaic did not address whether Commerce could decline to consider the expenses that the plaintiff actually incurred in receiving the countervailable subsidy.

available, and used."); 19 C.F.R. § 351.525(a) (Commerce calculates an ad valorem subsidy rate by "dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period."). Likewise, Commerce's reliance on 19 C.F.R. § 351.503(c) and the CVD Preamble is not convincing. See IDM at 26 n.26. In the CVD Preamble, Commerce stated "if there is a financial contribution and a firm . . . receives revenues beyond the amount it otherwise would earn[], that is the end of the inquiry insofar as the benefit element is concerned," and provided two examples to illustrate the point. CVD Preamble at 65,361. In both examples, government regulation negatively affected a company, but the company nevertheless received subsidies for compliance with the new regulation. Id. The CVD Preamble confirms that, in such scenarios, Commerce does not need to consider the negative effects of the government regulation on the company in determining the benefit. See id. That principle, however, does not govern the present scenario, where Commerce is attributing the revenue QatarEnergy earned during the POI to the GOQ but is not considering the expenses that the GOQ also forwent. Similarly, 19 C.F.R. § 351.503(c)'s command that Commerce is not required to "consider the effect or impact of the government action on the firm's performance" does not allow Commerce to ignore QMC-Muntajat's expenses in calculating the benefit while relying on those same expenses to measure the financial contribution. See 19 C.F.R. § 351.503(c).

In the light of the above, the court disagrees with Commerce that QMC-Muntajat received a benefit in the gross amount of revenue it received. Accordingly, the court remands to Commerce to reconsider its benefit analysis. On remand, Commerce should take into consideration QatarEnergy's expenses to develop, maintain, and administer the industrial cities and ports when calculating the benefit. The benefit must be representative of the actual benefit received, which

may be profit as QMC-Muntajat suggests,[26] or the result of another analysis Commerce deems reasonable.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's rejection of QAFCO's reconciliation data at verification, but remands to Commerce to reconsider its selection of its adverse rate for the water and electricity for LTAR programs and to reconsider its benefit determination for the provision of land rights program consistent with this opinion.  The remand shall be issued within 75 days.  Comments may be filed 30 days thereafter and any responses 15 days thereafter.

 /s/ Jane A. Restani 
Jane A. Restani, Judge

Dated: July 27, 2026
      New York, New York

---

[26] Plaintiffs suggest the benefit should be determined by subtracting QatarEnergy's operating expenses from their revenues.  See Pls. Mot. at 39, 42.  That does not capture asset depreciation, however.  It is up to Commerce to determine how it will recalculate the benefit.