C-518-002
Court No. 25-53
Slip. Op. 26-81
**Public Document**
E&C/OII: KJ

***Qatar Melamine Company and QatarEnergy Marketing v. United States,***
**Court No. 25-53 (CIT July 27, 2026)**
**Melamine from Qatar**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

# I. SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Qatar Melamine Company and QatarEnergy Marketing v. United States*, Slip Op. 26-81 (CIT July 27, 2026) (*Remand Order*). These final results of redetermination arise from the final determination in the countervailing duty (CVD) investigation of melamine from Qatar covering the period of investigation (POI) from January 1, 2023, through December 31, 2023.[1] The Court remanded for further review and consideration of the issues of: (1) Commerce's selection of a 16.00 percent subsidy rate as facts available with an adverse inference (AFA) for the provision of electricity and water for less than adequate remuneration (LTAR); and (2) Commerce's determination of the benefit for the provision of management, usage, and usufruct rights (usufruct rights program).[2] Consistent with the *Remand Order*, Commerce has reviewed and reconsidered, as appropriate, its decisions with respect to these two

[1] *See Melamine from Qatar: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 89 FR 97593 (December 9, 2024) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Remand Order*.

issues and made the following changes to the subsidy rates determined in the *Final Determination*: we utilized QatarEnergy's highest reported water and electricity usage information to calculate the AFA rate, which results in rates of 1.36 percent for the water for LTAR program and 6.82 percent for the electricity for LTAR program; and we recalculated the benefit amount for the usufruct rights program by subtracting QMC-Muntajat's claimed POI expenses from the gross revenue forgone by the Government of Qatar (GOQ). This recalculation results in a rate of 0.52 percent for this program. In total, the changes result in a final subsidy rate for QMC-Muntajat of 32.89 percent.

## II. BACKGROUND

Commerce published its *Final Determination* on December 9, 2024.[3] The respondent in the underlying investigation is Qatar Melamine Company (QMC), Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C (Muntajat), and its cross-owned affiliates, Qatar Fertiliser Company (P.S.C.) (QAFCO), Industries Qatar Q.P.S.C.(Industries Qatar), and QatarEnergy (collectively, QMC-Muntajat). QMC-Muntajat challenged Commerce's *Final Determination* with respect to Commerce's rejection of QAFCO's electricity and water reconciliation data at verification, Commerce's selection of a 16.00 percent subsidy rate as facts otherwise available with an adverse inference for the provision of water and electricity, and Commerce's determination of the benefit for the provision of usufruct rights.[4] The Court remanded Commerce to reconsider the issues of (1) Commerce's selection of a 16.00 percent subsidy rate as AFA for the provision of electricity and water for LTAR; and (2)

[3] *See Final Determination*.
[4] *See Remand Order* at 2.

Commerce's determination of the benefit for the provision of management, usage, and usufruct rights (usufruct rights program).[5]

On October 2, 2026, Commerce released its Draft Redetermination and invited interested parties to comment.[6] On October 8 and 9, 2026, QMC-Muntajat[7] and the petitioner[8] each filed timely comments on Commerce's Draft Redetermination.

## III. REMANDED ISSUES

### A. <u>Commerce's Selection of an AFA rate for the Provision of Water and Electricity for LTAR</u>

#### 1. <u>Background</u>

In the *Final Determination*, Commerce applied AFA in its calculation of the subsidy rate for the provision of electricity and water to QMC-Muntajat.[9] The Court affirmed Commerce's general application of AFA; however, the Court remanded to Commerce the calculation of the subsidy rate it used as AFA for the provision of electricity and water. Specifically, the Court ordered Commerce to then explain why its AFA rate "(1) is reflective in some way of the actual subsidy rate Plaintiffs received for water and electricity and (2) incentivizes compliance without leading to punitive or aberrational results."[10] The Court further instructed Commerce to consider whether it may use any record information in selecting a reasonable adverse rate.[11]

