**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| QATAR MELAMINE COMPANY (A QATARI PRIVATE SHAREHOLDING COMPANY) AND QATARENERGY MARKETING (1), A QATARI PRIVATE SHAREHOLDING COMPANY (f/k/a QATAR CHEMICAL AND PETROCHEMICAL MARKETING AND DISTRIBUTION COMPANY (MUNTAJAT) Q.P.J.S.C.),<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>CORNERSTONE CHEMICAL COMPANY<br><br>Defendant-Intervenor. | Court No. 25-00053<br><br>**NON-CONFIDENTIAL**<br><br>**Business Proprietary Information has been deleted from Pages 4–5, 7, 9-11.** |

**PLAINTIFFS' COMMENTS IN OPPOSITION TO FINAL RESULTS OF REDETERMINATION**

Jay C. Campbell
Richard G. King
C. Alejandro Dilley
Chunfu Yan

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

November 19, 2026

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. THE AFA RATE COMMERCE SELECTED FOR THE PROVISION OF ELECTRICITY IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ..... 2

A. Commerce Misconstrues the Legal Standard for Selecting AFA ..... 2

B. Commerce Failed To Select an AFA Rate that Reasonably Reflects the Actual Subsidy Rate for the Provision of Electricity to QAFCO ..... 3

C. The 6.82% Rate that Commerce Selected as AFA for the Provision of Electricity Is Punitive ..... 8

III. CONCLUSION ..... 11

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*BMW of N. Am. LLC v. United States*,
926 F.3d 1291 (Fed. Cir. 2019)....................7, 9

*F.lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000)....................8

*Gallant Ocean (Thailand) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010)....................8, 9

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)....................6

*Oman Fasteners, LLC v. United States*,
125 F.4th 1068 (Fed. Cir. 2025).................... passim

*Qatar Melamine Company and Qatar Energy Marketing v. United States*,
Court No. 25-00053, Slip Op. 26-81 (Ct. Int'l Trade 2026) ....................1, 2, 3, 10

*SolarWorld Americas, Inc. v. United States*,
273 F. Supp. 3d 1254 (Ct. Int'l Trade 2017) ....................6

### STATUTES AND REGULATIONS

19 U.S.C. § 1677(5A) ....................10

19 U.S.C. § 1677b(c)(1)....................6

19 U.S.C. § 1677e(b) ....................3

19 U.S.C. § 1677e(d) ....................3

19 U.S.C. § 1677e(d)(2)....................10

19 U.S.C. § 1677e(d)(3)....................3

### ADMINISTRATIVE DETERMINATIONS

*Melamine from Qatar*,
89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.);
and accompanying Issues & Decision Memorandum....................1, 7

# I. INTRODUCTION

Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.) ("Muntajat") (collectively, "QMC-Muntajat" or "Plaintiffs") hereby submit comments in opposition to the final results of redetermination issued by the U.S. Department of Commerce ("Commerce") pursuant to this Court's decision in *Qatar Melamine Company and Qatar Energy Marketing v. United States*, Court No. 25-00053, Slip Op. 26-81 (Ct. Int'l Trade 2026) ("*Remand Order*"). *See Final Results of Redetermination Pursuant to Court Remand*, Court No. 25-53 (Ct. Int'l Trade July 27, 2026) (ECF 74) (P.R.-REM 8) ("*Remand Results*").[1] This case concerns Commerce's final countervailing duty ("CVD") determination in *Melamine from Qatar*, 89 Fed. Reg. 97593 (Dep't Commerce Dec. 9, 2024) (final CVD determ.) (P.R. 285); *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Melamine from Qatar* (C-518-002) (Dec. 2, 2024) (P.R. 282) ("*Final IDM*"), the period of investigation ("POI") for which was calendar year 2023. For the reasons discussed below, Commerce's *Remand Results* should not be sustained with respect to Commerce's selection of a subsidy rate based on adverse facts available ("AFA") for the Provision of Electricity.