---

[5] *Id.* at 3.
[6] *See* Draft Results of Redetermination Pursuant to Remand, *Qatar Melamine Company and QatarEnergy Marketing v. United States*, Court No. 25-53, Slip Op. 26-81 (CIT July 27, 2026), dated October 2, 2026 (Draft Redetermination).
[7] *See* QMC-Muntajat's Letter, "Comments on Draft Remand Results," dated October 9, 2026 (QMC-Muntajat's Draft Remand Comments).
[8] *See* Petitioner's Letter, "Petitioner's Comments on Draft Results of Remand Redetermination," dated October 8, 2026 (Petitioner's Draft Remand Comments). The petitioner is Cornerstone Chemical Company.
[9] *See Final Determination* IDM at Comment 4.
[10] *See Remand Order* at 21.
[11] *Id.*

2. Analysis

Pursuant to the Court's *Remand Order*, Commerce has recalculated the AFA rates for water and electricity for LTAR programs using QatarEnergy's verified usage and lowest tariff rates, yielding rates of 1.36 percent for water for LTAR and 6.82 percent for electricity for LTAR. The combined 8.18 percent AFA subsidy rate is both supported by record evidence and reasonably reflects the Plaintiffs' actual subsidization rate, as discussed below.

In recalculating the subsidy rates for the provision of electricity and water for LTAR, Commerce relied on record evidence provided by QatarEnergy in its Section III response to Commerce's CVD questionnaire.[12] The water and electricity usage and rate information provided by QatarEnergy is the only complete and verified information of the same sort that is missing from the record because of QAFCO's failure to report its full usage information. Accordingly, Commerce determined it was the most appropriate record information upon which to construct a rate based on the Court's remand directions. This calculation uses the actual total consumption of water and electricity reported by QatarEnergy, and the lowest (*i.e.*, the most adverse) of the actual per-unit rates paid by QatarEnergy to acquire water and electricity from Kahramaa, the GOQ's utility authority. QAFCO, the cross-owned company which failed to provide Commerce with complete and accurate records of water and electricity consumption during the POI, also purchases water and electricity from Kahramaa.[13] QAFCO, like QatarEnergy, pays water and electricity rates established by Kahramaa's rate schedule.[14] Using QatarEnergy's reported water and electricity usage and rates, purchased from the same supplier

---

[12] See QatarEnergy's Letter, "QatarEnergy General Questionnaire Response," dated May 10, 2024 (QatarEnergy's Section III Response), at Exhibit WATER-QATAREN-01 and -04. See also QatarEnergy's Section III Response at Exhibit ELECTR-QATAREN-01.
[13] *See* QAFCO's Letter, "QAFCO's General Questionnaire Response," dated May 10, 2024, at 13.
[14] *Id*. at 14.

QAFCO uses, to fill in the gaps in the record created by QAFCO's failure to report, allows Commerce to calculate a rate reasonably reflective of the actual rate received by the Plaintiff.

While Commerce has recalculated this rate and explained why the newly calculated rate is reflective in some way of the actual subsidy rate that the Plaintiffs received, it respectfully does so under protest.[15] Requiring Commerce to "explain why {the} selected rate is reflective in some way of the actual subsidy rate" enjoyed by the plaintiffs for their water and electricity appears in tension with the language of the Act. Section 776(d)(3) of the Tariff Act of 1930, as amended (the Act), provides that, when Commerce uses an adverse inference under subsection (b)(1)(A), it is not required to "demonstrate that the countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party." Further, the statute provides that Commerce "may use an inference that is adverse to the interests of the respondent in selecting from available facts to arrive at a rate, without being required to make assumptions about what the information, if properly submitted, would establish."[16] In light of these provisions, we respectfully submit that the Act does not appear to require Commerce to establish that the selected rate corresponds to, or otherwise reflects, the actual subsidy rate received by the plaintiffs.