[1] When citing documents from the administrative record of the underlying countervailing duty investigation, we assign the prefix "P.R." (for "public record") to public documents and the prefix "C.R." (for "confidential record") to confidential documents, followed by the reference number for the document. Similarly, when citing documents from the administrative record of Commerce's remand proceeding, we assign the prefix "P.R.-REM" to public documents and the prefix "C.R.-REM" to confidential documents, followed by the reference number for the document.

## II. THE AFA RATE COMMERCE SELECTED FOR THE PROVISION OF ELECTRICITY IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

This Court held that Commerce's selection of 8% subsidy rates as AFA for both the provision of electricity and the provision of water was unsupported by substantial evidence and contrary to law. *See Remand Order* at 19. Accordingly, the Court remanded for Commerce to redetermine the AFA subsidy rate and to "explain why its selected rate (1) is reflective in some way of the actual subsidy rate Plaintiffs received for water and electricity and (2) incentivizes compliance without leading to punitive or aberrational results." *Remand Order* at 21. As recognized by the Court, "while Commerce has a wide latitude to select an adverse rate, it must still select a rate that is 'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'" *Remand Order* at 19 (citing *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1086 (Fed. Cir. 2025) (citation omitted)). The 6.82% rate selected by Commerce on remand as AFA for the Provision of Electricity fails to comply with the *Remand Order* for three reasons: (1) Commerce misconstrued the legal standard for selecting AFA; (2) Commerce failed to select an AFA rate that reasonably reflects the actual subsidy rate for the provision of electricity to QAFCO; and (3) the AFA rate selected is excessive and punitive.

### A. Commerce Misconstrues the Legal Standard for Selecting AFA

At the outset, Commerce shirks its statutory obligation to select an AFA rate that reasonably approximates the actual rate, with an additional amount "limited to what is needed to deter noncompliance . . . ." *Oman Fasteners*, 125 F.4th at 1086. By doing so, Commerce on remand selected an AFA rate for the Provision of Electricity that is neither in accordance with law nor supported by substantial evidence, as discussed in **Sections II.B** and **C**, below.

Commerce opined in the *Remand Results* that a requirement "to 'explain why {the} selected {AFA} rate is reflective in some way of the actual subsidy rate' enjoyed by the plaintiffs for their water and electricity appears in tension with the language of the Act" at 19 U.S.C. § 1677e(d)(3). *Remand Results* at 5. The Federal Circuit, however, rejected this interpretation of the statute in *Oman Fasteners*, stating, "{W}e have long held that 'the 'inference' that Commerce 'may use' in 'selecting from among the facts otherwise available' must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.''" *Oman Fasteners*, 125 F.4th at 1086. Addressing § 1677e(d)(3) specifically, the Federal Circuit continued:

> That well-established standard, focusing on accuracy but allowing a departure for deterrence, takes due account not only of the overall statutory regime but also of particular statutory guides – that Commerce is not 'required' to 'estimate' what the rate 'would have been' if the relevant party 'had cooperated' or to 'demonstrate' that the rate chosen 'reflects an alleged commercial reality of the interested party,' 19 U.S.C. § 1677e(d)(3) . . . .

*Id.* The Federal Circuit's interpretation of 19 U.S.C. § 1677e(b) and (d) in *Oman Fasteners* overrides Commerce's misguided suggestion that it is free to select an AFA rate that is not reasonably related to the actual subsidy rate.

### B. Commerce Failed To Select an AFA Rate that Reasonably Reflects the Actual Subsidy Rate for the Provision of Electricity to QAFCO

In part, the Court remanded for Commerce to redetermine the AFA subsidy rate and to "explain why its selected rate . . . is reflective in some way of the actual subsidy rate Plaintiffs received for water and electricity . . . ." *Remand Order* at 21. Here, Commerce failed to demonstrate that the 6.82% AFA rate it selected for the Provision of Electricity reasonably reflects the actual subsidy rate. Nor did Commerce adequately support its conclusion that it was free to use QatarEnergy's much larger electricity consumption figure as a surrogate for that of QAFCO.

Lastly, Commerce's attempt to distinguish the Federal Circuit's decision in *Oman Fasteners* is unavailing.