Additionally, with respect to the calculation of a subsidy rate for the provision of water and electricity for LTAR, the Court has required that Commerce explain why this recalculated rate "incentivizes compliance without leading to punitive or aberrational results."[17] As an initial matter, Commerce considered the need to incentivize compliance without being punitive in selecting the 16.00 percent rate applied at the *Final Determination*. After discovering unreported

---

[15] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).
[16] *Id*.
[17] *See Remand Order* at 21.

water and electricity usage for QAFCO at verification, Commerce considered various AFA plug options to account for this record deficiency. This investigation is the first CVD case involving Qatar; therefore, the information Commerce could apply was restricted to this instant record. At the time of the *Final Determination*, this investigation's record contained two calculated program rates: 24.04 percent for a corporate income tax exemption program, and 1.71 percent for the usufruct rights program. Respectfully, Commerce considered applying the highest calculated rate from this investigation of 24.04 percent as the AFA rate for the *Final Determination*, and our position remains that this rate would have been within our discretion to select.[18]

However, after considering these two options, Commerce concluded that neither option was likely to incentivize compliance without being punitive because the selected rate would need to be applied twice (*i.e.*, for each program, water and electricity), leading to a rate of 48.08 percent, which is disproportionately high relative to the known subsidization, or a rate of 3.42 percent, which Commerce judged insufficiently high to incentivize compliance.

After considering these two options, Commerce instead determined to apply a simple average of the GOQ's highest tariff category rates for water and electricity on the record, yielding the 16.00 percent rate which the Court remanded back to Commerce. We also note that in another case involving a first CVD case for a country (Laos), we have used the income tax exemption program as a plug rate for other programs.[19]

---

[18] *See, e.g., Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012), stating "{i}n this case, however, the countervailing duty imposed for Essar's participation in the CIP was on par with similar subsidy programs and therefore not punitive."

[19] *See Silicon Metal from the Lao People's Democratic Republic: Final Affirmative Countervailing Duty Determination*, 91 FR 8425 (February 23, 2026), and accompanying IDM.

The purpose of section 776(b) of the Act is "to provide respondents with an incentive to cooperate" with Commerce's investigation, not to impose punitive damages.[20] As explained above, because both QAFCO and QatarEnergy purchase water and electricity from the same supplier, the surrogate values used in the calculation of the rate reflect a reasonably accurate estimate of QAFCO's actual purchases of electricity and water. The recalculated rates are provided under protest because Commerce believes it already appropriately considered incentivization of compliance in calculating the original 16.00 percent combined water and electricity rate in the *Final Determination*. Here, with the recalculated water and electricity rates, Commerce has complied with the Court's request. By selecting the highest possible actual usage and the lowest (*i.e.*, the most adverse) per-unit rate paid by QatarEnergy in the POI, we are calculating a reasonable rate that is intended to induce compliance. Commerce considers the recalculated rates to include a built-in increase meant to incentivize future compliance because the record contains information on the approximate amount of unreported water and electricity usage, respectively. By making an adverse inference that QAFCO's water and electricity usage, if fully reported, would have mirrored QatarEnergy's, the recalculated rates applied now pursuant to the *Remand Order* are tied to the subsidization from QAFCO's cross-owned affiliate's actual usage and rates.

We further consider this rate non-aberrational because it is tethered to the actual, verified consumption and tariff rates on the record of this investigation for QAFCO's cross-owned affiliate QatarEnergy. For these reasons, we have reconsidered our selection of the basis for our AFA determination and adjusted it in conformity with the Court's opinion.

---

[20] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, at 1276 (*Essar Steel*), quoting *F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see also AG der Dillinger Huttenwerke v. United States*, 648 F.Supp.3d 1321, 1332-33 (CIT 2023).

## B. Commerce's Determination of the Benefit for Provision of Usufruct Rights

### 1. Background

In the *Final Determination*, Commerce determined that the GOQ's usufruct rights program to QatarEnergy for the duration of its existence, over various industrial cities and certain ports was a countervailable recurring subsidy.[21] In the Post-Preliminary Analysis we determined that the program provides a financial contribution in the form of revenue forgone, within the meaning of section 771(5)(D)(ii) of the Act, because the GOQ's granting of usufruct rights to QatarEnergy included the right to collect land lease and port income from these areas, which would otherwise have been collected by the GOQ absent the delegation of these rights to QatarEnergy by decree.[22] Commerce determined that a benefit was conferred under this program in the amount of the revenue QatarEnergy collected from rental payments and port fees.[23] In the Post-Preliminary Calculation Memorandum, Commerce did not consider any expenses incurred by QatarEnergy during the POI to develop and maintain the industrial cities and port areas.[24] Accordingly, Commerce calculated a net countervailable subsidy rate of 1.71 percent *ad valorem*. At the *Final Determination*, Commerce maintained that expenses incurred by QatarEnergy should not be subtracted from the gross benefit QatarEnergy received in the form of rental income and port fees collected because "QatarEnergy's expenses in operating or maintaining the land and port areas at issue are not among the exhaustive list of offsets provided for under section 771(6) of the Act."[25]