In the *Remand Results*, Commerce calculated a subsidy rate for the Provision of Electricity to QAFCO based on QatarEnergy's reported amount of electricity consumption and the lowest rate paid by QatarEnergy for electricity during the POI as surrogate values. *See Remand Results* at 4; Memorandum from Kayden Jenson to The File, RE: *Draft Remand Redetermination Analysis Memorandum* (C-518-002) (Oct. 6, 2026) (C.R.-REM 1 / P.R.-REM 3) ("*Calculation Memo*"). According to Commerce, "because both QAFCO and QatarEnergy purchase . . . electricity from the same supplier, the surrogate values used in the calculation of the rate reflect a reasonably accurate estimate of QAFCO's actual purchases of electricity . . . ." *Remand Results* at 7. Put differently, Commerce made "an adverse inference that QAFCO's . . . electricity usage, if fully reported, would have mirrored QatarEnergy's . . . ." *Remand Results* at 7.

The record evidence, however, indicates that QAFCO's electricity consumption was nowhere near the level of QatarEnergy's consumption and, thus, disproves Commerce's adverse inference. QAFCO is a much smaller enterprise than QatarEnergy. QAFCO's business activity is limited to the production of urea and ammonia, *see* QMC-Muntajat CVD Questionnaire Response (C-518-002) (May 10, 2024) (C.R. 45-103 / P.R. 82-93) at Exhibit GEN-QAFCO-01 (separate year-2023 audited financial statements of QAFCO at note 1) ("*Section III Response*"), while QatarEnergy's much more expansive business activities include the exploration and production of crude oil and gas; the production of refined products; and the marketing and sale of crude oil, liquefied gas, natural gas, and refined products, *see Section III Response* at Exhibit GEN-QATAREN-02 (separate year-2023 audited financial statements of QatarEnergy at note 1). In 2023, QAFCO had revenue of [ ] billion Qatari Riyal ("QAR") and owned property, plant, and

equipment valued at [ ] billion QAR, *see Section III Response* at Exhibit GEN-QAFCO-01 (separate year-2023 audited financial statements of QAFCO at balance sheet (statement of financial position) and profit or loss statement). That same year, QatarEnergy had revenue of [ ] billion QAR and owned property, plant, and equipment valued at [ ] billion QAR, *see id.* at Exhibit GEN-QATAREN-02 (separate year-2023 audited financial statements of QatarEnergy at balance sheet (statement of financial position) and profit or loss statement) – dwarfing the values of QAFCO's revenue, property, and productive assets.

Because of its much smaller scale, QAFCO's electricity consumption was a mere fraction of QatarEnergy's electricity consumption. As supported by the companies' initial response to the CVD Questionnaire, whereas QAFCO received ***one electricity bill*** per month from Qatar General Electricity & Water Corporation ("Kahramaa"), the state-owned electricity provider, *see Section III Response* at Exhibit ELECTR-QAFCO-02 (showing that, for February and August 2023, QAFCO received one electricity bill each month from Kahramaa), QatarEnergy, in stark contrast, received ***[ ] to [ ] electricity bills*** – each of which is meter-specific – per month from Kahramaa, *see Section III Response*, QatarEnergy General Questions Response at pages QATAREN-13 – QATAREN-14 & Exhibit ELECTR-QATAREN-01 (see "Bills count" column). QatarEnergy received ***over 1,700 pages of electricity bills*** from Kahramaa in February 2023 alone. *See* QMC-Muntajat Response to Section III Supplemental Questionnaire (C-518-002) (June 27, 2024) (C.R. 175-242 / P.R. 167-191) at 53 & Exhibit WATER-QATAREN-07 ("*Supplemental Section III Response*").