---

[21] *See Final Determination* IDM at Comment 3.
[22] The GOQ granted QatarEnergy usufruct rights over the Mesaieed Industrial City (MIC), the Ras Laffan Industrial City (Ras Laffan), and the Dukhan Concession Area (DCA). *See* Memorandum, "Post-Preliminary Analysis Calculations for Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C," dated September 12, 2024 (Post-Preliminary Calculation Memorandum) at 9.
[23] *Id.*at 11.
[24] *Id*. at 9-12.
[25] [28] *See Final Determination* IDM at Comment 3 (quoting *Hyundai Steel Co. v. United States*, 651 F.Supp.3d 1321 (2023) ("The Court also concludes that Commerce reasonably determined that the Government of Korea's provision

2. <u>Analysis</u>

Pursuant to the Court's *Remand Order*, Commerce reconsidered its benefit analysis, taking into consideration QatarEnergy's expenses to develop, maintain, and administer the industrial cities and ports, even though they are not among the types of expenses that section 771(6) authorizes Commerce to deduct from the benefit prior to determining the rate.[26] Accordingly, pursuant to the *Remand Order* and respectfully under protest, Commerce has subtracted QatarEnergy's POI expenses from the benefit they received and determined the net countervailable subsidy rate for the usufruct rights program to be 0.52 percent. To calculate this subsidy rate, Commerce has, at the Court's instruction, taken into consideration the amount of capital expenditures, operating expenses, and manpower costs incurred by QMC-Muntajat during the POI to maintain the cities and ports. The sum of these expenses was subtracted from the gross revenue forgone by the GOQ during the POI. This figure corresponds with the profit from operations on the land granted to the respondent by the GOQ and aligns with the Court's instruction to reconsider its benefit analysis and determine a benefit representative of the actual benefit received by the respondent.[27]

## IV. INTERESTED PARTY COMMENTS

On October 2, 2026, Commerce issued the Draft Results of Redetermination and provided interested parties with an opportunity to comment.[28] Commerce received comments from Cornerstone Chemical Company (*i.e.*, the petitioner) and QMC-Muntajat.[29] These comments are summarized verbatim from the executive summaries in the relevant submissions and are

---

of rights under the Port of Incheon program, specifically the right to collect revenues from third parties using the port, conferred a benefit to Hyundai Steel.")).

[26] *See Remand Order* at 28-29.

[27] *Id*. at 29.

[28] *See* Draft Redetermination.

[29] *See* Petitioner's Draft Remand Comments; *see also* QMC-Muntajat's Draft Remand Comments.

addressed below. After considering both parties' submissions, we made no changes to our conclusions in the Draft Results of Redetermination for these final results of redetermination.

**Comment 1: Usufruct Rights**

*Petitioner's Comments*:

The following is a verbatim summary of the comments submitted by the petitioner. For further details, *see* Petitioner's Draft Remand Comments at 4-5.

> As for the usufruct rights program, Commerce complied with the *Remand Order* under protest by subtracting from the benefit the expenses that QatarEnergy claims to have incurred in connection with the associated industrial cities and ports. Petitioner shares Commerce's concern that reducing the benefit under this program by QatarEnergy's claimed costs would be inconsistent with the statute, as the costs at issue are not among the exhaustive list of offsets provided for under section 771(6) of the Act. Moreover, adopting a general practice of applying cost-based offsets to subsidy benefits would result in CVD rates that fail to capture the full extent of unfair subsidy benefits. Accordingly, if Commerce concludes that the approach to this program in the Draft Results is the only available means of complying with the *Remand Order*, it should maintain its protest.

QMC-Muntajat did not comment on this issue.

**Commerce's Position:** Commerce agrees with the petitioner in recognizing that QatarEnergy's claimed costs are not among the exhaustive list of offsets provided for under section 771(6) of the Act. Accordingly, we made no changes from the Draft Results of Redetermination and continue to apply the recalculated usufruct rights benefit according to the Court's guidance, under protest.