Although QMC-Muntajat presented these facts to Commerce during the remand proceeding, *see* QMC-Muntajat's Comments on Draft Remand Redetermination (C-518-002) (Oct. 8, 2026) (C.R.-REM 3 / P.R.-REM 7), Commerce did not engage. Instead, Commerce simply

noted its disagreement and asserted that the court in *SolarWorld* upheld its "practice to rely on the highest consumption figures reported by other suppliers or by the respondent." *Remand Results* at 18 (citing *SolarWorld Americas, Inc. v. United States*, 273 F. Supp. 3d 1254, 1277 (Ct. Int'l Trade 2017)). In *SolarWorld*, however, the court merely affirmed Commerce's "determination to apply AFA"; Commerce's ***selection*** of AFA was not at issue. *See SolarWorld*, 273 F. Supp. 3d at 1277-78. Moreover, in *SolarWorld*, Commerce's use of "the highest consumption figures" for inputs reported by other suppliers arose in a different context – unreported factors of production for the determination of normal value in an antidumping investigation involving a nonmarket economy country under 19 U.S.C. § 1677b(c)(1). *See id.* at 1277. This context is not analogous to Commerce's adverse inference in this case that QAFCO's electricity usage during the POI mirrored QatarEnergy's, despite contradictory evidence on the record. Commerce must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

Lastly, Commerce attempted but failed to distinguish *Oman Fasteners*. *See Remand Results* at 14-15. In particular, Commerce noted that, in *Oman Fasteners*, the Federal Circuit found "that the respondent's behavior . . . did not demonstrate 'intentional conduct, such as deliberate concealment or inaccurate reporting.'" *Remand Results* at 15 (citing *Oman Fasteners* at 1088 (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003)). Here, in contrast, Commerce claimed, QMC-Muntajat did not report the omission "until long after it discovered the error" and that "there was intentional conduct by the respondent to fail to provide the requested electricity usage information . . . ." *Remand Results* in 15-16. Here, however, the

record lacks any evidence that QAFCO intentionally concealed the small amount of unreported purchases of electricity under the Residential and Commercial tariff categories. Nor did Commerce find in the original investigation that QAFCO deliberately withheld reporting of these additional purchases. *See Final IDM* at 5-7, 29; Commerce Memorandum, RE: Verification of the Questionnaire Responses of Qatar Melamine Company and Muntajat (C-518-002) (Oct. 30, 2024) (C.R. 355 / P.R. 260) at 15-17 ("*QMC-Muntajat Verification Report*"). Rather, QAFCO explained at verification that it did not report purchases of electricity for its plant workers' residences and recreational club because it thought that only purchases of utilities consumed for production purposes were required.[2] *See* QMC-Muntajat Case Brief (C-518-002) (Nov. 6, 2024), at Appendix (Decl. of J. Campbell at ¶7) & Attachment at page 1 (Reconciliation of Electricity and Water) (C.R. 358-368 / P.R. 265-272) ("*Original Case Brief*").

In selecting AFA, "Commerce should consider the overall facts and circumstances of each case, including the level of culpability of the non-cooperating party in an AFA analysis." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019)). Here, QAFCO's omission was inadvertent and arose from confusion about differences in the reporting instructions for the AD and CVD investigations. *See Original Case Brief* at Appendix (Decl. of J. Campbell at ¶7). Moreover, the quantity of QAFCO's unreported electricity purchases was small, amounting to approximately [ ]% of the quantity of its reported purchases. *See id.* at Appendix, Attachment at page 1 (Reconciliation of Electricity and Water). In light of these circumstances, together with the evidence that QAFCO, in fact, consumed far less electricity than QatarEnergy, it was unreasonable for Commerce to assume – even as an adverse inference – that QAFCO's electricity

[2] As demonstrated in Plaintiffs' Reply Brief, Commerce unreasonably discredited QAFCO's explanation in the final CVD determination. *See* Pls.' Reply Br. at 9-10 (citing *Final IDM* at 7).

consumption mirrored that of QatarEnergy. For these reasons, Commerce's use of QatarEnergy's electricity consumption as a surrogate for QAFCO's consumption level and the resulting 6.82% subsidy rate that it calculated as AFA for the Provision of Electricity are unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

### C. The 6.82% Rate that Commerce Selected as AFA for the Provision of Electricity Is Punitive

Even taking deterrence into account, Commerce's choice of AFA must not result in "punitive, aberrational, or uncorroborated margins." *F.lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (emphasis added); *see also Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010). Here, the 6.82% selected by Commerce on remand for the Provision of Electricity is punitive and, thus, not in accordance with law.