**Comment 2: The Provision of Water and Electricity for LTAR**

*Petitioner's Comments*:

The following is a verbatim summary of the comments submitted by the petitioner, citations omitted. For further details, *see* Petitioner's Draft Remand Comments at 2-4.

> Regarding the {GOQ's} provision of water and electricity for {LTAR}, the Draft Results comply with the *Remand Order* by relying on QatarEnergy's usage rates to

> recalculate, under protest, the {AFA} subsidy rates for these programs. However, the Draft Results also identify serious concerns that the recalculated, and significantly reduced, AFA rates are in tension with the statute. Specifically, the statute does not require Commerce to demonstrate that an AFA rate "reflects an alleged commercial reality of the interested party" or "estimate what the countervailable subsidy rate . . . would have been if the interested party . . . had cooperated." Moreover, Petitioner is concerned that the recalculated AFA rates are so low as to fail to induce compliance, as the statute requires. Petitioner therefore agrees that, to the extent any reduction in the AFA rates is necessary to conform with the *Remand Order*, such a change should be made under protest.

*QMC's Comments*:

The following is a verbatim summary of the comments submitted by QMC, citations omitted.

For further details, *see* QMC-Muntajat's Draft Remand Comments at 2-5.

> Commerce's selection of a 6.82% rate as {AFA} for the Provision of Electricity to {QAFCO} is inconsistent with the statutory standard, which requires Commerce to select "a rate that is 'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'" In particular, Commerce's use of QatarEnergy's electricity consumption as a surrogate for QAFCO's electricity consumption is unreasonable based on the record evidence that the level of QatarEnergy's consumption was exponentially larger than QAFCO's. Moreover, the 6.82% AFA rate is 14 times higher than the preliminary rate Commerce calculated for the Provision of Electricity (0.48%), making the AFA rate "punitive, aberrational, or uncorroborated, . . . and excessive . . . ." Lastly, Commerce's view that the statute, {section 776(d)(3) of the Act}, does not require the AFA rate to be a reasonably accurate estimate is untenable in light of the U.S. Court of Appeals for the Federal Circuit's {(Federal Circuit)} rejection of this interpretation of the statute in *Oman Fasteners*.

**Commerce's Position:** As an initial matter, Commerce agrees with the petitioner and shares its concern that lowering the AFA rates for these programs may fail to properly induce compliance, as required by the statute.[30] Accordingly, Commerce continues to follow the Court's guidance with respect to the recalculation of these rates but does so under protest.

[30] *See, e.g.*, *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("the purpose of the adverse (inference) statute is to provide respondent with an incentive to cooperate with Commerce's investigation"); and *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) ("Congress intended for Commerce to use (adverse inferences) to induce cooperation with its (AD) investigations").

The Court affirmed Commerce's general application of AFA in the *Final Determination*. Pursuant to section 776(b)(1)(A) of the Act, Commerce has the discretion to use an inference adverse to the interests of a party that has failed to act to the best of its ability. The Court in *Ta Chen* noted that so long as data is corroborated, Commerce acts within its discretion when choosing which sources and facts it will rely upon to support an adverse inference.[31] Commerce's use of QatarEnergy's electricity consumption as a surrogate for QAFCO's energy consumption is reasonable and within its discretionary capacity to choose the facts relied on for application of an adverse inference. The recalculation method that QMC-Muntajat proposes, to *merely* consider the percentage of missing usage information and the size of its operations relative to other entities, is not an application of facts available with *adverse inference* but a facts available calculation, which fails to account for the failure of QAFCO to properly and timely report its full electricity and water usage in the course of the investigation. Pursuant to section 776(a) of the Act, facts available may be applied when the missing information is not necessarily attributable to the respondent/participating interested party. Conversely, AFA is applied pursuant to section 776(b) of the Act when an interested party has failed to cooperate to the best of its ability to comply with a request for information. In the instant case, QAFCO has without doubt failed to cooperate to the best of its ability by failing to provide information regarding its full electricity and water usage. QMC-Muntajat, including its cross-owned company, QAFCO, led Commerce to believe that it had reported its full water and electricity usage through the course of the investigation. Only on day four of verification, QAFCO decided to reveal that it had unreported usage. As affirmed in countless cases, verification is not the time for collection of new information, only to verify already submitted information. The Court has affirmed

[31] *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) (*Ta Chen*).