In *Gallant Ocean*, the CAFC held that an AFA rate that was "more than ten times higher than the average dumping margin for cooperating respondents" was "'punitive, aberrational, or uncorroborated,' . . . and excessive . . . ." *Gallant Ocean*, 602 F.3d at 1324 (quoting *F.lii De Cecco*, 216 F.3d at 1032. Here, the 6.82% rate that Commerce selected as AFA in the *Remand Results* is ***14 times higher*** than the 0.48% preliminary rate that Commerce determined for the Provision of Electricity overall, and ***over 60 times higher*** than the preliminary subsidy rate for the provision of electricity to QatarEnergy. *See* Post-Preliminary Analysis Memorandum for the Countervailing Duty Investigation of Melamine from Qatar (C-518-002) (Sept. 12, 2024) (P.R. 248) at 7 ("*Post-Preliminary Decision Memo*") (determining a subsidy rate of 0.48% for the Provision of Electricity); Post-Preliminary Analysis Calculations for Qatar Melamine Company and Muntajat (C-518-002) (Sept. 12, 2024) (C.R. 304-05 / P.R. 249) ("*Post-Preliminary Calculation Memo*"), Attach. 2, Tab "Benefit.BPI" (determining a subsidy rate of 0.11% for the

provision of electricity to QatarEnergy). Consequently, the 6.82% AFA rate is punitive and excessive and, thus, not a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *Oman Fasteners*, 125 F.4th at 1086.

In response, Commerce asserted in the *Remand Results* that *Gallant Ocean* requires a comparison of "the AFA rate to an overall calculated 'margin' or 'rate{}'" – as opposed to the 0.48% subsidy rate "for *this single program* calculated prior to Commerce becoming aware of QMC-Muntajat's deficient and incomplete reporting." *Remand Results* at 17 (citing *Gallant Ocean*, 602 F.3d at 1324). On this basis, Commerce reasoned that "a 6.82 percent rate for the electricity for LTAR program is {***not***} punitive because it represents only a fraction of the highest calculated program rate for the same respondent in the same proceeding" (*i.e.*, the 24.04% rate calculated for income tax exemptions). *Remand Results* at 17.

In staking this position, however, Commerce continues to defy the Federal Circuit's holding that the AFA rate "must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'" *Oman Fasteners*, 125 F.4th at 1086 (citations omitted). The 24.04% subsidy rate that Commerce calculated for income tax exemptions says nothing about the reasonableness of 6.82% as an AFA rate for the Provision of Electricity because these two programs are completely unrelated. Moreover, Commerce ignores that it had calculated a subsidy rate of only [ ]% for the provision of electricity to QatarEnergy, which Commerce deemed appropriate to use as a surrogate company for QAFCO. *See Post-Preliminary Calculation Memo*, Attach. 2, Tab "Benefit.BPI."

The Federal Circuit has recognized that, in selecting an AFA rate, Commerce should "consider surrounding facts and circumstances{,}" including "mitigating circumstances." *BMW*

*of N. Am.*, 926 F.3d at 1301 n.3 (citing 19 U.S.C. § 1677e(d)(2) ("'the administering authority may apply any of the countervailable subsidy rates . . . specified under {paragraph (1)}, including the highest such rate or margin, *based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available*'") (emphasis added by court) & 1302 ("mitigating circumstances"). Here, several mitigating circumstances further demonstrate that the 6.82% rate selected by Commerce as AFA is punitive and excessive. First, the amount of QAFCO's unreported electricity consumption was small, so much so that the Court invited Commerce to "exercise its discretion to reopen the record to accept it." *Remand Order* at 21. Second, as discussed above in **Section II.B**, QAFCO did not deliberately conceal certain purchases of electricity, but rather was confused about differences in the reporting instructions for the AD and CVD investigations. Third, Commerce chose to resort to AFA for QAFCO's unreported purchases of electricity at the Residential rate, despite not having found that the government's provision of electricity at the Residential rate was "specific" within the meaning of 19 U.S.C. § 1677(5A). *See Post-Preliminary Decision Memo* at 5-6. In other words, Commerce applied total AFA to QAFCO's use of a program that was not entirely countervailable in the first place.