Commerce's application of AFA because of these failures. Further modifying the subsidy rate for the electricity for LTAR program in the way QMC-Muntajat requests would not effectuate the intent of section 776(b) of the Act because QMC-Muntajat's proposal is to apply facts available, not AFA.

The appropriate AFA rate must be one that also induces cooperation. Commerce must also consider that, if QMC is given a rate insufficient to induce cooperation, despite its failure to cooperate to the best of its ability by not reporting accurate usage of a program, this will undermine Commerce's power to induce cooperation in other proceedings. While we believe that the original rate Commerce applied appropriately considered incentivization of compliance, under protest, the updated rate appropriately induces cooperation.

QMC-Muntajat relies heavily on the Federal Circuit's opinion in *Oman Fasteners* in asserting that the recalculated AFA rate is unreasonable.[32] Therein the Federal Circuit explains that the "inference that Commerce may use in selecting from among the facts otherwise available must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance."[33] This is what Commerce has done in the redetermination of this rate. Commerce disagrees with QMC-Muntajat that the redetermined rate "bears no relation to the actual subsidy rate."[34] As explained above, Commerce relied on record data provided by QAFCO's affiliate as a surrogate for the data QAFCO failed to report. This surrogate data uses water and electricity rates paid by QatarEnergy to the same utility provider that supplies QAFCO with water and electricity.[35] Commerce's rate calculation began with a

---

[32] *See* QMC-Muntajat's Draft Remand Comments at 5 (citing *Oman Fasteners, LLC. v. United States*, 125 F.4th 1068 (Fed. Cir. 2025) (*Oman Fasteners*) at 1086).
[33] *Id.*
[34] *See* QMC-Muntajat's Draft Remand Comments at 5.
[35] *See* QAFCO's Letter, "QAFCO's General Questionnaire Response," dated May 10, 2024, at 13; *see* QatarEnergy's Letter, "QatarEnergy General Questionnaire Response," dated May 10, 2024, at 11.

reasonably accurate estimate, but then incorporates an adverse inference – effectively, the built-in increase *Oman Fasteners* describes – to serve as a deterrent to non-compliance.

We note that in *Oman Fasteners* the Court was evaluating the reasonableness of a 154.33 percent AFA rate which originated from the petition in the underlying investigation, in context of multiple calculated antidumping duty (AD) rates for the respondent Oman Fasteners; the highest of these calculated rates was 1.65 percent.[36] Although we lack additional segments of this proceeding, or other Qatari CVD cases to draw additional context regarding actual subsidization, we look to other calculated rates from this instant investigation to evaluate reasonableness in selecting an AFA rate. In this investigation, the recalculated AFA rate of 6.82 percent for the electricity for LTAR program is lower than the highest calculated individual program rate from this investigation, suggesting that it is well within the universe of potential subsidization.[37] As the highest calculated individual program rate in this investigation was 24.04 percent, nearly four times the recalculated AFA rate of 6.82 percent, and as this highest calculated rate was duly verified and substantiated by record evidence, we consider the recalculated AFA rate to be a reasonably accurate estimate of the potential subsidization.

Moreover, while we maintain that our redetermined AFA rate reasonably relates to QMC-Muntajat's actual rate, as ordered by this Court, we also find that this case is patently distinguishable from *Oman Fasteners*. That case concerned a single questionnaire response that was filed sixteen minutes late by the respondent.[38] Due to the untimely filed questionnaire response, Commerce applied facts available with adverse inferences (total AFA) under section

---

[36] *See Oman Fasteners*, 125 F.4th at 1073.
[37] *See Final Determination* IDM at 13-14, showing highest calculated individual program rate of 24.04 percent for the Corporate Tax Exemptions program.
[38] *Id.* at 1083.