Finally, the record includes reasonable alternatives for an AFA rate for the Provision of Electricity. For example, although it would be unreasonable to assume that QAFCO purchased the same quantity of electricity as QatarEnergy for the reasons discussed above in **Section II.B**, Commerce could continue to use the lowest per-unit rate paid by QatarEnergy for electricity, *see Remand Results* at 4, and then apply this adverse rate to QAFCO's usage of electricity, after increasing QAFCO's reported quantity of electricity purchases by [ ]% to account for the unreported amount, *see QMC-Muntajat Verification Report* at 16 ("According to the company the

unreported electricity represents approximately [ ] percent of QAFCO's total electricity consumption during the POI."). Commerce also could use the 1.36% AFA rate selected for the Provision of Water. *See Remand Results* at 4. Because water, like electricity, is a utility, the AFA rate selected for water is reasonably related to QAFCO's purchase of electricity, with an increase to deter noncompliance.[3] Plaintiffs proposed additional alternatives in their post-argument brief. *See* Pls.' Post-Argument Brief at 3-4 (ECF 60). "Commerce, when applying the adverse-inference provision, must pursue accuracy, with any departure limited to what is needed to deter noncompliance . . . ." *Oman Fasteners*, 125 F.4th at 1086. Here, in light of the mitigating circumstances described above, any of these alternatives for the AFA rate would be sufficient to induce compliance.

## III. CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court hold and declare that Commerce's *Remand Results* are not in accordance with law; remand this matter to Commerce to issue a revised final determination in conformity with the Court's decision; and grant Plaintiffs such additional relief as the Court may deem just and proper.

---

[3] Commerce "also note{d} that QMC-Muntajat did not take issue with our recalculation methodology for the water for LTAR program even though it was methodologically identical to the recalculation of the {electricity for LTAR} program, suggesting that it finds QatarEnergy's water usage relevant to QAFCO's potential water usage." *Remand Results* at 18. No, Plaintiffs do not concede that QAFCO's water usage approximated that of QatarEnergy. Rather, Plaintiffs declined to challenge the 1.62% rate selected as AFA for the Provision of Water because, unlike the 6.82% rate selected for the Provision of Electricity, the 1.62% rate is neither punitive nor excessive.

Respectfully submitted,

WHITE AND CASE LLP

/s/ Jay C. Campbell
Jay C. Campbell
Richard G. King
C. Alejandro Dilley
Chunfu Yan

Counsel to Plaintiffs Qatar Melamine Company (a Qatari Private Shareholding Company) ("QMC") and QatarEnergy Marketing (1), a Qatari Private Shareholding Company (f/k/a Qatar Chemical and Petrochemical Marketing and Distribution Company (Muntajat) Q.P.J.S.C.)

Date: November 19, 2026

## CERTIFICATE OF COMPLIANCE

I, Jay C. Campbell, certify that the attached comments in opposition to the final results of redetermination pursuant to court remand comply with the word limitation requirement set forth in the Standard Chambers Procedures. The word count for these comments, as computed by the White & Case word processing system (Microsoft® Word for Microsoft 365 MSO) is 3,179 words.

/s/ Jay C. Campbell
Jay C. Campbell

## CERTIFICATE OF SERVICE

I, Jay C. Campbell, of the law firm White & Case LLP, hereby certify that copies of the attached submission have been served this 20th day of November 2026 by secure electronic mail on the following parties:

***On behalf of Defendant United States:***

**Kristin Elaine Olson**
U.S. Department of Justice
Civil Division – Commercial Litigation Branch
P.O. Box 480
Benjamin Franklin Station
Washington, DC 20044
Email: kristin.olson@usdoj.gov

***On behalf of Defendant-Intervenor Cornerstone Chemical Company:***

**Stephen James Orava**
**Patrick James McLain**
King & Spalding, LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4706
Email: sorava@kslaw.com
Email: PMcLain@kslaw.com