776(b) to the respondent, and the respondent company received an AD rate of 154.33 percent.[39] Moreover, the rates which Commerce determined for the respondent before and after the review were the following percentages: 0.63, 0.0, 0.00, and 1.65.[40] The Federal Circuit found that there was no adequate basis on the record for finding respondent's slight failure to cooperate to reasonably justify the rate Commerce assigned.[41] The Federal Circuit's reasonableness holding was informed by its finding that this "slight tardiness" did not merit such a departure from accuracy as to increase the rate to 154.33 percent.[42] Conversely, the record of this investigation is missing necessary information as a result of QMC-Muntajat's failure to cooperate to the best of its ability to provide the requested electricity usage information. The Federal Circuit in *Oman Fasteners* recognized "facts relevant to assessing the character of the actions at issue under the governing standard" in assessing an AFA finding and justifying the reasonableness of the selected rate,[43] finding that the respondent's behavior in that case did not demonstrate "intentional conduct, such as deliberate concealment or inaccurate reporting."[44] Again, we find the instant record is distinct because it demonstrates that QMC-Muntajat did not make Commerce aware of its failure to provide the requested information until long after it discovered the error and after its opportunity to correct the record at the start of verification, as requested in writing, had passed.[45] Thus, on the instant record, Commerce determined that there was

[39] *Id.* at 1073.
[40] *Id.* at 1086.
[41] *Id.* at 1088.
[42] *Id.*
[43] *Id.* at 1087-1088.
[44] *Id.* at 1088 (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003)).
[45] *See* Commerce's Letter, "Verification of Qatar Melamine Company/Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C. Questionnaire Responses," dated September 12, 2024, at 6 (stating "{i}f you identified errors in the responses while preparing for verification, please provide the following *at the outset of verification*," (emphasis added)); *see also* Memorandum, "Verification of the Questionnaire Responses of Qatar Melamine Company and Muntajat," dated October 30, 2024, at 15 and 18 (stating "{t}he company did not present this as a minor correction, but presented it on day four of verification.").

intentional conduct by the respondent to fail to provide the requested electricity usage information, unlike in *Oman Fasteners.*

In *Oman Fasteners*, the Federal Circuit noted that Commerce's decision was a "departure from the established principle that Commerce, when applying the adverse-inference provision, must pursue accuracy, with any departure limited to what is needed to deter non-compliance with Commerce rules and orders." In a way, this remark demonstrates the tension we highlighted earlier in this remand. The statute explains that, when applying adverse inferences, the resulting rate need not reflect the plaintiff's actual commercial reality; otherwise, the rate would not incorporate adverse inferences. *Oman Fasteners* furthers this principle by noting that, when calculating a rate, Commerce should pursue accuracy, with any departure from accuracy limited to what is needed to deter non-compliance. Ultimately, Commerce is limited by the bounds of the record when determining an appropriate rate that would deter non-compliance.

QMC-Muntajat also points to *Gallant Ocean (Thailand)* and the court's holding that an AFA rate greater than 10 times the average dumping margin for cooperating respondents was punitive.[46] In that AD administrative review, the AFA rate Commerce applied "incorrectly presumed that the adjusted petition rate was reliable in the face of much more reliable information… The adjusted petition rate did not and does not represent commercial reality"[47] Commerce disagrees with QMC-Muntajat's interpretation of that holding when applied to the facts of this CVD investigation. First, Commerce's applying a petition rate (*i.e.*, a rate predating the full investigation record, predating respondent-specific information, and predating the respondent Gallant Ocean's participation in the later administrative review entirely) in *Gallant*

---

[46] *See Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) (*Gallant Ocean (Thailand)*), at 1324.
[47] *Id.* at 1323.

*Ocean* is distinct from this case, in which we applied respondent-specific information on the record developed during the course of the investigation to that same respondent. Further, *Gallant Ocean* explained the AFA rate was not only "more than ten times higher than the average *dumping margin* for cooperating respondents," but also that it was "more than five times higher than the *highest rate* applied to a cooperating respondent"[48] (emphasis added). While noting that CVD subsidization is distinct from dumping margins in an AD proceeding, applying this same logic to the instant investigation plainly does not yield such a disproportionate result. QMC-Muntajat misreads *Gallant Ocean* in asserting that the 6.82 percent electricity for LTAR program rate applied as AFA is "punitive" because it seeks to compare this rate to the known subsidization rate of 0.48 percent for *this single program* calculated prior to Commerce becoming aware of QMC-Muntajat's deficient and incomplete reporting. Instead, *Gallant Ocean*'s holding would have us compare, in evaluating reasonableness, the AFA rate to an overall calculated "margin" or "rate." Although we have no other respondents to use as the benchmark for what may be excessive, punitive, or aberrational when it comes to calculated AFA rates, we do have QMC-Muntajat's calculated rates for its other programs which were duly verified and for which it fully cooperated. As noted above, those programs include a tax program with a subsidization rate of 24.04 percent. We, therefore, disagree that a 6.82 percent rate for the electricity for LTAR program is punitive because it represents only a fraction of the highest calculated program rate for the same respondent in the same proceeding. Moreover, this Court has held that, "when making a discretionary determination {such as determining AFA rate},… Commerce can use a case-by-case analysis, so long as it is 'consistent with its statutory authority.'"[49] The Court has

[48] *Id.* at 1324.
[49] *See Qingdao Taifa Grp. Co. v. United States*, 35 C.I.T. 820, 828 (2011), *aff'd*, 467 F. App'x 887 (Fed. Cir. 2012) (quoting *Allied-Signal Aerospace Co. v. United States*, 28 F.3d 1188, 1191 (Fed. Cir. 1994).

also held that, although Commerce should act reasonably, "Commerce is not required to justify its determinations in terms of past alternatives" under these circumstances.[50] Accordingly, QMC-Muntajat's suggestion that the increase in *Gallant Ocean*'s *dumping margin* would affect Commerce's *single program* calculation in this case is unfounded.

QMC-Muntajat argues that Commerce's use of QatarEnergy's electricity consumption data as a surrogate for QAFCO's missing data is inappropriate because QatarEnergy is a larger enterprise with greater utility demands.[51] Commerce disagrees that the use of QatarEnergy's data is inappropriate. It is Commerce's practice to rely on other companies' consumption data when filling gaps in the record caused by a respondent's failure to report.[52] In *SolarWorld*, the Court upheld Commerce's practice to rely on the highest consumption figures reported by other suppliers or by the respondent.[53] Here, we have no other respondent, past or present, to turn to for surrogate consumption data. Additionally, relying on QAFCO's own incomplete consumption data would merely apply facts available rather than AFA in making our determination. QMC-Muntajat did not point to any other record evidence that could be applied as AFA. We also note that QMC-Muntajat did not take issue with our recalculation methodology for the water for LTAR program even though it was methodologically identical to the recalculation of this program, suggesting that it finds QatarEnergy's water usage relevant to QAFCO's potential water usage. It did not explain why, accepting arguendo that QatarEnergy and QAFCO are of significantly different sizes, QatarEnergy's consumption is probative for water usage but not electricity usage for QAFCO. Based on the record in this investigation, QatarEnergy's consumption information most similarly approximates that of QAFCO.

---

[50] *Id*.
[51] *See* QMC-Muntajat's Draft Remand Comments at 2-4.
[52] *See SolarWorld Americas, Inc. v. United States*, 273 F.Supp.3d 1254 at 1277 (*SolarWorld*).
[53] *Id.*

Accordingly, we find that the use of QatarEnergy's consumption data is the best option for recalculating an AFA rate to comply with the Court's remand and adheres to Commerce's approved practice.

## V. FINAL RESULTS OF REDETERMINATION

Based on the analysis and modifications described above, QMC-Muntajat's recalculated estimated countervailable subsidy rates for the POI are as follows:

| Program | Redetermined Subsidy Rate (percent) |
|---|---|
| Provision of Water for LTAR | 1.36 |
| Provision of Electricity for LTAR | 6.82 |
| Provision of Management, Usage, and Usufruct Rights Over Industrial Areas | 0.52 |

Because the countervailing subsidy rates for QMC-Muntajat and all-other companies are different from those in the *Final Determination*, we intend to issue a *Timken*[54] notice with the amended final results should the Court sustain these final results of redetermination. In addition, Commerce intends to issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

10/19/2026

X [signature]

Signed by: Scot Fullerton

Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

[54] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010).